**The below described is SIGNED.**



**Dated: February 08, 2013**

_____
**JOEL T. MARKER**
**U.S. Bankruptcy Judge**

_____

*Prepared and Submitted By:*

Peggy Hunt (Utah State Bar No. 6060)
Chris Martinez (Utah State Bar No. 11152)
Nathan S. Seim (Utah State Bar No. 12654)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: hunt.peggy@dorsey.com
        martinez.chris@dorsey.com
        seim.nathan@dorsey.com

*Attorneys for D. Ray Strong, Chapter 11 Trustee for
Castle Arch Real Estate Investment Company, LLC*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| In re: | Bankruptcy Case No. 11-35082 |
| | Bankruptcy Case No. 11-35237 |
| CASTLE ARCH REAL ESTATE | Bankruptcy Case No. 11-35243 |
| INVESTMENT COMPANY, LLC; CAOP | Bankruptcy Case No. 11-35242 |
| MANAGERS, LLC; CASTLE ARCH | Bankruptcy Case No. 11-35246 |
| KINGMAN, LLC; CASTLE ARCH | (Substantively Consolidated) |
| SECURED DEVELOPMENT FUND, LLC; | |
| CASTLE ARCH SMYRNA, LLC; CASTLE | Bankruptcy Case No. 11-35241 |
| ARCH OPPORTUNITY PARTNERS I, LLC; | Bankruptcy Case No. 11-35240 |
| *and* CASTLE ARCH OPPORTUNITY | (Jointly Administered) |
| PARTNERS II, LLC, | |
| | (Chapter 11) |
| Debtors. | |
| | The Honorable Joel T. Marker |

1

**FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF ORDER
GRANTING CHAPTER 11 TRUSTEE'S MOTION TO SUBSTANTIVELY
CONSOLIDATE CAOP MANAGERS, LLC; CASTLE ARCH KINGMAN, LLC;
CASTLE ARCH SMYRNA, LLC; CASTLE ARCH SECURED DEVELOPMENT FUND,
LLC; CASTLE ARCH STAR VALLEY, LLC AND CASTLE ARCH REAL ESTATE
INVESTMENT COMPANY, LLC**

An evidentiary hearing was held by this Court on January 31, 2013 on the *Chapter 11
Trustee's Motion to Substantively Consolidate CAOP Managers, LLC; Castle Arch Kingman,
LLC; Castle Arch Smyrna, LLC; Castle Arch Secured Development Fund, LLC; Castle Arch Star
Valley, LLC and Castle Arch Real Estate Investment Company, LLC* (the "Consolidation
Motion")[1] filed by D. Ray Strong, duly appointed Chapter 11 Trustee for Castle Arch Real Estate
Investment Company, LLC (the "Trustee").  Appearances were made by Peggy Hunt and Nathan
S. Seim, Dorsey & Whitney LLP, on behalf of the Trustee; Lon A. Jenkins, Jones Waldo
Holbrook & McDonough, P.C., on behalf of the Official Committee of Unsecured Creditors for
Castle Arch Real Estate Investment Company, LLC (the "Creditors' Committee"); John T.
Morgan on behalf of the Office of the United States Trustee; Andrew B. Clawson, Pearson
Butler Carson & Cook, PLLC, on behalf of Castle Arch Secured Development Fund, LLC;
Michael L. Labertew, Labertew & Associates, LLC, on behalf of Castle Arch Smyrna, LLC,
Caste Arch Kingman, LLC and CAOP Managers, LLC; and Richard Dance, *pro se*.

At the hearing, the Court admitted into evidence Trustee's Exhibits A-JJJ based on the
uncontested proffer of the Trustee's testimony as set forth in the *Declaration of D. Ray Strong,
Chapter 11 Trustee for Castle Arch Real Estate Investment Company, LLC, in Support of Motion*

---

[1] Docket No. 537.

to Substantively Consolidate CAOP Managers, LLC; Castle Arch Kingman, LLC; Castle Arch

Smyrna, LLC; Castle Arch Secured Development Fund, LLC; Castle Arch Star Valley, LLC and

Castle Arch Real Estate Investment Company, LLC (Exhibit Admission) (the "Document

Declaration").[2]  Furthermore, the Court accepted the uncontested proffer of the Trustee's

testimony as stated in the *Declaration of D. Ray Strong, Chapter 11 Trustee for Castle Arch Real*

*Estate Investment Company, LLC, in Support of Motion to Substantively Consolidate CAOP*

*Managers, LLC; Castle Arch Kingman, LLC; Castle Arch Smyrna, LLC; Castle Arch Secured*

*Development Fund, LLC; Castle Arch Star Valley, LLC and Castle Arch Real Estate Investment*

*Company, LLC* (the "Trustee Declaration"),[3] as well as the uncontested proffer of testimony of

Nathan S. Seim stated on the record.

Based on the Consolidation Motion; the *Memorandum of Law in Support of Chapter 11*

*Trustee's Motion to Substantively Consolidate CAOP Managers, LLC; Castle Arch Kingman,*

*LLC; Castle Arch Smyrna, LLC; Castle Arch Secured Development Fund, LLC; Castle Arch Star*

*Valley, LLC and Castle Arch Real Estate Investment Company, LLC*[4]; the *Notice of Chapter 11*

*Trustee's Motion to Substantively Consolidate CAOP Managers, LLC; Castle Arch Kingman,*

*LLC; Castle Arch Smyrna, LLC; Castle Arch Secured Development Fund, LLC; Castle Arch Star*

*Valley, LLC and Castle Arch Real Estate Investment Company, LLC and Notice of Hearing* (the

---

[2] Docket No. 579.  Pursuant to the Court's *Order Granting Ex Parte Motion for Leave to File Documents Conventionally*, Docket No. 575, the Trustee filed the Document Declaration electronically, but given their volume, the Exhibits attached to the Document Declaration were filed with the Court conventionally.  As stated on the record, Exh. K was amended by the Trustee after it was filed, and the Court admitted amended Exh. K, substituting it for Exh. K attached to the Document Declaration.

[3] Docket No. 578.

[4] Docket No. 538.

"Notice of Hearing")[5]; the *Certificate of Service* attached to the Notice of Hearing; the Document

Declaration; the Trustee Declaration; the evidence presented and received at the hearing,

including Exhibits A-JJJ noted above, as well as the testimony of the Trustee and Nathan Seim;

the representations and arguments of counsel; the applicable law; and for good cause appearing,

the Court granted the Consolidation Motion on the record at the hearing and made limited

findings of fact and conclusions of law on the record, which are incorporated herein by this

reference.

Pursuant to Federal Rule of Bankruptcy Procedure 7052 and this Court's Local Rules, the

Court now enters these Findings of Fact and Conclusions of Law in support of its *Order*

*Granting Chapter 11 Trustee's Motion to Substantively Consolidate CAOP Managers, LLC;*

*Castle Arch Kingman, LLC; Castle Arch Smyrna, LLC; Castle Arch Secured Development Fund,*

*LLC; Castle Arch Star Valley, LLC and Castle Arch Real Estate Investment Company, LLC*

entered concurrently herewith.  To the extent that any Findings of Fact are Conclusions of Law,

they are adopted as such, and to the extent that any Conclusions of Law are Findings of Fact,

they are adopted as such.

## I.

## JURISDICTION AND NOTICE

### *Jurisdiction*

1.       On October 17, 2011 (the "CAREIC Petition Date"), Castle Arch Real Estate

Investment Company, LLC ("CAREIC") filed a petition seeking relief under Chapter 11 of the

Bankruptcy Code, and on October 20, 2011 (together, the October 20, 2011 and the CAREIC

---

[5] Docket No. 544.

4

Petition Date are referred to herein as the "Petition Date"), CAOP Managers, LLC ("CAOP Managers"), Castle Arch Kingman, LLC ("CAK"), Castle Arch Secured Development Fund, LLC ("CASDF"), Castle Arch Smyrna, LLC ("CAS"), Castle Arch Opportunity Partners I, LLC ("CAOP I") and Castle Arch Opportunity Partners II, LLC ("CAOP II") (collectively with CAREIC, the "Debtors") also filed Chapter 11 petitions.

2.      This Court has subject matter jurisdiction over the Consolidation Motion pursuant to 11 U.S.C. § 105 and 28 U.S.C. §§ 157 and 1334.   This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

3.      This Court has personal jurisdiction over CAREIC, CAOP Mangers, CAK, CAS and CASDF, and over Castle Arch Star Valley, LLC ("CASV"), a non-debtor (collectively, the "Legacy Debtors").  The Trustee, as the trustee of CAREIC and as manager of the other Legacy Debtors, controls the Legacy Debtors, which Legacy Debtors, through the Trustee, have consented to the jurisdiction of this Court.

### *Notice And Lack Of Objection*

4.      Based on the evidence presented at the hearing, the mailing matrix attached to the Notice of Hearing[6] is a true and correct listing of all known parties in interest.

5.      All parties in interest, including all known creditors and interest holders, were (a) served with the Notice of Hearing, which also provided notice of the relief sought in the Consolidation Motion; and (b) provided an opportunity to be heard.

6.      No objections to the Consolidation Motion were filed with the Court.

---

[6] Docket No. 544, Certificate of Service, Exh. A.

7.     The Trustee has presented a letter dated January 12, 2013 from Lindy L. Conner stating that Ms. Conner opposes the Consolidation Motion.[7]  However, Ms. Conner did not appear at the hearing on the Consolidation Motion, and based on the evidence,[8] the Court finds that any objection being made by Ms. Conner has been withdrawn.

## II.

## PROCEDURAL HISTORY

### *The Entities In Question And The Trustee's Appointment And Investigation*

8.     In the Consolidation Motion, the Trustee seeks to substantively consolidate only the "Legacy Debtors"— defined above as a collective reference to CAREIC, CAOP Managers, CAK, CASDF, CAS and non-debtor CASV—but not Debtors CAOP I and CAOP II (together, CAOP I and CAOP II are the "CAOP Debtors").[9]

9.     After the Petition Date, the Debtors continued to operate their businesses as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

10.     On February 14, 2012, the Creditors' Committee in CAREIC's Chapter 11 case filed a *Motion to Appoint a Chapter 11 Trustee Under 11 U.S.C. § 1104 or, in the Alternative, to Convert Case Under 11 U.S.C. § 1112* (the "Trustee Motion"),[10] which Trustee Motion was opposed by the Debtors and certain parties in interest.  After an evidentiary hearing, the Debtors

---

[7] Exh. EEE.

[8] *See* Trustee Declaration ¶¶ 105-108.

[9] Trustee Declaration ¶ 5.

[10] Docket No. 58.

represented to the Court that they were stipulating to the appointment of a Chapter 11 trustee in

CAREIC's case.  The Court accepted the stipulation, finding:

> Given the fact that the testimony was that the affiliates have really never had any separate
> operating boards, I think it makes sense, since counsel are here for the affiliates, that they
> advise whoever they're reporting to that there shouldn't be any substantial transactions
> pending a review of the whole landscape by the trustee in the CAREIC case.[11]

11.     On April 30, 2012, the Court entered its *Order for Appointment of Trustee,*[12]

ordering the United States Trustee to appoint a qualified person to serve as trustee, and on May

3, 2012, the Court entered its *Order Approving Appointment of Trustee*,[13] appointing Mr. Strong

as the Chapter 11 Trustee for CAREIC.

12.     The Trustee is a highly qualified, certified and licensed forensic accountant, with

more than 18 years of experience providing investigative accounting, bankruptcy and litigation

services, including significant experience serving as a fiduciary.[14]

13.     The Trustee, together with his Court-appointed professionals, acting at his

direction, have conducted an investigation of the Debtors, CASV and other affiliated non-debtor

entities, including by (a) reviewing the Debtors' books and records; (b) reviewing public records

related to the Debtors, including filings with the Securities and Exchange Commission (the

"SEC"), relevant state governmental entities and this Court; (c) interviewing or deposing

numerous persons, including members of former management; (d) discussing the Debtors and

their respective cases with counsel for Creditors' Committee, former counsel for CAREIC,

---

[11] Exh. DDD (Transcript dated April 26, 2012, p. 8, lns. 13-20).

[12] Docket No. 208.

[13] Docket No. 215.

[14] Trustee Declaration ¶ 1 & Exh. A.

counsel for entities who represent the Debtors other than CAREIC, and creditors and investors; and (e) investigating the nature, extent and value of the real property owned by the Legacy Debtors, including by reviewing land records, and meeting with city officials and engineers. This investigation is still on-going.[15]

## III.

## FACTS IN SUPPORT OF CONSOLIDATION

### A.

### *Debtors' Corporate Organization*

14.     CAREIC is a California limited liability company domesticated in Utah; CAOP Managers and CASV are Utah limited liability companies, with CASV being domesticated in Wyoming; and CAK, CASDF and CAS are Nevada limited liability companies.[16]

15.     CAREIC owns all or substantially all of the membership interests of each of the other Legacy Debtors.[17]

16.     Since their organization, CAREIC has served as the sole manager of CAK, CAS, CASDF, CASV and CAOP Managers.[18]

---

[15] Trustee Declaration ¶ 11.

[16] Trustee Declaration ¶ 12.

[17] Exh. D (Common Units Owned by CAREIC).

[18] Trustee Declaration ¶ 14.

**B.**

**_Common Management, Offices, Bank Accounts, Accounting and Reporting_**

17.     Prior to the Petition Date, all of the Debtors, as well as numerous affiliated non-Debtor entities (collectively, the "Castle Arch Entities"), such as CASV, were managed by a single paid management team.  Thus, CAREIC's Board of Directors and Officers also managed the other Debtors and Castle Arch Entities.[19]

18.     The CAREIC Board of Directors met periodically and kept minutes of its meetings, many of which are unsigned, but no separate Board meetings for any of the Legacy Debtors were held inasmuch as any business of these entities was dealt with in CAREIC Board meetings.[20]

19.     CAREIC employees, such as accountants, performed accounting and many other administrative services for all of the Debtors and Castle Arch Entities on a consolidated basis.[21]

20.     While some of the individual members of CAREIC's management team maintained offices in their respective places of residence, many of the administrative services,

---

[19] Trustee Declaration ¶ 15; s*ee also, e.g.,* Exhs. WW-AAA (Form 10-KSB, Annual Report for the fiscal year ending Dec. 31, 2005, Part III, Item 9; Form 10-KSB, Annual Report of the fiscal year ending Dec. 31, 2006, Part III, Item 9; Form 10-KSB, Annual Report for the fiscal year ending Dec. 2007, Part III, Item 9; Form 10-KSB, Annual Report for the fiscal year ending Dec. 31, 2008, Part III, Item 9).

[20] Trustee Declaration ¶ 16; *see also, e.g.,* Exh. BBB (Transcript dated April 19, 2012, p. 172 at lns. 4-10 (testimony of David Hunt that: "No CAREIC subsidiary or affiliated entity ever had any functioning board . . . . Only one functioning board I knew of in the CAREIC family of companies, and that was CAREIC's board.")).

[21] Trustee Declaration ¶ 17; *see also, e.g.* Exh. BBB (Transcript dated April 19 2012, pp. 244-45 (testimony of Glenn Martinsen that CAREIC affiliates pay CAREIC a management fee for all the services provided to them as "administrative expense" is conducted at the CAREIC level)).

such as accounting and bookkeeping, were conducted for all entities on a consolidated basis by a

single group of employees out of a single office located in Utah.[22]

21.     Private Placement Memoranda issued by the Legacy Debtors to prospective

investors represented that CAREIC would manage and control the relevant Legacy Debtor.[23]

22.     For example, a Private Placement Memorandum issued for CASDF consistently

states throughout that CAREIC, not CASDF, would be managing investor funds,[24] and that:

> As of the date of this offering, CAREIC owns all common units of [CASDF] and
> members of CAREIC's management team effectively control [CASDF].
>
> . . . .
>
> As of February 1, 2008, we had only limited cash in connection with start-up activities.
> CAREIC currently provides all of our management functions and will cover our working
> capital requirements and has sufficient cash available to do so during the next 12 months.
>
> . . . .
>
> Our business is managed by CAREIC which manages and controls our affairs and has
> responsibility and final authority in almost all matters affecting our business.  These
> duties include dealings with members and holders of our Preferred Units[,] accounting,
> tax and legal matters, communications and filings with regulatory agencies and all other
> needed management and operational duties.  Additionally, because five officers and
> directors own a controlling interest in CAREIC, they may be deemed to control our
> activities through CAREIC.  As our only Manager, CAREIC has complete authority and
> responsibility for:

---

[22] Trustee Declaration ¶ 18.

[23] *See, e.g.,* Exhs. FFF-JJJ (CAK Private Placement Memorandum dated May 22, 2006; CAS Private Placement
Memorandum dated June 25, 2007; CASDF Private Placement Memorandum dated Feb. 1, 2008; CAS Private
Placement Memorandum dated Feb. 1, 2008; CAK Private Placement Memorandum dated Sept. 15, 2008); *see also,
e.g.,* Exhs. WW-AAA (SEC filings assumed that CAREIC controlled all Legacy Debtors).

[24] Exh. HHH (CASDF Private Placement Memorandum dated Feb. 1, 2008,  pp. 7, 13-15, 17, 23-29 & 35).

- underwriting and originating our investments;

- deciding what agreements we enter into and whether we enter into
participations with other investors;

- managing our investments; and

- managing all our other operations.

Holders of our Preferred Units have no right to participate in the management and control of our business or affairs. CAREIC has complete responsibility for the selection, evaluation and negotiation of our investments. CAREIC provides all managerial, executive, supervisory and administrative services for our operations, including managing the investments we hold. Our books and records are maintained by CAREIC, and are audited by independent certified public accountants.[25]

23.     Also, CASDF's Operating Agreement, which was attached to this Private

Placement Memorandum, states that CAREIC "shall direct, manage and control the business of

[CASDF] to the best of its ability and shall have full and complete authority, power and

discretion to make any and all decisions and to any and all things which [CAREIC] shall deem to

be reasonably required to accomplish the business and objections of [CASDF]."[26]

24.     Despite requiring CAREIC to handle all operations of CASDF,[27] neither the

Private Placement Memorandum nor CASDF's Operating Agreement make any provision for

how much CAREIC is to be compensated for its services.[28]

---

[25] *Id.,* pp. 7, 21, 23; *see also id.,* p. 20 ("[CASDF] does not have any directors, officers or employees. Rather, all of [CASDF's] operations are performed by our Manager CAREIC's employees, officers and consultants.") & p. 24 (listing CAREIC's many responsibilities and stating: "CAREIC directs our investments into real estate projects, and manages our investment portfolio and our operations.").

[26] *Id.* at Exh. "A" (Operating Agreement) at p. 4.

[27] *Id.*, pp. 23-24 & Exh "A" (Operating Agreement) at pp. 4–7 (containing comprehensive listing of CAREIC responsibilities).

[28] *See generally, id.*

25.     Bank accounts were opened for the Debtors and many of the Castle Arch Entities, and all of these bank accounts were controlled by CAREIC's management.  The use of these funds is discussed in greater detail in ¶¶ 46–59 below, but generally cash raised from investors, which was the primary source of the Legacy Debtors' cash, was used indiscriminately by the Debtors to fund whatever entity was in need of cash at any given time.[29]

26.     Reporting required to be made to the SEC was done on a consolidated basis. [30]

27.     Separate accounting records and General Ledgers were maintained for each of the Legacy Debtors.[31]

28.     However, large volumes of transactions between the Legacy Debtors were being accounted for and reported in numerous, and often, commingled intercompany General Ledger accounts.[32]

29.     Furthermore, often the book entries do not identify the applicable Legacy Debtor to which the transaction relates, and transactions are summarized by very general or inadequate descriptions or do not reflect the true nature of the transaction booked.[33]

---

[29] Trustee Declaration ¶ 21.

[30] Trustee Declaration ¶ 22 & Exhs. WW-AAA (Form 10-KSB, Annual Report for the fiscal year ending Dec. 31, 2005; Form 10-KSB, Annual Report of the fiscal year ending Dec. 31, 2006; Form 10-KSB/A No. 1, dated Dec. 31, 2006; Form 10-KSB, Annual Report for the fiscal year ending Dec. 2007; Form 10-KSB, Annual Report for the fiscal year ending Dec. 31, 2008).

[31] Trustee Declaration ¶ 23 & Exhs. MM and RR-VV (General Ledgers and Intercompany Accounts).

[32] Trustee Declaration ¶ 24 & Exhs. MM and RR-VV (General Ledgers & Intercompany Accounts).

[33] Trustee Declaration ¶ 25.

30.     Additionally, there are large "bulk" summarized transactions within CAREIC's commingled intercompany accounts with very little information regarding the numerous underlying transactions.[34]

31.     There also is evidence that services provided to several Legacy Debtors were being invoiced on a consolidated basis, and the payment of those services was only being accounted for by CAREIC, and not allocated to the individual Legacy Debtor who received the services or benefit.[35]

32.     Finally, CAREIC consolidated debts of the other Legacy Debtors in its notes payable schedules and analyses.[36]

## C.

### *Legacy Debtor Formation and Fundraising*

33.     With the exception of relatively limited revenues from the sale of certain property holdings, neither CAREIC nor any of the other Legacy Debtors had any operating revenue.[37] Rather, operations were primarily funded by monies raised from investors in a series of public offerings, each of which is summarized on Exhibit B, entitled "*Timeline of Castle Arch Entity Formations and Investment Offerings*" (the "Timeline").[38]

---

[34] Trustee Declaration ¶ 26.

[35] Trustee Declaration ¶ 27 & Exh. EE (Example Of Invoices That Were Not Allocated To Intercompany Accounts On CAREIC General Ledger).

[36] Trustee Declaration ¶ 28 & Exh. FF (CAREIC Notes Payable Schedules Including Debt For All Debtors).

[37] Trustee Declaration ¶ 30.

[38] Trustee Declaration ¶ 30 & Exh. B (Timeline) (showing summary of offerings made and total placements); *see also, e.g.*, Exh. WW (Form 10-KSB, Annual Report for the fiscal year ending December 31, 2005, Part II, Item 6 (zero revenues, operations "funded by capital funding")); Exh. XX (Form 10-KSB, Annual Report of the fiscal year ending December 31, 2006, Part II, Item 6 (net revenues of $48,041 from sale of limited amount of land owned, but,

34.     According to the Debtors' records, the Debtors raised a total of $73,593,717.00 (as reported in the Debtors' Master Tracking Sheet maintained to track investor funds), net of redemptions, from investors during the period of May 2004, when CAREIC made its initial Series A offering, through the Petition Date.[39]

35.     The Trustee's charts graphing cash and public offerings set forth in Exhibits E, F and G (collectively, the "Cash Charts") and the Timeline demonstrate a pattern.  As cash was consumed and additional cash was needed, CAREIC caused new securities offerings to be made, initially through CAREIC alone, and then later through the other Debtors that CAREIC caused to be formed.[40]  Paragraphs 36 through 39 below provide a brief summary of this pattern.

36.     When initially organized in April 2004, CAREIC raised funds from investors for the purposes of acquiring and developing real property primarily located in the Western United States.[41]

---

"our operations are currently funded by capital funding")); Exh. ZZ (Form 10-KSB, Annual Report for the fiscal year ending December 2007, Part II, Item 6 (zero revenues)); Exh. AAA (Form 10-KSB, Annual Report for the fiscal year ending December 31, 2008, Part II, Item 7 ("We had revenues of $1,980,000 from the sale of raw land, at cost, from our Kingman Arizona raw land holdings . . . .  These revenues were not derived from our primary business target of selling property that we have improved . . . .  Due to our limited revenues or operations are currently funded by capital funding.")).

[39] Trustee Declaration ¶ 31, Exh. B (Timeline), Exh. C (Schedule of Net Investor Funds Raised (this number is $73,626,718 in the Debtors' General Ledger)) & Exh. LL (Master Tracking Sheet).

[40] As seen on the Cash Charts, the Legacy Debtors primarily engaged in securities offerings from April 2004 through approximately April 2008 in an effort to raise money for the "Legacy Model" of purchasing and developing raw land.  Trustee Declaration ¶ 33 n. 23 & Exhs. E-G (Cash Charts).  But, with the downturn in the economy and the crash of the real estate market, CAREIC caused the CAOP Debtors to be formed in 2009, *see id.* & Exh. B (Timeline), and commenced its "Distressed Property Model" of investing in distressed properties.  *Id.*

[41] Trustee Declaration ¶ 34, Exh. B (Timeline) & Exh. E (Monthly Investor Funds Raised By Debtor); *see also* Exhs. WW & XX (Form 10-KSB, Annual Reports for the fiscal years ending Dec. 31, 2005 & Dec. 31, 2006, Part I, Item 1 ("We are a residential and commercial land development company with target properties located primarily in the Western United States.  Our principal activities are securing acquisition rights to properties, obtaining zoning and other entitlements for the properties, securing financing for the purchase of the properties, improving the properties' infrastructure and amenities, and selling the properties.")).

37.     However, after four separate securities offerings during the period of April 2004 through June 2005 that raised approximately $31 million, additional funding was required because, while property rights had been purchased, the property had not been developed and there was a virtual lack of revenues to fund operations.[42]  Thus, CAREIC caused new "Castle Arch" entities to be formed as additional vehicles through which funds could be raised, referred to by the Trustee as the "Legacy Model" – a business model involving the Legacy Debtors that focused on acquiring and developing real property.[43]

38.     CAREIC caused CAK to be organized in April 2006, and through a $30 million securities offering in May 2006, approximately $10 million was ultimately raised.[44]  As cash again diminished, CAREIC caused CAS to be formed in January 2008, and CAS raised a total of approximately $4.5 million through two securities offerings made in June 2007 and February 2008.[45]  In January 2008, when cash reserves again began to dip, CAREIC caused CASDF to be organized, and CASDF made a securities offering in February 2008, raising approximately $8.4

---

[42] Trustee Declaration ¶ 35, Exh. B (Timeline) & Exhs. E-G (Cash Charts); *see also* Exhs. WW (Form 10-KSB, Annual Report for the fiscal year ending December 31, 2005, Part II, Item 6 (zero revenues, operations "funded by capital funding")) & Exh. XX (Form 10-KSB, Annual Report of the fiscal year ending December 31, 2006, Part II, Item 6 (net revenues of $48,041 from sale of limited amount of land owned, but, "our operations are currently funded by capital funding")).

[43] Trustee Declaration ¶ 35, Exh. B (Timeline) & Exhs. E-G (Cash Charts).

[44] Trustee Declaration ¶ 36, Exh. B (Timeline) & Exhs. E-G (Cash Charts).

[45] *Id.*

million.[46]  In April 2008, when funds were again low, CAREIC made a final fifth securities

offering, raising approximately $7.1 million.[47]

     39.     In 2009, after the crash of the real estate market and the financial crisis, which

likely made fundraising under the Legacy Model difficult,[48] CAREIC caused the CAOP Debtors

to be formed to raise funds for what the Trustee refers to as the "Distressed Property Model."

Under this business model, funds raised from investors were used to invest in distressed

properties or pools of distressed properties through, in many instances, joint ventures with third

parties.[49]  Fundraising through this Distressed Property Model continued up to the Petition Date,

with some investment of these funds being made after the Petition Date.[50]

## D.

### *Fundraising Purpose*

     40.     Consistent with the Legacy Model, real properties or rights to purchase real

property were obtained by the Legacy Debtors,[51] referred to generally herein as the "Kingman

Property," which is real property or options to purchase real property located in Mohave County,

Arizona; the "Tooele Property," which is real property and related water rights located in Tooele

County, Utah; the "Smyrna Property," which is real property located in Rutherford County,

---

[46] *Id.*

[47] *Id.*

[48] CAK made a second Series B securities offering in September 2009 for $15 million, but it only managed to raise approximately $50,000.  Trustee Declaration ¶ 37, Exh. B (Timeline) & Exhs. E-G (Cash Charts).

[49] *Id.*

[50] *Id.*

[51] Trustee Declaration ¶ 38.

Tennessee; and the "Star Valley Property," which is real property located in Lincoln County, Wyoming.[52]

41.     Despite the purchase of these properties and attempted development, a large portion of the Legacy Debtors' business focused on fundraising.[53]

42.     In particular, according to the face of the Debtors' books and records as of the Petition Date, of the approximately $73 million that they raised from investors: (a) in excess of $8 million was used for executive compensation and related expenses; and (b) in excess of $10 million was used to pay fundraising expenses, including "finders' fees," commissions and other associated costs.[54] These two expense groupings alone account for approximately 25% of all funds raised by the Debtors from investors since 2004.[55]

43.     The Debtors initially raised funds from investors through the sale of securities by non-licensed finders.  Eventually, management became concerned about this practice, and it thereafter commenced a time-consuming and expensive search for a FINRA licensed broker-dealer to sell the Debtors' and Castle Arch Affiliates' securities.  This resulted in the ill-fated relationship with the "Longview" entities, the costly litigation for which has now been settled.[56]

44.     The Debtors' securities sales were also subject to a SEC inquiry in June 2009, which was also time consuming and costly.  CAREIC employed counsel to assist it with this

---

[52] Trustee Declaration ¶ 39.

[53] Trustee Declaration ¶ 40.

[54] Trustee Declaration ¶ 40 & Exh. NN (CAREIC Profit and Loss Statement as of Oct. 16, 2011); *see also* Exhs. OO-QQ (Profit and Loss Statements as of Oct. 16, 2011 for other Legacy Debtors).

[55] Trustee Declaration ¶ 40.

[56] Trustee Declaration ¶ 41; *see* Docket No. 519 (Order approving settlement).

investigation, and it shut down virtually all fundraising operations while management focused on responding to the inquiry.[57]

45.     Despite spending tens of millions prior to the Petition Date in purchasing and attempting to develop properties, almost all of the real properties that the Legacy Debtors purchased and currently own remained undeveloped, and there are no entitlements currently in place.  The only real property that was developed to a point that developed units could be sold as of the Petition Date was the Star Valley Property.[58]

**E.**

### *Use of Investor Funds And Payments*

46.     The Legacy Debtors had relatively little revenues generated from operations, but rather operating costs (including significant executive compensation and expenses) were funded by monies raised from the sale of securities to investors.[59]

47.     CAREIC had several bank accounts in its name prior to the Petition Date.[60]

48.     When CAREIC caused a new entity to be formed, it typically caused at least one bank account to be opened in the name of the new entity.  Thus, each of the Legacy Debtors had at least one bank account.[61]

---

[57] Trustee Declaration ¶ 42.

[58] Trustee Declaration ¶ 43.

[59] Trustee Declaration ¶ 44.

[60] Trustee Declaration ¶ 45.

[61] Trustee Declaration ¶ 46.

49. From the face of the Debtors' accounting records, it appears that funds obtained from investors in one of the Legacy Debtors were primarily deposited into a bank account held in the name of that Legacy Debtor.[62]

50. However, it was not uncommon for funds obtained from investors in one of the Legacy Debtors to be deposited into a bank account of another one of the Legacy Debtors. When this occurred, the single transaction spawned multiple book entries in the relevant Legacy Debtors' General Ledger accounts, including entries in intercompany receivable and/or intercompany payable accounts of the Legacy Debtors involved.[63]

51. Sometimes, investor money deposited with an incorrect Legacy Debtor was never returned to the Legacy Debtor in which the investment had been made.[64] In the Trustee's example of an instance where a cash investment in CASDF was retained by CAREIC, the deposit of the investor's cash was recorded in a commingled intercompany account on CAREIC's General Ledger and resulted in several journal entries on CASDF's General Ledger reporting the amount as a draw on the purported "Third CAK Loan" (as defined below).[65] In reality, these funds were retained by CAREIC and no loan or draw was made by CASDF to CAK.[66]

---

[62] Trustee Declaration ¶ 47.

[63] Trustee Declaration ¶ 48; *see also, e.g.,* Exhs. MM (CAREIC Intercompany Accounts) & RR-VV (General Ledgers).

[64] Trustee Declaration ¶ 49 & Exh. V (chart titled "CASDF Investor Money Deposited Into CAREIC Bank Account (Investor Money Never Transferred to CASDF)").

[65] Trustee Declaration ¶ 49 & Exh. V; *see* discussion *infra* at ¶¶ 76–82 (discussing Third CAK Note).

[66] Trustee Declaration ¶ 49.

52.     Sometimes, money invested with one Legacy Debtor was deposited directly into CAREIC's bank account, but unlike the Trustee's example above, the money was then subsequently transferred by CAREIC to the relevant Legacy Debtor in which the investment had been made.[67] These single transactions resulted in multiple book entries by both CAREIC, the entity that received the investor's money, and the Legacy Debtor who should have received the investor's money, including entries in CAREIC's General Ledger account for "Intercompany Payable," and entries in the General Ledger account for "Intercompany Receivable" of the Legacy Debtor who should have received the investor's money in the first instance.[68]

53.     Furthermore, it was not uncommon for one Legacy Debtor's cash to be used to directly pay the expenses of another Legacy Debtor.[69]  This occurred in regard to the purchases of real properties and the servicing of debt,[70] and it also occurred in making payments to investors.[71]  In the example provided by the Trustee, the source of payments to CASDF investors included not only monies raised by earlier investors in CASDF, but also from cash held by CAREIC and the CAOP Debtors.[72]

---

[67] Trustee Declaration ¶ 50, Exh. W (chart titled "CASDF Investor Money Deposited Into CAREIC Bank Account (Investor Money Subsequently Transferred to CASDF)"): Exh. X (chart titled "CAK Investor Money Deposited Into CAREIC Bank Account (Investor Money Subsequently Transferred to CAK)") & Exh. Y (chart titled "CAS Investor Money Deposited Into CAREIC Bank Account (Investor Money Subsequently Transferred to CAS)").

[68] Trustee Declaration ¶ 50.

[69] Trustee Declaration ¶ 51.

[70] *Id.; see also* discussion *infra* at ¶¶ 64–91.

[71] Trustee Declaration ¶ 51; *see also* Exh. C (Schedule of Net Investor Funds Raised (Redemptions/Adjustment) (showing redemptions paid to investors)).

[72] Trustee Declaration ¶ 51, Exh. CC (excerpt of CASDF's General Ledger showing examples of transfers from CAREIC and CAOP Debtors to cover interest payments to CASDF's investors) (Account 10820, dates 06/05/09 ($20,000 by CAREIC); 07/09/09 ($19,866.17 by CAREIC); 08/04/09 ($19687.19 by CAREIC; dated 09/01/09

54.     Also, the Trustee has provided an example of one interest payment made to a CASDF investor to illustrate that certain redemptions and interest payments for CASDF were also being made directly by CAREIC and recorded as an intercompany transaction.[73]  In the Trustee's example, the transaction resulted in recorded entries in the General Ledgers of CASDF and CAREIC, as an "Intercompany Payable" by CASDF and as an "Intercompany Receivable" by CAREIC.[74]

55.     Intercompany transfers of cash appear to have been recorded in the Legacy Debtors' accounting records by journal entries.[75]  Yet, there are thousands of these intercompany and cash entries, often with a single transfer being booked to several accounts, including through commingled "Intercompany" General Ledger accounts which recorded intercompany receivables and payables of multiple Debtors.[76]

56.     Given the number of intercompany transfers and the weaving of these transfers through multiple General Ledger accounts that are often times commingled, significant time and expense would be required to "unscramble" the intercompany transfers and transactions of the Legacy Debtors from the journal entries alone.[77]

---

($20,000 by CAREIC); 10/02/09 ($20,000 by CAREIC); 11/02/09 ($19,767.19 by CAREIC); 12/03/09 ($22,267.19 by "CAOP"); 12/15/09 (2 payments of $20,000 each by CAOP II); 01/19/10 ($10,000 by unknown Debtor); 02/03/10 ($23,000 by "CAOP"); 03/05/10 ($17,000 by CAREIC))) & Exh. Z (chart titled "CASDF Investor Redemption/Interest Paid By CAREIC").

[73] Trustee Declaration ¶ 52 & Exh. Z (chart titled "CASDF Investor Redemption/Interest Paid By CAREIC").

[74] *Id.*  The "Intercompany Receivable" account included in the CAREIC General Ledger was a commingled account with activity of other Legacy Debtors.  Trustee Declaration ¶ 52, n.39.

[75] Trustee Declaration ¶ 53.

[76] *Id.*, Exh. M (CAREIC Intercompany Ledger) & Exhs. RR-VV (General Ledgers).

[77] Trustee Declaration ¶ 53.

57.    Also, due to the complexity of the booked entries and the Trustee's opinion that the book entries may not always be accurate or reflect the true nature of the transaction booked, a true and accurate accounting of the respective intercompany claims would require the Trustee to analyze all cash transactions and underlying supporting invoices and documents commencing from 2004 through the time of his appointment.[78]

58.    Finally, the Trustee has concluded and it is uncontroverted that, on a whole, the Debtors' cash was used collectively, as if part of one big "piggy bank," with funds from the account of whichever entity had cash on deposit being transferred, commingled, and used by the entity in need of cash at any given time.  In other words, entities with cash at the time would fund the cash requirements and needs of the entities without sufficient cash.[79]

59.    Accordingly, if the Legacy Debtors were to remain recognized as separate legal entities, it is the Trustee's opinion that to obtain a true and correct account of the respective intercompany claims, he would initially need to independently analyze and trace the numerous intercompany transactions based on a review of booked entries and actual use of cash.  Such an investigation would be very expensive and time-consuming and would likely consume a large part of any distribution to parties in interest in this case.[80]

---

[78] Trustee Declaration ¶ 54.

[79] Trustee Declaration ¶ 55.

[80] Trustee Declaration ¶ 56.

**F.**

**_Commingling Of Assets And Debts_**

60.　　When organized in April 2004, CAREIC intended to purchase and develop real

properties.  But, because of its virtual lack of revenues and need for new cash to fund operations,

CAREIC ultimately caused new entities to be formed to raise funds.[81]  Once these new Legacy

Debtors were created, it appears that the intent of pre-petition management was that CAREIC

would acquire undeveloped land, or the right to purchase undeveloped land, and then transfer its

acquisitions to the separately organized Legacy Debtors for development. However, this is not

actually what occurred. [82]

61.　　Based on the evidence, the Legacy Debtors' affairs would be very difficult to

"unscramble" in light of the fact that, in addition to the significant commingling and

intercompany transfers of cash discussed above, assets were purchased as part of very

convoluted intercompany transactions.[83]

62.　　If the Legacy Debtors were to remain recognized as separate legal entities, great

time and expense, including significant litigation expense, would be required to unwind these

real estate transactions, and any attempt to do so and account for the numerous intercompany

---

[81] _See_ discussion _supra_ at ¶¶ 33–45 (discussing formation and fundraising purpose).

[82] Trustee Declaration ¶ 57.

[83] _See_ Trustee Declaration ¶ 58; _see also_ discussion _infra_ at ¶¶ 64–91 (providing examples of convoluted and
commingled intercompany transactions).

transfers would, in addition to the required independent cash analysis discussed above,[84] likely

consume a large part of any distribution to parties in interest in this case.

63.     The Trustee has provided several examples which support the Court's findings

and conclusions, discussed in subparagraphs (1) through (3) below.

*(1)     The CAK Notes Issued to CASDF*

64.     The Trustee has provided evidence of three Promissory Notes issued by CAK to

CASDF, and the transactions related thereto, to illustrate the tangled nature of the Legacy

Debtors' affairs.[85]  In many cases, these Promissory Notes and related book entries do not reflect

the true nature of the transactions/loans documented by former management.[86]  Each of these

Promissory Notes and the related transactions are discussed immediately in subparts (a)-(c)

below.

(a)  The First CAK Note

65.     Based on the evidence, including the summary of the transactions set forth in

Exhibit H, titled "*CASDF/CAK Loan #1 ($1,280,000)/Lingenfelter Option # 2 – Kingman Land

Purchase (380 Acres)*" (the "First Loan Chart") and the documents attached to the First Loan

Chart as Exhibits H1 through H20, all of which summarize transactions related to the purchase of

380 acres of the Kingman Property, it appears that: (a) the 380 acres purchased were titled in the

name of CAREIC; but, (b) the total purchase price of approximately $9.5 million was financed

by a Promissory Note that CAREIC issued to the seller in the principal amount of approximately

---

[84] *See* discussion *supra* at ¶¶ 56–59 (discussing need for independent cash analysis outside of Debtors' accounting records).

[85] *See* Trustee Declaration ¶¶ 57-78 & Exhs. H-N, including all sub-Exhibits thereto.

[86] *Id.*

$8.2 million, with the balance of the purchase price being paid in cash from contributions made by numerous, primarily non-CAREIC sources.[87]

66.     The portion of the cash that was contributed for the purchase of the 380 acres, together with other monies transferred by CASDF to CAREIC for operations, form the basis of a Promissory Note dated March 25, 2008 between CAK and CASDF in the principal amount of $1,280,000.00, which states that it is secured by a different parcel of Kingman Property than the 380 acres (the "First CAK Note").[88]

67.     As to the contribution of cash for CAREIC's purchase of the 380 acres, the evidence shows that: (a) $840,109.00 was transferred directly by CASDF to the title company on or about the date of closing; and (b) the remaining $760,000.00 was paid on or about the date of closing by CAREIC from funds that were deposited into its commingled operating account by other Legacy Debtors, including (i) a transfer of cash from CAREIC's money market account (that likely included commingled Debtor funds as a result of earlier intercompany transfers) to its commingled operating account, (ii) a transfer of cash from CAS, and (iii) a transfer of cash from CAK.[89]

68.     The $840,109.00 that was transferred by CASDF for CAREIC's purchase of the 380 acres, plus a series of cash transfers that CASDF made to CAREIC's commingled operating

---

[87] Trustee Declaration ¶¶ 60-61 & Exh. H (First Loan Chart), including Exhs. H-1 – H-20.

[88] Trustee Declaration ¶ 61 & Exh. H (First Loan Chart), including Exhs. H-10 – H-20.

[89] Trustee Declaration ¶ 62 Exh. H (First Loan Chart), including Exhs. H-10 – H-13 & H-16 – H-20.

account totaling $440,000.00 and used for CAREIC's operations, are the basis of the

$1,280,000.00 principal amount of the First CAK Note that CAK issued to CASDF.[90]

69.    Thus, while the First CAK Note purports to document a loan from CASDF to

CAK,[91] it in fact represents monies that CASDF transferred to or for the benefit of CAREIC.[92]

70.    The March 25, 2008 date on the face of the First CAK Note[93] does not coincide

with the fact that CASDF's transfers totaling $440,000.00 actually took place from March 31,

2008 through April 22, 2008, after the First CAK Note was allegedly issued.[94]

71.    Finally, adding to the confusion is the fact that, although the First CAK Note is

documented as a money purchase secured transaction, the property that the funds were used to

purchase—the 380 acres—do not collateralize the First CAK Note.  Rather, the First CAK Note

states that it is secured by 40.09 acres of Kingman Property that had been purchased in 2007 in

CAK's name.[95]

### (b) The Second CAK Note

72.    Transactions related to a second Promissory Note dated July 2, 2008 issued by

CAK to CASDF in the principal amount of $3,200,000.00 (the "Second CAK Note")[96] are

summarized on Exhibit I, a chart titled "*CASDF/CAK Loan #2 ($3,200,000)*" (the "Second Loan

---

[90] Trustee Declaration ¶ 63 & Exh. H (First Loan Chart), including H-10 – H-13 & H-16 – H-20.

[91] *See* Exh. H-15 (First CAK Note).

[92] Trustee Declaration ¶ 64 & Exh. H (First Loan Chart), including H-10 – H-13 & H-16 – H-20.

[93] *See* Exh. H-15 (First CAK Note).

[94] Trustee Declaration ¶ 65 & Exh. H (First Loan Chart), including Exhs. H-10 – H-13 & H-16 – H-20.

[95] Trustee Declaration ¶ 65 & Exh. H (First Loan Chart), including Exh. H-14 (First Mortgage).

[96] *See* Exh. I-8 (Second CAK Note).

Chart").[97]  CAREIC's purchase of 120 acres of the Kingman Property allegedly pledged as

collateral by CAK for the Second CAK Note is summarized on Exhibit J, a chart titled

"*CASDF/CAK Loan #2 ($3,200,000)—Purchase of Property Used to Collateralize Loan*" (the

"Property Chart").[98]

73.     Based on the evidence summarized in Exhibits I and J, including Exhibits I-1

through I-14 and Exhibits J-1 through J-22, it appears that: (a) the Second CAK Note purports to

create an obligation by CAK to CASDF for monies that were transferred as part of a mortgage;

but in fact, (b) the monies that were transferred from CASDF's bank accounts were either (i) not

transferred to CAK, but directly to CAREIC, or (ii) were transferred to CAK which then

transferred them to pay CAREIC's operating expenses or to pay obligations of CAS.[99]

74.     The $3.2 million principal amount of the Second CAK Note is based on the

following transfers, some of which occurred after the July 2, 2008 date stated on the Second

CAK Note: (a) two transfers made in May 2008 from a CASDF account to CAREIC's

commingled operating account in the total amount of $750,000.00; (b) one transfer made in

August 2008 from a CASDF account in the total amount of $450,000.00 to CAREIC's savings

account which was then transferred to CAREIC's commingled operating account; and (c) a

transfer of $2 million on July 10, 2008 (after the date of the Second CAK Note) from CASDF to

CAK, which CAK then transferred as follows: (i) on July 11, 2008, $1.5 million was transferred

---

[97] Trustee Declaration ¶ 66 & Exh. I (Second Loan Chart).

[98] Trustee Declaration ¶ 67 & Exh. J (Property Chart, box marked "A" (describing CAREIC's acquisition of a total of 120 acres of land used as collateral)); *see also* Exh. I (Second Loan Chart, box marked "A" (describing total 120 acres of land used as collateral)).

[99] Trustee Declaration ¶ 68, Exh. I (Second Loan Chart) & Exh. J (Property Chart).

by CAK to CAREIC accounts, which were then used by CAREIC to pay its operational expenses and obligations of CAS purportedly owed to Director William Davidson, (ii) also on July 11th, $400,000.00 was transferred by CAK to Geringer Capital Inc. to pay for loans that such entity purportedly made to CAS, and (iii) later, in October 2008, the remaining $100,000.00 was transferred by CAK to CAREIC's commingled operating account for its operations.[100]

75.    Additionally, although the Second CAK Note was issued by CAK, the 120 acres of Kingman Property pledged to CASDF to secure that Note is in fact titled in CAREIC's name.[101]  Furthermore, a significant portion of the funds used by CAREIC to purchase at least 120 acres of this Kingman Property was obtained from loan proceeds that CAREIC obtained from other multiple non-CAREIC sources, including third-party lenders who issued loans collateralized by the Tooele Property, rather than by the Kingman Property it was purchasing.[102]

(c) The Third CAK Note

76.    Numerous transactions resulting in a third Promissory Note dated June 30, 2009 issued by CAK to CASDF in the principal amount of $3,325,893.00 (the "Third CAK Note") are set forth on Exhibit K, a chart titled "*CASDF/CAK Loan #3 ($3,325,893)*" (the "Third Loan Chart").[103]

77.    Based on the Third Loan Chart, as well as Exhibits K-1 through K-20, it appears that (a) the Third CAK Note purports to create an obligation for monies that CASDF transferred

---

[100] Trustee Declaration ¶ 69, Exh. I (Second Loan Chart) & Exhs. I-1 – I-14.

[101] *See* Exh. I (Second Loan Chart, Box marked "A" (describing total 120 acres of land used as collateral)) & Exh. J (Property Chart, Boxes marked "A" (describing CAREIC's acquisition of 120 acres of land used as collateral)).

[102] Trustee Declaration ¶ 70, Exh. I (Second Loan Chart), including Exhs. I-1 – I-11, & Exh. J (Property Chart), including Exhs. J-1 – J-22.

[103] Trustee Declaration ¶ 71 & Exh. K (Third Loan Chart).

to CAK; but in fact, (b) the monies that were transferred from CASDF's bank accounts (i) were not transferred to CAK, but directly from CASDF to CAREIC, (ii) were transferred by CASDF directly to a third party who apparently was owed money by CAS, or (iii) were monies invested by CASDF investors that were directly deposited in CAREIC's operating account. Of the CASDF monies transferred to CAREIC, most were used for CAREIC's operations, and some were used to purchase the water rights associated with the Tooele Property.[104]

78.     The Third CAK Note, dated June 30, 2009, in most instances well after all of CASDF's transfers to CAK had been made, appears to have been used to "paper" these earlier transactions.[105]

79.     The Third CAK Note claims to be secured by four separate tracks of land, identified on the Third Loan Chart in the boxes marked "A," "B," "C," and "D." While the Third CAK Note was issued to CASDF by CAK,[106] the land purporting to collateralize the Note is, with the exception of 40.56 acres identified in box "C," titled in CAREIC's name. Those 40.56 acres are titled in CAK's name.[107]

80.     Although this purported collateral is titled in CAREIC and CAK's name, with the exception of the "Green Land" in CAREIC's name (shown in box "A" of the Third Loan Chart), which was paid for from CAREIC's commingled operating account,[108] the purchases of the

---

[104] Trustee Declaration ¶ 72, Exh. K (Third Loan Chart) & Exhs. K-1 – K-20.

[105] Trustee Declaration ¶ 73, Exh. K (Third Loan Chart) & Exh. K-5 (Third CAK Note).

[106] *See* Exh. K-5 (Third CAK Note).

[107] Trustee Declaration ¶ 74, Exh. K (Third Loan Chart) & Exh. K-1 – K-20.

[108] *See* Exh. L (CASDF/CAK Loan # 3 ($3,325,893) (A) Purchase of Green Property Used to Collateralize Loan).

"Lingenfelter Option #2" noted in box "B" of the Third Loan Chart, the "Water Tower Property"

noted in box "C" and the 60 acres from the Lingenfelter Option #1 noted in box "D" of the Third

Loan Chart are convoluted and utilized funds from other Legacy Debtors.[109]

81.      Exhibit M, a chart titled "*CASDF/CAK Loan #3 ($3,325,893) (B) Purchase of*

*Lingenfelter Option # 2*" (the "Option Purchase Chart"), and Exhibits M-1 through M-17

attached thereto, summarize CAREIC's acquisition of the Lingenfelter Option #2, noted in box

"B" of the Third Loan Chart.[110]  Although titled in CAREIC's name and purportedly pledged by

CAK for the Third CAK Loan to CASDF, cash used to purchase the Lingenfelter Option #2 was

obtained as set forth on the Option Purchase Chart, including from monies transferred to

CAREIC by CAS and CAK, and the proceeds that CASDF paid directly to the title company as

part of the First CAK Note discussed above.[111]

82.      Exhibit N, a chart titled "*CASDF/CAK Loan #3 ($3,325,893) (C) Purchase of*

*Water Tower Property"* (the "Water Tower Chart"), and Exhibits N-1 through N-9 attached

thereto, summarize CAK's acquisition of the Water Tower Property, noted in box "C" of the

Third Loan Chart.[112]  As set forth thereon, although titled in CAK's name and pledged as

collateral for the Third CAK Loan to CASDF, cash used to purchase the Water Tower Property

appears to have primarily been paid directly from the proceeds of a loan between Robhana, Inc.

---

[109] Trustee Declaration ¶ 75.

[110] Trustee Declaration ¶¶ 76-77.

[111] Trustee Declaration ¶ 77, Exh. M (Option Purchase Chart) & Exhs. M-1 – M-17.

[112] Trustee Declaration ¶¶ 76 & 78.

and CAS, and in part by CAREIC.  Thus, it does not appear that CAK contributed much, if any,

money for the purchase of the Water Tower Property that was titled in its name.[113]

*(2)    Acquisition of the Smyrna Property*

83.    A second example of the tangled affairs of the Legacy Debtors is demonstrated by

the purchase of the Smyrna Property, discussed immediately below.[114]

84.    As summarized in Exhibit O, a chart titled "*Smyrna, TN – 486 Acres*

*($5,600,000)*" (the "Smyrna Chart"), and Exhibits O-1 through O-36, which provide the details

of the acquisition of certain parcels of the Smyrna Property,[115] although the Smyrna Property is

titled in CAS's name, the purchase of this Property involved a complicated series of transfers and

monies obtained from a conglomeration of sources, many of which were never even transferred

to CAS, but rather were paid directly to the title company by, among others, CAK and CAREIC,

or by CAREIC after transfers of cash to it by CAS.[116]

85.    Also, a significant portion of the monies used to pay for the purchase of the

Smyrna Property came from loans made to CAS from CAREIC Board members Bill Davidson

and Robert Geringer, as well as from an entity called "Robhana, Inc." (collectively, the "CAS

Loans").[117]

---

[113] Trustee Declaration ¶ 78, Exh. N (Water Tower Chart) & Exhs. N-1 – N-9.

[114] Trustee Declaration ¶ 79.

[115] Trustee Declaration ¶ 80.

[116] Trustee Declaration ¶ 81, Exh. O (Smyrna Chart) & Exhs. O-1 – O-36.

[117] Trustee Declaration ¶ 82 & Exh. O (Smyrna Chart).

86.     With the exception of the CAS Loan to Robhana, Inc.,[118] the majority of cash

used to repay the CAS Loans was paid directly to the lenders by Legacy Debtors other than

CAS.[119]  Even in the case of the CAS Loan to Robhana, Inc., CAREIC and CAK contributed

cash, not insignificant, to repay the lender, including a payment made by CAREIC directly to

Robhana, Inc.[120]

*(3)      Acquisition of Certain Tooele Water Rights*

87.     The Trustee also uses the purchase of certain water rights related to the Tooele

Property (the "Water Rights") to demonstrate the entangled nature of the Legacy Debtors'

affairs.[121]

88.     Exhibit S, a chart titled "*Tooele, UT Water Rights – 155.93 Acre Feet

($2,353,562)*" (the "Tooele Chart"), which summarizes the acquisition of 155.93 acre feet of

approximately 616 total acre feet of Water Rights owned, together with Exhibits S-1 through S-

18, which provide the documents used by the Trustee to create the Tooele Chart,[122] demonstrates

that although the Water Rights were titled in CAREIC's name, the purchase of these Water

Rights involved the collection of funds from numerous sources, including by the other Legacy

---

[118] Trustee Declaration ¶ 83, Exh. R (CAS Loan Payments – Robhana, Inc*.) &* Exh. R-10 – R-12.

[119] Trustee Declartion ¶ 83, Exh. P (CAS Loan Payments – Bill Davidson), Exhs. P-1 – P-14, Exh. Q (CAS Loan
Payments – Robert Geringer) & Exhs. Q-1 – Q-14.

[120] Trustee Declaration ¶ 83, Exh. R (CAS Loan Payments – Robhana, Inc. ($1,800,000)) & Exhs. R-1 – R-12.

[121] Trustee Declaration ¶ 84.

[122] Trustee Declaration ¶ 85.

Debtors, the majority of which were transferred to CAREIC's commingled operating account and paid to the title company handling the purchase transaction.[123]

89.     Also, of the total purchase price of approximately $2.3 million, $540,000.00 of the funds used by CAREIC to pay for the Water Rights were sourced from loans that certain individuals, primarily insiders, made to CAREIC (the "Water Loans").[124]

90.     Although loans to CAREIC, these Water Loans are recorded as notes payable of CAS in its General Ledger.[125]  In addition, all of the Water Loans apparently made for CAREIC's purchase of the Water Rights state that they are collateralized by the Water Rights, as well as the Smyrna Property titled in CAS's name.[126]

91.     Jeff Austin, a former CAREIC Board member and Officer, made one of the Water Loans in the principal amount of $100,000.00.[127]  This loan was accounted for and, ultimately, repaid as follows:  (a) Austin's Water Loan to CAREIC for purchase of the Water Rights was recorded as a notes payable in CAS's General Ledger; and (b) the majority of this Water Loan was repaid from funds that CAREIC obtained from a loan it obtained from Saggiani Properties,

---

[123] Trustee Declaration ¶ 86, Exh. S (Tooele Chart) & Exhs. S-1 – S-18.

[124] Trustee Declaration ¶ 87, Exh. S (Tooele Chart), Exh. S-6 (transactions with Kirby Cochran), Exh. S-7 (20% Secured Promissory Note issued by CAREIC to Jeff Austin and accounting records), Exh. S-8 (20% Secured Promissory Note issued by CAREIC to Kimberlee Higa and accounting records), Exh. S-9 (20% Secured Promissory Note issued by CAREIC to Nolan Higa and accounting records), & Exh. S-10 (20% Secured Promissory Note issued by CAREIC to Bill Davidson and accounting records).

[125] Trustee Declaration ¶ 88, Exh. S (Tooele Chart) & Exh. S-11 – S-16 (excerpts of CAREIC's General Ledgers and journals, bank records and receipts).

[126] Trustee Declaration ¶ 88, Exh. S (Tooele Chart) & Exhs. S-6 – S -10 (promissory notes).

[127] Trustee Declaration ¶ 89, Exh. S (Tooele Chart) & Exh. S-7 (20% Secured Promissory Note issued by CAREIC to Jeff Austin and accounting records).

LLC, which loan states that it is collateralized by a portion of the Smyrna Property owned by CAS.[128]

## G.

### *CASV*

92.     CAREIC caused CASV to be organized as a Utah limited liability company in December, 2009, and it was domesticated to do business in the State of Wyoming in January, 2010.[129]

93.     CAREIC is the sole member and manager of CASV and at all times controlled CASV.[130]

94.     CASV was not an entity that offered securities for sale, and it appears to have had no capital.[131]

95.     Rather, CAREIC's funds were deposited in bank accounts held in CASV's name, these CASV accounts were controlled by CAREIC, and the accounts and transactions involving the accounts were listed on CAREIC's General Ledger as if they were its own.[132]  Doug Child, CAREIC's Chief Financial Officer and a Board member prior to the Petition Date ("Child"), has

---

[128] Trustee Declaration ¶ 89, Exh. S (Tooele Chart), Exh. T (CAREIC Loan Payments – Jeff Austin) & Exhs. T-1 – T-7.

[129] Trustee Declaration ¶ 90.

[130] Trustee Declaration ¶ 91.

[131] Trustee Declaration ¶ 92.

[132] Trustee Declaration ¶ 93 & Exh. BB (Star Valley Bank Accounts Included in CAREIC General Ledger as of October 16, 2011).

testified that these bank accounts were established and used by CAREIC after threat of a tax levy, and that the bank accounts in CASV's name were CAREIC's accounts.[133]

96.     CASV's only other asset appears to be the Star Valley Property.[134]

97.     As summarized on Exhibit U, a chart titled "*Thayne, WU (Star Valley Property) – 40 Acres ($800,100)*" (the "Star Valley Chart"), as well as Exhibits U-1 through U-18, although CAREIC and, primarily, CAK, provided funds to purchase the Star Valley Property, the seller of the Star Valley Property issued a Warranty Deed to Sierra Construction and Excavation, Inc. in June 2007, which then assigned the Deed to CAREIC.[135]  In April 2008, CAREIC executed a Warranty Deed, transferring the Star Valley Property to Child.  Concurrent with this transfer in 2008, Child obtained a loan from the Bank of Star Valley, claimed to be secured by the Star Valley Property (the "Child-BSV Loan").  In December 2009, CAREIC caused CASV to be organized and Child transferred the Star Valley Property to it by Quit Claim Deed, and CASV guaranteed the Child-BSV Loan.[136]

98.     At no time did CASV have any capital to fund the Child-BSV Loan or to pay any other obligations related to the Star Valley Property.[137]

99.     CASV did not file a bankruptcy petition.[138]

---

[133] Exh. BBB (Transcript dated April 19, 2012, pp. 89-93).

[134] Trustee Declaration ¶ 94.

[135] Trustee Declaration ¶ 95, Exh. U (Star Valley Chart) & Exhs. U-1 – U-18.

[136] *Id.*

[137] Trustee Declaration ¶ 96.

[138] Trustee Declaration ¶ 97.

100.    But, CAREIC has listed its 100% interest in CASV and the Star Valley Property as its assets.[139]  CAREIC has also listed the Bank of Star Valley and the Lincoln County Treasurer as secured creditors.[140]

101.    Also, in its Statement of Financial Affairs, CAREIC lists a Chase account ending in the number 5597 as one of its closed bank accounts, when in fact this was a bank account held in the name of CASV.[141]

102.    In CAREIC's Schedules, it states that CASV was "never operated"[142] and Child has testified that CASV was not an operating company.[143]

103.    The Bank of Star Valley and the Lincoln County Treasurer have been served with notice of the Consolidation Motion, and they have not objected to the relief sought therein.[144]

104.    Based on these facts, CASV and CAREIC were at all times one and the same. Consolidation of CASV is not only necessary to prevent injustice, but given the facts, no creditor can say that it has relied on the separateness of CASV.[145]

105.    The Bank of Star Valley and Lincoln County have filed proofs of claim against CAREIC.[146]

---

[139] Trustee Declaration ¶ 98 & Exh. HH (CAREIC's Schedules A & B).

[140] Trustee Declaration ¶ 98 & Exh. HH (CAREIC's Schedule D).

[141] Trustee Declaration ¶ 99 & Exh. HH (CAREIC's Statement of Financial Affairs).

[142] Trustee Declaration ¶ 100 & Exh. HH (CAREIC's Schedule B at ¶ 13).

[143] Exh. BBB (Transcript dated April 19, 2012, p. 89, lns. 11-15).

[144] Trustee Declaration ¶101; *see* Notice of Hearing, Docket No. 544, at Certificate of Service, Exh. A.

[145] Trustee Declaration ¶ 102.

[146] *See* CAREIC Claim Docket, Claim Nos. 23 & 34.

**H.**

**_Benefit And Other Conclusions_**

106.    In determining the advantages, disadvantages and equities involved in substantively consolidating the Legacy Debtors, the Trustee and his Court-appointed professionals, at his direction, have reviewed all potential assets known as of this time and all claims that were scheduled by the Legacy Debtors or have been filed, as reflected on the Court's respective claims dockets for each of the Legacy Debtors, that have not been disallowed or re-characterized as equity as of this time.[147]

107.    Based on this analysis, as well as all of the facts set forth above, the Trustee has concluded, in an appropriate exercise of his business judgment, that substantive consolidation of the Legacy Debtors is in the best interests of all parties in interest, and in fact is necessary to prevent injustice.[148]  This conclusion is supported by the evidence described above and at least for the following reasons:

(a)    The Legacy Debtors' assets and affairs are hopelessly commingled;

(b)    Cash of the Legacy Debtors was used indiscriminately to fund whichever entity was in need of cash at the time;

(c)    The Legacy Debtors were all managed by the same Board of Directors and Officers, and were provided administrative services on a consolidated basis;

---

[147] Trustee Declaration ¶ 103.

[148] Trustee Declaration ¶¶ 2 & 104.

(d)     CAREIC caused all of the other Legacy Debtors to be formed, and in the case of

CAK, CAS and CASDF, they were created by CAREIC as a vehicle by which to obtain

additional investor funds;

(e)     CASV was treated as if it were CAREIC in CAREIC's books and records, as well

as the Statements and Schedules that CAREIC filed in this case;

(f)     None of the Legacy Debtors had any corporate existence outside of the CAREIC

corporate family;

(g)     Based on Private Placement Memoranda issued and other representations to the

public, such as filings with the SEC, all of the Legacy Debtors consistently represented

themselves as being controlled by CAREIC; and

(h)     Certain significant forensic accounting and litigation expense that would be

required (plus the potential cost of any separately appointed fiduciaries and their professionals),

to "unscramble" the Legacy Debtors, to the extent possible, would greatly threaten any recovery

by parties in interest in these cases.[149]

## IV.

## CONCLUSIONS OF LAW

### *Authority To Order Substantive Consolidation*

108.     Substantive consolidation is an extraordinary remedy, arising out of federal

common law for the purpose of advancing the equitable powers of the bankruptcy courts.[150]

---

[149] Trustee Declaration ¶ 104.

[150] *See* 11 U.S.C. § 105(a); *In re Owens Corning, Inc.*, 419 F.3d 195, 205, 208 & 216 (3d Cir. 2005); *see also In re George Love Farming, LC*, 366 B.R. 170, 180 (Bankr. D. Utah 2007) (Thurman, J.) (recognizing same).

The result is that "claims of creditors against separate debtors morph to claims against the consolidated survivor."[151]

109.    The Court of Appeals for the Tenth Circuit has stated:

The power to consolidate authorizes the court to pierce the several corporate veils and to disregard the existence of the separate corporate entities.  Thus where a corporation is a mere instrumentality or alter ego of the bankrupt corporation, with no independent existence of its own, equity would favor disregarding the separate corporate entities.  It is, of course, proper to disregard a separate legal entity when such action is necessary to avoid fraud or injustice.[152]

110.    "The bankruptcy court's power of substantive consolidation has been considered part of the bankruptcy court's general equitable powers since the passage of the Bankruptcy Act of 1898."[153]

111.    This power is widely accepted under the Bankruptcy Code, including by this Court.[154]

---

[151] *Owens Corning*, 419 F.3d at 205.

[152] *Federal Deposit Ins. Corp. v. Hogan (In re Gulfco Inv. Corp.)*, 593 F.2d 921, 928-29 (10th Cir. 1979) (relying on *Fish v. East*, 114 F.2d 177, 191 (10th Cir. 1940)); *see George Love Farming*, 366 B.R. at 179–80.

[153] *Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 763 (9th Cir. 2000) (citing in part *Sampsell v. Imperial Paper & Color Corp.,* 313 U.S. 215, 219 (1941)).

[154] *See, e.g., Owens Corning,* 419 F.3d at 206-209 (discussing history and concluding that although extraordinary, "[n]o court has held that substantive consolidation is not authorized"); *Bonham*, 229 F.3d at 765 (same); *Gulfco Inv. Corp.*, 593 F.2d at 921 (recognizing power); *Fish*, 114 F.2d at 177 (same); *George Love Farming,* 366 B.R. at 180 (same); *see also In re Horsley*, No. 99-30458 JAB, 2001 WL 1682013, at *3 (Bankr. D. Utah Aug. 17, 2001) (Boulden, J.) (stating that the ability to order substantive consolidation was "implied from the bankruptcy court's general equitable powers"); *Heller v. Langenkamp (In re Tureaud)*, 59 B.R. 973, 975-77 (N.D. Okla. 1986) (affirming order consolidating individual debtor with non-debtor entities controlled by the debtor); *In re Mansfield Corp.*, Bankr. Case No. 02-28236 (Bankr. D. Utah) (Boulden, J.), Order Substantively Consolidating Cases [Docket No. 245].

## *Substantive Consolidation Of The Legacy Debtors Is Appropriate*

112. "The propriety of ordering substantive consolidation is primarily a factual question and is determined by a balancing of interests" of those seeking consolidation and those opposing it, if any.[155]

113. In *Fish v. East,* the Tenth Circuit set forth the following ten factors to consider in a consolidation analysis:

(1)    The parent corporation owns all or majority of the stock of the subsidiary;

(2)    The parent and subsidiary corporations have common directors or officers;

(3)    The parent corporation finances the subsidiary;

(4)    The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation;

(5)    The subsidiary has grossly inadequate capital;

(6)    The parent corporation pays the salaries or expenses or losses of the subsidiary;

(7)    The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation;

(8)    In the papers of the parent corporation, and in the statements of its officers, the subsidiary is referred to as such or as a department or division;

(9)    The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation; and

(10)   The formal legal requirements of the subsidiary as a separate and independent corporation are not observed.[156]

---

[155] *Matter of Baker & Getty Fin. Servs., Inc.*, 78 B.R. 139, 142 (Bankr. N.D. Ohio 1987); *see In re F.A. Potts & Co.*, 23 B.R. 569 (Bankr. E.D. Pa. 1982).

[156] *Fish*, 114 F.2d at 191.

114.    Later, in *Gulfco,* the Tenth Circuit again recognized these "*Fish*" factors for substantive consolidation. [157]

115.    More recently, in *In re Horsley*, this Court stated: "The *Gulfco/Fish* criteria can be reduced into two general components: (1) the extent to which the entity to be substantively consolidated was managed or controlled by the debtor, and (2) whether the entity to be substantively consolidated had an economic existence independent from the Debtor."[158]

116.    Finally, as recognized by numerous courts, the degree of difficulty and expense involved with segregating and ascertaining individual assets and liabilities of each of the entities is particularly relevant.[159]  Thus, substantive consolidation is proper where the assets of the entities in question are "hopelessly commingled,"[160] or where difficult accounting problems caused by intercompany debt are "so strong that the great expense (in order to bring about an unscrambling) threaten[s] recovery."[161]

117.    Based on this law and its application to the Findings of Fact set forth above, substantive consolidation of the Legacy Debtors is appropriate.

118.    Thus, the Legacy Debtors are substantively consolidated.

---

[157] 593 F.2d at 928–29.

[158] *In re Horsley*, 2001 WL 1682013, at *4.

[159] *See, e.g., Gulfco,* 593 F.2d at 929–30 (recognizing consolidation is appropriate where intercompany debt create difficult accounting problems); *accord In re Introgen Therapeutics, Inc.*, 429 B.R. 570, 582 (Bankr. W.D. Tex. 2010) (noting that this is one of the factors in the "traditional test"); *In re Raymond Prof'l Group*, 421 B.R. 891, 913 (Bankr. N.D. Ill. 2009); *In re BLI Farms*, 312 B.R. 606, 621 (E.D. Mich. 2004); *In re Donut Queen*, 41 B.R. 706, 709 (Bankr. E.D.N.Y. 1984) (citing *In re Vecco Constr. Indus., Inc.*, 4 B.R. 407, 410 (Bankr. E.D. Va. 1980)).

[160] *Gulfco*, 593 F.2d at 928 (discussing *Fish*).

[161] *Id.* at 930.

### *Nunc Pro Tunc Consolidation Of CASV*

119.    In addition, substantive consolidation of CASV as of the CAREIC Petition Date is

appropriate.

120.    The Court has considered the test for *nunc pro tunc* consolidation set forth in *In re*

*Auto-Train Corp.*,[162] and concludes that the Trustee has shown that *nunc pro tunc* consolidation

of CASV achieves benefit and avoids harm.

121.    Furthermore, in accordance with the test for *nunc pro tunc* consolidation in *In re*

*Baker & Getty Fin. Services, Inc.*,[163] such consolidation is appropriate because CAREIC treated

CASV as if it were CAREIC, and creditors and parties in interest have dealt with CASV and

CAREIC as if they were the same.

122.    Accordingly, CASV is substantively consolidated with the other Legacy Debtors

as of the CAREIC Petition Date.

---

End of Document

---

[162] 810 F.2d 270 (D.C. Cir. 1987).

[163] 974 F.2d 712 (6th Cir. 1992).