**The below described is SIGNED.**



**Dated: April 15, 2013**

_____

**JOEL T. MARKER**
**U.S. Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>CASTLE ARCH REAL ESTATE INVESTMENT COMPANY, LLC; CAOP MANAGERS, LLC; CASTLE ARCH KINGMAN, LLC; CASTLE ARCH SECURED DEVELOPMENT FUND, LLC; CASTLE ARCH SMYRNA, LLC; CASTLE ARCH STAR VALLEY, LLC; *and* CASTLE ARCH OPPORTUNITY PARTNERS I, LLC; CASTLE ARCH OPPORTUNITY PARTNERS II, LLC,<br><br>Debtors. | Case Nos. 11-35082, 11-35237, 11-35243, 11-35242 and 11-35246<br>(Substantively Consolidated)<br>Case Nos. 11-35241 and 11-35240<br>(Jointly Administered)<br><br>Chapter 11<br><br>Judge Joel T. Marker |

---

### MEMORANDUM DECISION

---

Robert Geringer filed a claim against Castle Arch Real Estate Investment Company, LLC for over $7 million in wages, rent, and indemnification relating to his work with the company prior to bankruptcy, and the Trustee objected to the claim. Conceding that the evidence to support his claim is largely circumstantial—the indemnification that makes up the bulk of the claim was never reduced to a formal written agreement—Geringer testified that the company's CEO agreed to indemnify Geringer for his guaranty obligation and pointed to the company's

partial performance as proof of the indemnity. But the Trustee—a stranger to these transactions—is right to be skeptical. The officers of the company were unable to confirm the existence of an open-ended indemnity, the available documentary evidence does not sufficiently establish the contours of the agreement, and Geringer directly contradicted himself in a sworn statement in a related state court matter.

The Court conducted a trial of the Trustee's claim objection on February 28 and March 1, 2013 and took the matter under advisement. After considering the evidence properly before the Court, assessing the credibility of the witnesses, considering the arguments of counsel, and conducting an independent review of applicable law, the Court issues the following Memorandum Decision to explain why Geringer's claim must be largely disallowed.[1]

## I. FACTS

### A.      Indemnification

On direct examination and in the broadest sense, Geringer tells the better story, or at least the most complete one out of the four witnesses who testified given his centrality to all of the relevant events. Geringer, an actively licensed tax attorney and a veteran real estate developer, was approached by Kirby Cochran through and along with Robert Clawson in 2004 because Cochran was interested in pursuing a real estate development venture and needed someone with real estate experience. Castle Arch Real Estate Investment Company, LLC (Castle Arch) was organized on April 15, 2004[2] with Geringer as president, Cochran as CEO, and CPA Doug Child as CFO along with an advisory board, although the company only really began operating in

---

[1] This Memorandum Decision constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52, made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7052. Any of the findings of fact herein are also deemed to be conclusions of law, and any conclusions of law herein are also deemed to be findings of fact, and they shall be equally binding as both.

[2] Trustee's Exhibit 43, p. 20.

2005.  Castle Arch's basic starting business model was to acquire raw land with investor money, obtain zoning and other entitlements, and then resell the property for a profit.

Castle Arch's Operating Agreement gave Cochran "full and complete authority, power and discretion to make any and all decisions and to do any and all things which the chief executive officer shall deem to be reasonably required to accomplish the business and objectives of the Company.  No Member, other than the chief executive officer, shall have the authority to bind the Company, unless given that authority by the chief executive officer."[3]  Because Geringer was the only one with real estate experience, and at Geringer's own request, Cochran granted Geringer "the authority to bind the corporation with regard to any contracts, liabilities, obligations or other matters relating to the operation of [Castle Arch] or with regard to the acquisition, disposition or encumbrance of any properties."[4]

Geringer had known Brett Baillio since 1993 when Baillio served as a broker on a deal in Texas, and they became both business acquaintances and friends.  Baillio never worked with Geringer outside a broker capacity until 2003 when Baillio approached Geringer regarding joint development of a property in Coalinga, California, which they did successfully through an entity named Contour Development.  While evaluating this first Coalinga property and through other contacts, Geringer learned of a possible development opportunity in nearby Firebaugh, California as well as another property in Coalinga.

As it turns out, Baillio had already done substantial work developing both properties and had executed Purchase and Sale Agreements with the owners of both of these properties in September 2004, with purchase prices of $3,838,250 for Coalinga and $7,890,900 for

---

[3] Geringer's Exhibits 23-25, § 3.1.  The original Operating Agreement actually provides that "[n]o Member, other than the chief executive officer, shall have the authority to bind the Company, unless given that authority by the board of directors."  The two amended Operating Agreements change the last three words to "chief executive officer."
[4] G. Exhibit 1.

Firebaugh.[5]   Around January 2005, Geringer estimated the ultimate developed values of the properties at $11,000,000 for Coalinga and $19,500,000 for Firebaugh.  Given the relatively advanced stage of development of both properties and the pressure that Geringer was getting to find some projects to jump-start Castle Arch's business plans, Geringer sought to acquire Baillio's purchase rights for the benefit of Castle Arch.   Although Baillio wasn't initially interested in assigning his purchase rights to Castle Arch, Geringer ultimately persuaded him to do so by assuring him that he would still get something out of the deal for his work to date, that Castle Arch could close on the purchases, and that Baillio would be freed up to focus on other existing projects.

Baillio and Castle Arch executed contracts called Assumption and Assignment of Purchase and Sale Agreement in January 2005 as to both the Coalinga and Firebaugh properties.[6] Both Agreements provide for Castle Arch's replacement of escrow deposits, expense reimbursement to Baillio, a cut of subsequent profits to Baillio, and Baillio's option to reacquire the purchase rights on certain terms if Castle Arch is unable or unwilling to close.  Castle Arch wasn't able to close and Baillio wanted his purchase rights back, but Castle Arch also didn't want to lose its sunk costs and sizeable expected profit margin.  As such, Geringer on behalf of Castle Arch negotiated contracts with Baillio called Reassignment and Assumption of Purchase and Sale Agreement in June 2005 as to both the Coalinga and Firebaugh properties.[7]   As described by Geringer, by voluntarily reassigning the purchase rights to Baillio and informally agreeing to help him finish the entitlement and closing processes, Baillio gave Castle Arch

---

[5] G. Exhibits 17 and 20.

[6] G. Exhibits 18 and 21.  The Coalinga Assignment Agreement is dated January 27, 2005.  The Firebaugh Assignment Agreement is undated, although it was apparently executed at roughly the same time as the Coalinga Assignment Agreement.

[7] G. Exhibits 19 and 22.  The Coalinga Reassignment Agreement is dated June 8, 2005.  The Firebaugh Reassignment Agreement is undated, although it was apparently executed at roughly the same time as the Coalinga Reassignment Agreement.

roughly half of the expected upside on each of the properties, stated as a specific dollar amount. In Coalinga's case, Baillio agreed to pay Castle Arch $4,750,000 by December 31, 2005 in addition to certain reimbursement; in Firebaugh's case, it was $5,650,000 payable partly by promissory note by December 31, 2005.[8]

The Coalinga purchase apparently had to close in June 2005 shortly after the reassignment to Baillio, and the Firebaugh purchase apparently had to close in January 2006. Unfortunately, Baillio was just as unable to close as Castle Arch had been, and Geringer assisted Baillio with finding non-traditional lenders to finance the property acquisitions.[9]  Robhana, Inc. loaned $3.5 million to Baillio Development, Inc. on June 29, 2005 to purchase the Coalinga property,[10] and Geringer executed the personal guaranty required by Robhana on the same date.[11] Palm Finance Corporation loaned $8.2 million to Baillio Development, Inc. on January 31, 2006 to purchase the Firebaugh property,[12] and Geringer executed the personal guaranty required by Palm Finance on the same date.[13]  Palm Finance was significantly more demanding than Robhana, also requiring a lien on the Firebaugh property, a lien on Geringer's house, a pledge of Geringer's Castle Arch membership interests, a certification that Geringer wouldn't directly profit from the transaction other than through his status as a Castle Arch member, and a lien on a promissory note for money owed to Contour Development in connection with the first Coalinga property that Baillio and Geringer had developed.  Palm Finance also required somebody to put

---

[8] Geringer offered June 2005 appraisals of the properties into evidence as Exhibits 68 and 73, which the Court received for the limited purpose of showing the states of mind of Geringer and Castle Arch.  The Coalinga appraisal asserts a value of $14,138,000; the Firebaugh appraisal asserts a value of $16,856,000.
[9] Geringer didn't explain why more conventional loans were unavailable or whether they were even sought.  He only testified that Baillio approached him for assistance after Baillio's own anticipated financing sources fell through.
[10] G. Exhibit 46.
[11] G. Exhibit 47.
[12] G. Exhibit 54.
[13] G. Exhibit 55.

up $1 million in cash, which Castle Arch paid.  So by this point, Castle Arch was already into these projects for approximately $1.3 million.

Just prior to each of these loans, Geringer testified that Cochran orally agreed that Castle Arch would indemnify Geringer on each of the guarantees that he was about to execute.  The Robhana loan was refinanced in January 2007 through First Federal Bank of California (later OneWest Bank),[14] and the Palm Finance loan was refinanced in April 2007 through ANB Financial (later ANB Ventures).[15]  Several appraisals of the properties were performed in connection with the refinances and debt maturation in 2007-08, which were offered into evidence only to show state of mind, and the same developer who bought the first Coalinga property from Contour Development executed a letter of intent to purchase the Firebaugh property for $19,140,000 in January 2006.[16]  But no sales occurred, Castle Arch didn't get paid by Baillio under the Reassignment Agreements as anticipated, and Geringer eventually had to start making good on his guarantees.  Castle Arch covered this debt service for a period of time but then stopped payments in early 2008, which to Geringer coincided with the decimation of the housing market and the astronomical decline in the properties' values—along with the likelihood of Castle Arch realizing anything from the Reassignment Agreements or otherwise.[17]

---

[14] G. Exhibits 48 and 49.

[15] G. Exhibits 59-63.

[16] The May 20, 2007 Coalinga appraisal asserts a value of $16,140,000 (G. Exhibit 69).  The January 26 (or January 15), 2007 Firebaugh appraisal asserts a value of $18,490,000 (G. Exhibit 74); the August 24, 2007 appraisal asserts a value of $15,000,000 (G. Exhibit 75); and the May 2, 2008 appraisal asserts a value of $5 million (G. Exhibit 76).  The letter of intent is G. Exhibit 3.

[17] The March 9, 2010 Coalinga appraisal asserts a value of $3,640,000 (G. Exhibit 70), and a verbal offer was received (and rejected) in early 2013 for $250,000.   On March 12, 2012, a sale of the Firebaugh property closed for $1 million (G. Exhibit 66), which served in part to reduce the amount of Geringer's claim.

By February 2008, Geringer was e-mailing Cochran and others regarding pushback that he was getting about Castle Arch continuing to make debt service payments.[18]  He also e-mailed Controller Jad Howell in February 2008 and CFO Doug Child in October 2008, again asserting his right to indemnification from Castle Arch.[19]  But Castle Arch made no further payments.  OneWest ultimately sued Geringer and others in California in January 2010,[20] and the parties settled in 2011.[21]  Geringer settled with ANB in April 2011 before it filed suit in the form of purchasing the ANB debt at a discount.[22]  There is no evidence of any indemnity demand by Geringer after his resignation from Castle Arch on July 15, 2009 until he filed proof of claim #27-1 on February 17, 2012, which was amended by proof of claim #27-2 filed on January 11, 2013.[23]

The Chapter 11 Trustee, obviously a newcomer both to these transactions and the bankruptcy case itself (which began as a voluntary chapter 11 with Castle Arch as debtor-in-possession), in one sense missed the forest for the trees in responding to Geringer's version of events.  Rather than viewing the series of transactions as a whole, the Trustee broke them into snapshots and drew conclusions from these disassembled pieces.  In particular, the Trustee focused on the fact that Baillio owed Castle Arch $10.4 million under the Reassignment Agreements as of June 8, 2005, before the Robhana and Palm Finance loans and Geringer's execution of his guarantees.  As such, the Trustee characterized the loans and guarantees as

---

[18] G. Exhibit 8.
[19] G. Exhibits 9-10.
[20] G. Exhibit 50.
[21] G. Exhibit 51.  The settlement agreement is dated February 28, 2011, but the signatures are all dated much later.
[22] G. Exhibit 64.
[23] Geringer testified to several reasons why he made no such demand, including his desire to pursue resolution of the guarantees without additional complications, the fact that adding Castle Arch to the fight wouldn't absolve him of his guarantees, and Castle Arch's "financial issues." See 2/28/13 Transcript (Geringer) at 160:21-163:12.

making no sense in terms of their timing and as providing no economic benefit to Castle Arch. The Court disagrees. Viewed in context and as an entire series of events designed to produce a profit for Castle Arch, the transactions make plausible sense from a business perspective even if they could have been better structured and even though they ultimately resulted in no monetary recovery for Castle Arch.

That said, the Trustee was much more successful in poking enough holes in Geringer's ship to make it sink. To begin, Geringer never explained why he failed to get the alleged indemnity agreement in writing, either at the time of the alleged oral promises or at any time thereafter.[24] Geringer is an attorney and a seasoned real estate developer who was doing his first deals with people that he barely knew, and he had many other agreements reduced to writing, including his Consulting Agreement with Castle Arch,[25] loans to Castle Arch Smyrna for amounts as small as $25,000,[26] and the letter he demanded from Cochran regarding his authority to bind Castle Arch as to real estate matters.[27] Even the Assignment and Reassignment Agreements themselves contain explicit indemnity provisions.

Geringer testified that he didn't want to issue a press release regarding the Reassignment Agreements[28] until the property was sold and the money was in the bank but that Cochran and Jeff Austin convinced him to approve the form of a release because it was Castle Arch's duty as a public company to release information immediately. However, the Trustee's Exhibits 4 and 5

---

[24] The Trustee's attempt to enforce this point by citing the Castle Arch Operating Agreement is not well taken. He argues that § 5.4 of the February 16, 2007 Amended Operating Agreement (G. Exhibit 25) required Geringer to get the indemnity agreement in writing for it to be assumed as a corporate obligation. But this provision was in the original May 1, 2004 Operating Agreement (G. Exhibit 23) and both subsequent amendments (G. Exhibits 24-25), and it is properly viewed as simply barring corporate liability for individual member debts incurred prior to incorporation.
[25] G. Exhibits 26-28.
[26] T. Exhibits 55-56.
[27] G. Exhibit 1.
[28] G. Exhibit 2.

suggest that Geringer was actually "comfortable" with the idea and took no issue with the form of the release that was ultimately issued in October 2005.  In March 2008, <u>after</u> he already began having problems with Castle Arch paying on his alleged indemnity agreement, Geringer executed a management representation letter in connection with a Castle Arch audit stating that all material related party transactions and guarantees under which Castle Arch was contingently liable were properly recorded or disclosed in the company's consolidated financial statements[29]—yet neither Geringer nor Child could direct the Court to any such disclosure, and Geringer also admitted that he didn't really think it through when he signed that letter.  This was also well after Geringer had allegedly been expressing concerns "from relatively early on" in 2006-07 regarding Cochran's efforts to turn Castle Arch into a "capital-raising machine" and thus directing focus away from the company's intended business purpose.  And Geringer's original proof of claim alleged that "[p]rior to [the Robhana and Palm Finance transactions] and thereafter, Geringer was repeatedly assured by the Debtors' officers that he would be indemnified for any amounts he paid or losses he would sustain under these personal guaranties."[30]  His February 21, 2008 e-mail to Controller Jad Howell reiterates that "[Castle Arch] has an obligation to indemnify me on those transactions.  The Board discussed this previously and recognized the obligation."[31]  But in his response to the Trustee's objection, Geringer asserts that only Cochran made and was aware of the alleged indemnification agreement.  "As a result, other directors and officers were not privy to the conversations between Mr. Cochran and Mr. Geringer and truthfully have testified that they did not know about the

---

[29] T. Exhibit 42.
[30] G. Exhibit 15, Addendum to Proof of Claim, p. 3 of 49.
[31] G. Exhibit 9.

indemnification promise.  They did not need to know since they were only 'advisory' as Mr. Cochran clearly understood."[32]

But perhaps Geringer's biggest problem, both for his general credibility and for his specific assertion of an indemnity right, involves sworn statements that he made to the California state court in connection with the OneWest litigation.  In that lawsuit, OneWest sought a prejudgment writ of attachment against Geringer, which could only issue "on a claim which arises out of the conduct by the defendant of a trade, business, or profession."[33]  In opposing the application, Geringer submitted a declaration under penalty of perjury stating in no uncertain terms that he executed a guaranty in connection with the First Federal/OneWest refinance of the Robhana debt for three reasons and three reasons only: "Mr. Baillio and I have been close personal friends for nearly 20 years, repayment of the Loan was to be secured by real property, and I did not perceive the Guaranty to pose any material risk to me."[34]  And even though OneWest was clearly tying Geringer's guaranty to his employment with Castle Arch and the anticipated return for Castle Arch under the Reassignment Agreements,[35] Geringer asserts the "absurdity" of the contention that "Geringer, derivatively through Castle Arch, must have had a business relationship with Baillio Development and therefore must have given the Guaranty to support that relationship . . . .  Any suggestion that Geringer delivered his Guaranty as part of his trade, business, or profession is nothing more than wishful thinking on the Bank's part."[36]

---

[32] Response to Objection to Robert Geringer's Claim, docket #604, ¶ 40.

[33] Cal. Code Civ. Pro. § 483.010(c).

[34] T. Exhibit 57 (Declaration of Robert D. Geringer).  The Trustee also read portions of Baillio's deposition transcript into the record regarding Baillio's understanding of the motivation for Geringer's guarantees.

[35] *See, e.g.*, G. Exhibit 156 (Reply of OneWest Bank), pp. 3-5.

[36] T. Exhibit 57 and G. Exhibit 156 (Memorandum of Points and Authorities in Opposition to Attachment), pp. 4-5.  An earlier reference on p. 1 of the Memorandum states that "[a]s explained in the attached Declaration of Robert D. Geringer, he absolutely did not execute the Guaranty as part of his trade, business or profession."

Geringer's attempts to explain away these statements are clever, but the Court does not find Geringer credible on these points. For one, he alleged that his "trade or business" was somehow different than his "employment" with Castle Arch. He also claimed that his broadly stated perception that the guaranty wouldn't pose any material risk to him encompassed the unstated oral indemnification promise from Castle Arch, even though his declarations make clear that he was speaking about the large equity cushion that allegedly existed beyond the amount of the refinanced debt.[37] And at the end of the day, Geringer testified that the California court did find that his execution of the refinance guaranty arose out of his conduct of a trade, business, or profession with Castle Arch.

On top of all this, Geringer was unable to flesh out the material terms of the alleged indemnity agreement. In addition to his own testimony, Geringer points to the Castle Arch Operating Agreement, some e-mails from 2008, advisory board minutes, SEC filings, and Castle Arch payments as support for his claim. He also uses these to argue that the indemnity agreement is "founded upon an instrument in writing" for statute of limitations purposes. But while he's obviously pushing for an open-ended version of the agreement that envisions Castle Arch's promise to indemnify him in any amount and for all time, the evidence supports other possible versions of the agreement equally well or better.

For example, the e-mail chain from February 2008 includes Cochran asking for more information and stating that "I know as a board we said we would only pay until the end of Dec 2008"; Geringer discussing his view of events and stating that "I really need to know that this is not going to be left in my corner to sort out but that Castle Arch will continue to support these until we can get out from under them"; and Child expressing his need to "know or get refreshed

---

[37] T. Exhibits 57 and 58. Geringer apparently failed to produce these declarations during discovery. Trustee's counsel represented that they only learned of them through their own investigation and through production by Baillio.

on the details" of the deals and proposing that "[i]f we can mitigate the loss we bear by waiting a little longer and paying the interest, then that is probably what we should do."[38]  Child testified only to his understanding that Castle Arch had agreed to make debt service reimbursement payments to Geringer "for a period of time."   And Cochran, although a shockingly incredible witness, testified that he never made any indemnity agreement with Geringer.[39]  Geringer offered no e-mails to which anyone responded with an acknowledgment of his version of events.

None of the other items relied upon by Geringer sufficiently illuminate the contours of the alleged agreement.    Article XIV of the Operating Agreement addresses corporate indemnification for officers and directors who are sued in that capacity, and viewed properly in that context it says nothing about a member, officer, or director's execution of a personal guaranty for the perceived benefit of the company.[40]  Similar language in Castle Arch's SEC filings is equally unhelpful.[41]  The board minutes and handwritten notes certainly demonstrate the board's ongoing discussions about the Coalinga and Firebaugh properties between 2006 and 2008,[42] but they contain only a couple of cryptic references regarding the company's position with respect to Geringer's guaranty.[43]  And the Coalinga debt service payments made by Castle Arch are Geringer's best corroborating evidence of the existence of some kind of agreement, but

---

[38] G. Exhibit 8.  Similarly, the portions of Bill Davidson's deposition transcript read into the record as well as G. Exhibits 36 and 37 create less clarity rather than more.  The admitted part of Exhibit 36 was discussed during Cochran's testimony; Exhibit 37 was not substantively discussed at all.

[39] In addition to Cochran's general demeanor on the witness stand, the content of his answers was simply unbelievable.  He allegedly either couldn't recall much of anything about his years with Castle Arch, including the Coalinga and Firebaugh transactions, or he pointedly hedged his responses.  One of the few direct answers he gave was a flat "no" when asked whether he promised that Castle Arch would indemnify Geringer, even though he had responded with "I'm not sure" when asked at his deposition whether Castle Arch agreed to indemnify Geringer and with a similar answer in earlier questioning at trial.  If Cochran was trying to draw some kind of distinction between his own alleged promise (which itself would be sufficient to bind Castle Arch) and a promise by the company as a whole, such a distinction was unstated and does not improve his credibility.

[40] G. Exhibits 23-25, § 5.5 and Article XIV.

[41] *See, e.g.*, G. Exhibit 7, p. 21 of 40 (Limitation of Rights).

[42] G. Exhibits 38-44.

[43] *See, e.g.*, Exhibit 41, pp. 2-3; Exhibit 42, p. 4.

they say little about the nature and extent of such agreement.  Was the agreement to indemnify Geringer in the full amount of both guarantees and until the underlying debt was fully satisfied? Or was the agreement only for some period of time—either a date certain or until the economics of the transactions no longer made sense—or for some particular dollar amount?  Or, again, was there simply no contract, no meeting of the minds, no agreement at all?

## B.    Rent

Castle Arch has always had its headquarters at 9595 Wilshire Boulevard in Beverly Hills, California.  Originally, Castle Arch paid Geringer some amount to use a portion of the office space that he was already subleasing for his own businesses.  Before that lease expired in 2008, Geringer approached the landlord about negotiating a new lease directly with Geringer himself. Geringer testified that he "spoke to the Castle Arch people at one of the board meetings, specifically laid out what the rent for the whole suite was before, what it was going to be after, what their allocable share would be, and there was an agreement reached that, you know, I should renew the lease, enter into a new lease, and that Castle Arch would continue with the expense reimbursement that they had done."[44]  But the record is frankly unclear as to Castle Arch's alleged share of this new obligation.  As the Trustee points out in his proposed findings and conclusions, the number has been asserted as either $10,000, $15,000, or $20,000.[45]

Geringer's support for this alleged obligation comes from his October 8, 2004 Consulting Agreement with Castle Arch and the September 12, 2007 lease itself between Geringer as tenant and CSDV as landlord.[46]   The Consulting Agreement only states that "Officer shall receive

---

[44] 2/28/13 Transcript (Geringer) at 61:2-9.

[45] Trustee's Proposed Findings and Conclusions, docket #645, ¶ 46 n. 103.  Geringer makes certain representations about Castle Arch's alleged share of the rent in his Response to Objection to Robert Geringer's Claim (docket #604, pp. 21-22), but there is no evidentiary support for these assertions referenced in the Response.

[46] G. Exhibits 26 and 77.

$2,000 per month to cover office expenses.  In addition, in accordance with Castle Arch's normal policies for expense reimbursement, Castle Arch will reimburse Officer for all reasonable and necessary expenses beyond the base office expenses, incurred by Officer in the performance of Officer's duties under this Agreement, subject to the presentment of receipts or other documentation acceptable to Castle Arch."[47]  It also expires on the "last day of [the] consulting relationship" irrespective of the basis for termination, and it requires any amendments or modifications to be in writing.[48]  Castle Arch is not a party to the 2007 lease, which sets forth the total rent in § 1.6 and contains only an oblique acknowledgment in § 13.3 that "portions of the Premises may, so long as prior written notice thereof has been delivered from Tenant to Landlord . . ., be used from time to time by entities affiliated with and/or majority owned or managed by Robert D. Geringer."  The 2007 lease has an initial five-year term.

Child also testified that, whether via the Consulting Agreement or otherwise, "we had an agreement to provide for the reimbursement of expenses" that "eventually" included some allocation of lease payments on the Beverly Hills office.  But it was never clarified whether he was speaking about the original lease, the 2007 lease, or both.  He also didn't testify as to any specific numbers or to the specific allocation method, if any, during the relevant times.  The handwritten board meeting notes from February and September 2008 mention a lease and office reimbursements, but they are both after the fact and as cryptic on the subject of Castle Arch's position regarding the office space as the notes regarding indemnification.[49]

In any event, Castle Arch did make some sporadic rent reimbursement payments of $10,000/month, but even those payments ceased after Geringer resigned from Castle Arch on

---

[47] G. Exhibit 26, § 4.02.
[48] *Id.*, §§ 2 and 6.02.
[49] G. Exhibits 42 and 43.  As with many of the provisions regarding the alleged indemnity agreement, these aspects of the board meeting minutes and notes were not specifically addressed at trial.

July 15, 2009.  After other efforts to resolve the situation with the landlord failed, Geringer

renegotiated the lease in September 2010 for a smaller space and the payment of delinquent rent

over time.  Geringer isn't requesting any amounts incurred after the lease renegotiation, and he

didn't demand any rent reimbursement from Castle Arch until he filed his proof of claim.

## C.      Wages

Finally, under the Consulting Agreement and two addenda which require all amendments

or modifications to be in writing, Castle Arch agreed to pay Geringer $25,000/month in base

salary plus certain expenses.[50]  As Castle Arch's financial situation deteriorated in 2008 and

2009, Castle Arch explored ways of cutting costs including the reduction of officer salaries.  In

January 2009, at a board meeting that Geringer didn't attend and to which he testified that he

wasn't even invited, the board purportedly adopted a new "operating budget" that contained a

chart showing a 50% reduction in Geringer's salary from $25,000 to $12,500/month.[51]   Bill

Davidson and Doug Child e-mailed each other in March 2009 about the salaries for Geringer and

his staff (although Geringer himself was not in the e-mail chain).[52]  Geringer accepted several

reduced payments of $12,500 in 2009.[53]  And Geringer did respond to Cochran's proposal to

suspend all officer salaries in May 2009 (and Geringer himself testified that he had earlier

offered to reduce his salary to $0 if everyone else did likewise), but with something much less

than a full-throated "yes".  Rather, he restated his understanding of Cochran's proposal and

requested confirmation from all others on the e-mail chain of their agreement so that "there are

no misunderstandings" and so "that it is clear that it is being applied fairly to all."[54]

---

[50] G. Exhibits 26-28.
[51] T. Exhibit 48.
[52] T. Exhibit 50.
[53] G Exhibit 16, p. 6 of 60.
[54] T. Exhibit 51.

## II. DISCUSSION

In resolving a claim objection, § 502(b)(1) of the Bankruptcy Code requires the Court to "determine the amount of such claim . . . as of the date of the filing of the petition" and to "allow such claim in such amount, except to the extent that such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." Since Geringer's properly filed and supported claim is *prima facie* evidence of its validity and amount under Federal Rule of Bankruptcy Procedure 3001(f), the "well-established burdens of proof" provide that "[t]he objecting party has the burden of going forward with evidence supporting the objection. Such evidence must be of probative force equal to that of the allegations contained in the proof of claim. However, an objection raising only legal issues is sufficient. Once the objecting party has reached this threshold, the creditor claimant has the ultimate burden of persuasion as to the validity and amount of the claim."[55] The standard of proof is a preponderance of the evidence,[56] and "this standard is met if a proposition is more likely to be true than not—the Court must ask: is there a greater than 50% likelihood that a proposition is true."[57] Even equipoise of the evidence is not enough for the party with the burden of proof to prevail.[58]

### A.    Indemnification

As a matter of fact and based on the findings above, the Court simply cannot conclude that Geringer has shown the existence of the alleged indemnity agreement, especially in the open-ended form he envisions it, as being more likely true than not. The Trustee presented

---

[55] *In re Broadband Wireless Intern. Corp.*, 295 B.R. 140, 145 (10th Cir. BAP 2003) (internal citations omitted).

[56] *In re Hopkins*, 328 B.R. 575, 585 (Bankr. D. Utah 2005).

[57] *Kim v. Keeran (In re Keeran)*, Adv. No. 09-1208-j7, 2012 WL 1196531 at *7 (Bankr. D.N.M. Apr. 6, 2012).

[58] *Cooper v. GGGR Investments, LLC*, 334 B.R. 179, 191 n. 11 (E.D. Va. 2005).

evidence of sufficient probative force to rebut the *prima facie* evidence contained in the proof of claim, and there are just too many inconsistencies between Geringer's testimony and the documentary record and too many unanswered questions regarding the material terms of the agreement to push him over his ultimate 50% threshold.  It is black-letter law in both Utah and California that "[a] condition precedent to the enforcement of any contract is that there be a meeting of the minds of the parties, which must be spelled out, either expressly or impliedly, with sufficient definiteness to be enforced."[59]  If there was any agreement at all, which itself is suspect, its terms are too ill-defined to enforce.

In the alternative, the Court also concludes that the indemnification claim must fail as a matter of law.  The Court agrees with the Trustee that Geringer's indemnity claim arose in California for all of the reasons stated in ¶ 15 of the Trustee's proposed findings and conclusions.[60]  And whether analyzing the applicable California statute of limitations directly or through Utah's borrowing statute,[61] the result is the same.

California law provides for a four-year statute of limitations for actions "upon any contract, obligation or liability founded upon an instrument in writing"[62] and a two-year statute of limitation for actions "upon a contract, obligation or liability not founded upon an instrument of writing."[63]  The e-mails, board minutes and notes, SEC filings, Operating Agreement, and payment history do not dovetail into a sufficient "writing" upon which Geringer's indemnity claim can be founded.  Most of them are well after the fact, some of them are immaterial, and none of them either separately or together spell out sufficiently detailed terms to create an

[59] *Homestead Golf Club, Inc. v. Pride Stables*, 224 F.3d 1195, 1199 (10th Cir. 2000) (Utah law); *see also Hotels Nevada v. L.A. Pacific Center, Inc.*, 203 Cal.App.4th 336, 349 (Cal. App. 2 Dist. 2012) ("California law is clear that there is no contract until there has been a meeting of the minds on *all* material points.").
[60] Docket #645.
[61] U.C.A. § 78B-2-103.
[62] Cal. Code Civ. Pro. § 337(1).
[63] Cal. Code Civ. Pro. § 339(1).

enforceable contract. As such, the alleged indemnity agreement was an oral agreement, and the
two-year statute of limitations applies. The last payment Castle Arch made was in March 2008,
and Geringer was informed that Castle Arch would make no further payments by the end of
2008.[64] Although the actual terms of the alleged agreement are unclear as discussed above, it
appears that the contract as Geringer envisions it would be considered "entire" under California
law,[65] that the accrual rule of Cal. Civ. Code § 2778(1) rather than Cal. Civ. Code § 2778(2)
would apply, and that Castle Arch's cessation of Coalinga payments and subsequent repudiation
of the alleged agreement as to both Coalinga and Firebaugh rendered the breach "total" by at
least the end of 2008 or Geringer's resignation on July 15, 2009[66]—either way, more than two
years before the October 17, 2011 petition date.[67]

## B.    Rent

As a factual matter, Geringer's rent claim suffers from deficiencies similar to the
indemnity claim. There is no written agreement explicitly requiring Castle Arch to reimburse

---

[64] 3/1/13 Transcript (Child) at 280:2-281:4 and 303:25-305:24; T. Exhibit 43, p. 9 (Suspended Project).

[65] *Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.*, 116 Cal.App.4th 1375, 1388-89 (Cal. App. 5 Dist. 2004).

[66] *Fox v. Dehn*, 42 Cal.App.3d 165, 171-72 (Cal. App. 2 Dist. 1974). It might be argued that Castle Arch's refusal to honor the alleged Firebaugh indemnity was only an anticipatory repudiation depending on when the first payment on that debt was made and not reimbursed. In his proposed findings and conclusions (docket #644, p.7 n. 5), Geringer indicates that no Firebaugh debt service payments were due until sometime after July 2009. But Geringer testified that an impound account set up to cover Firebaugh payments ran out of money in "mid-to-late 2007," and proof of claim #27-2 shows an unreimbursed payment on the Firebaugh debt as early as May 14, 2008 (G. Exhibit 16, p. 11 of 60). As such, the alleged Coalinga and Firebaugh indemnity agreements appear to be indistinguishable in terms of when their breaches became "total".

[67] In closing arguments, the Trustee raised for the first time the argument that the Statute of Frauds might bar the indemnity claim because it could not be performed within one year. Not only was this argument not pursued in the Trustee's proposed findings and conclusions, but it hasn't been shown that the agreement was incapable of being performed within one year. The Trustee also unhelpfully raised an argument for the first time in his proposed findings and conclusions that the indemnity claim should be disallowed because it was procured by Geringer's fraud. The trial presentations were not directed to the elements of this allegation, the evidence actually adduced at trial does not support the theory, and Geringer had no chance to respond to the argument given its late emergence and the simultaneous submission of proposed findings and conclusions. The argument is accordingly rejected.

Geringer for any amount on the Beverly Hills lease, and the record is otherwise unclear at best as to whether and to what extent Castle Arch orally agreed to reimburse Geringer.  On this basis alone, the Court concludes that, as with the indemnification claim, there was no "meeting of the minds of the parties, which must be spelled out, either expressly or impliedly, with sufficient definiteness to be enforced."

The rent claim also fails as a matter of law under both the Statute of Frauds and statute of limitations.  The Consulting Agreement speaks only generally about reasonable and necessary expense reimbursement in accordance with "normal policies" and "subject to the presentment of receipts or other documentation acceptable to Castle Arch," and the 2007 lease itself provides no evidence of an obligation by Castle Arch as to any part of the leased space.  Again, it is difficult to determine given the hazy nature of the alleged agreement, but it appears that the agreement as envisioned by Geringer "is not to be performed within" one year of its making and thus would be barred by either the Utah or California Statute of Frauds.[68]  Alternatively, Castle Arch breached the agreement no later than July 2009, which was more than two years before the October 17, 2011 petition date.[69]

Despite this, the Trustee concedes a rent claim of $45,000 representing 4-1/2 months of rent at $10,000/month during the period ending with Geringer's resignation from Castle Arch on July 15, 2009.  Without challenge and solely in light of the Trustee's concession, the Court will allow Geringer a $45,000 claim for back rent.

---

[68] U.C.A. § 25-5-4(1)(a); Cal. Civ. Code § 1624(a)(1).

[69] For the reasons stated in ¶ 110 of the Trustee's proposed findings and conclusions (docket #645), the Court agrees that the California statute of limitations applies.  And since the alleged agreement was oral and "not founded upon an instrument of writing," Cal. Civ. Code § 339(1) provides a two-year limitations period.

### C.      Wages

As for Geringer's claim for back wages and non-rent expense reimbursement, what's sauce for the goose is sauce for the gander.   Although Geringer's Consulting Agreement explicitly requires any amendments or modifications to be in writing and signed by both Castle Arch and Geringer, the Trustee tries to show that Geringer agreed to accept a reduced salary by means similar to Geringer's use of e-mails and payments to support his indemnification claim. In particular and among other things, the Trustee offers minutes from a board meeting that Geringer didn't attend, an e-mail chain to which Geringer wasn't a party, his acceptance of some $12,500 payments, and his failure to "affirmatively refuse to reduce his salary."  This attempt at alchemy must fail.   Whether viewed as the Trustee's failure to present sufficiently probative evidence to challenge the *prima facie* evidence contained in the proof of claim, or viewed as Geringer's successful maintenance of his ultimate burden of proof in response to the Trustee's challenge, the Court must conclude on this record that it is more likely true than not that Geringer did <u>not</u> agree to reduce his salary.  Accordingly, his claim for back wages and non-rent expense reimbursement will be allowed as filed.

### D.      Prepetition Interest

Given that the Court is disallowing the indemnification claim and is allowing any amount of the rent claim based solely on the Trustee's concession, the only issue before the Court is whether Geringer's allowed wage claim should be augmented by prepetition interest. The Trustee argues that prepetition interest "would be inequitable given that Geringer waited years to assert claims against [Castle Arch], a 10% interest rate is a windfall in today's economy, and Geringer received hundreds of thousands of dollars of investor money during all relevant periods for use in an enterprise that did not comport with what was represented to creditors and investors

in a case where there is a possibility that investors will receive little, if any, return on their investment."[70]

The Court concurs with Geringer that the assertion of prejudgment interest on his claim implicates substantive state law.  Unlike the cases cited by the Trustee in his objection to Geringer's claim that address use of the federal postjudgment interest rate for determining prejudgment interest on Bankruptcy Code causes of action,[71] the propriety of prejudgment interest here is an aspect of Geringer's underlying contract damages for Castle Arch's failure to pay his salary and reimburse his non-rent expenses under the Consulting Agreement.  Although there is a question as to whether Utah or California law governs in this situation, both Utah and California law provide for a 10% interest rate in the absence of a different rate agreed upon by the contracting parties.[72]

The Court finds no undue delay in Geringer's assertion of his wage and non-rent expense reimbursement claims, which are based on the written Consulting Agreement and which were still viable on the petition date.  The Trustee's allegations about Geringer's compensation during his tenure with Castle Arch, the nature of the business operations, and the possible return to investors were generally not addressed at this claim objection trial, and speculation about those matters cannot be a basis for denying prepetition interest on Geringer's claim.  And 10% is obviously much higher than the current federal postjudgment interest rate, but it is the rate

---

[70] Trustee's Proposed Findings and Conclusions, docket #645, ¶ 43 n. 99.  The Trustee also argues, without much development, that no interest should be awarded because the Consulting Agreement does not provide for interest and that any interest award should be limited to the current federal postjudgment interest rate.

[71] Objection to Amended Proof of Claim No. 27-2 (Robert Geringer) Filed Against Castle Arch Real Estate Investment Company, LLC, docket #585, ¶ 105 n. 94.

[72] *See* U.C.A. § 15-1-1(2); Cal. Civ. Code § 3289(b); *Anderson v. Doms*, 75 P.3d 925, 932 (Utah App. 2003) ("A prejudgment interest award is proper when the damage is complete, the loss can be measured by the facts and figures, and the amount of loss is fixed as of a particular time."); *Dacey v. Taraday*, 196 Cal.App.4th 962, 988 (Cal. App. 1 Dist. 2011) (affirming award of 10% prejudgment interest on judgment based on a contract with no interest clause).

provided by Utah and California statute and is not unreasonably high under the circumstances in any event.  Moreover, the damage is complete, the loss is easily calculated and is fixed as of a particular time, the award of interest would serve to compensate Geringer for his loss, and the equities of the matter do not demand otherwise.

### III. CONCLUSION

Mr. Geringer may have gotten thoroughly taken on these deals.  He may have simply given the transactions insufficient thought or attention at the time.  Or there may have been no deals at all, at least not whose terms can be defined with any degree of certainty on this record.  But it's his ultimate burden to prove the properly challenged aspects of his claim by a preponderance of the evidence, which he has largely failed to do as both a matter of fact and a matter of law for the reasons set forth above.  Accordingly, except for the Trustee's conceded amount of $45,000 on the rent claim and Geringer's full asserted amount of $198,146.13 on the wage and non-rent expense claim (consisting of $181,667 for back wages and $16,479.13 for expense reimbursement inclusive of prepetition interest), proof of claim #27-2 is disallowed.  A separate Order will be issued in accordance with this Memorandum Decision.

-------------------------------------------END OF DOCUMENT-------------------------------------------

_____oooOooo_____

## SERVICE LIST

Service of the foregoing **MEMORANDUM DECISION** will be effected through the Bankruptcy Noticing Center to each party listed below.

Peggy Hunt
Chris Martinez
DORSEY & WHITNEY LLP
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
          *Counsel for Chapter 11 Trustee*

George B. Hofmann
Victor P. Copeland
PARSONS KINGHORN HARRIS, P.C.
111 E. Broadway, 11th Floor
Salt Lake City, UT  84111
          *Counsel for Robert D. Geringer*