Peggy Hunt (Utah State Bar No. 6060)
Nathan S. Seim (Utah State Bar No. 12654)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Email: hunt.peggy@dorsey.com
         seim.nathan@dorsey.com

*Attorneys for D. Ray Strong, Liquidating Trustee of the*
*Consolidated Legacy Debtors Liquidating Trust*

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>CASTLE ARCH REAL ESTATE INVESTMENT COMPANY, LLC; CAOP MANAGERS, LLC; CASTLE ARCH KINGMAN, LLC; CASTLE ARCH SECURED DEVELOPMENT FUND, LLC; CASTLE ARCH SMYRNA, LLC; CASTLE ARCH STAR VALLEY, LLC; *and*<br><br>CASTLE ARCH OPPORTUNITY PARTNERS I, LLC; CASTLE ARCH OPPORTUNITY PARTNERS II, LLC,<br><br>        Debtors. | Case Nos. 11-35082, 11-35237, 11-35243, 11-35242 and 11-35246 (Substantively Consolidated)<br><br>Case Nos. 11-35241 and 11-35240 (Jointly Administered)<br><br>(Chapter 11)<br>The Honorable Joel T. Marker<br><br>☐ Affects All Debtors<br>☒ Affects Only the Substantively Consolidated Debtors<br>☐ Affects only Castle Arch Opportunity Partners I, LLC<br>☐ Affects only Castle Arch Opportunity Partners II, LLC |

---

**TRUSTEE'S MOTION SEEKING AUTHORIZATION AND APPROVAL OF (1) SALE OF PROPERTY, INCLUDING AND RELATING TO REAL PROPERTY LOCATED IN MOHAVE COUNTY, ARIZONA, OUT OF THE ORDINARY COURSE OF BUSINESS, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, AND SUBJECT TO HIGHER AND BETTER OFFERS, PURSUANT TO
11 U.S.C. § 363(b) AND (f) AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002 AND 6004; (2) PROPOSED SALE PROCEDURES; AND (3) PAYMENT OF COSTS OF SALE, INCLUDING COMMISSION TO REAL ESTATE BROKER**

---

Pursuant to 11 U.S.C. § 363(b) and (f), as well as Rules 2002 and 6004 of the Federal

Rules of Bankruptcy Procedure, D. Ray Strong (the "Trustee"), as the duly appointed Liquidating

Trustee of the Consolidated Legacy Debtors Liquidating Trust (the "Legacy Trust") and the

Chapter 11 Trustee and post-confirmation estate representative for the consolidated bankruptcy

estates of Castle Arch Real Estate Investment Company, LLC ("CAREIC"), CAOP Managers,

LLC, Castle Arch Kingman, LLC, Castle Arch Smyrna, LLC, Castle Arch Secured Development

Fund, LLC and Castle Arch Star Valley, LLC ("CASV") (collectively, the "Legacy Debtors"),

by and through his undersigned counsel, moves this Court for entry of an Order authorizing and

approving: (1) the sale of certain property, including and related to real property located in

Mohave County, Arizona, with such sale being made out of the ordinary course of business, free

and clear of liens, claims, encumbrances and interests, and subject to higher and better offers,

with valid interests, if any, attaching to the net sale proceeds of the sale; (2) the proposed sale

procedures set forth herein; and (3) the Trustee's payment of the actual and necessary costs of

sale from the gross sale proceeds, including any outstanding taxes and the real estate commission

as described below.

This Motion is supported by the *Declaration of D. Ray Strong* (the "Strong Declaration"),

the *Declaration of Dell S. Nichols* (the "Nichols Declaration") and the *Declaration of Thomas A.

McKenna* (the "Buyer's Declaration"), filed concurrently herewith.  In further support hereof, the

Trustee states as follows:

**JURISDICTION AND VENUE**

1.      On October 17, 2011, CAREIC filed a petition for relief under Chapter 11 of the

Bankruptcy Code, and on October 20, 2011, the other Legacy Debtors, other than CASV, also

filed petitions seeking relief under Chapter 11 of the Bankruptcy Code.

2.      The Court has subject matter jurisdiction of this proceeding pursuant to 28 U.S.C.

§§ 157 and 1334.

3.      On June 7, 2013, the Bankruptcy Court entered an *Order Confirming Chapter 11*

*Trustee's First Amended Plan of Liquidation Dated February 25, 2013 as Modified* [Docket No.

705] (the "Confirmation Order"), thus confirming the *Second Amended Chapter 11 Trustee's*

*Plan of Liquidation Dated February 25, 2013* [Docket No. 701] (the "Confirmed Plan"),

pursuant to which the Court retains jurisdiction over this proceeding, which arises under the

Bankruptcy Code and arises in and is related to the above-captioned bankruptcy cases.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

**BACKGROUND**

*Case Background and the Kingman Property*

5.      On May 3, 2012, the Court entered an Order appointing the Trustee as the Chapter

11 bankruptcy Trustee for CAREIC [Docket No. 215], and in that capacity he managed each of

the other Legacy Debtors.

6.      On February 8, 2013, the Court entered an Order substantively consolidating the

Legacy Debtors [Docket No. 590].

7.      On June 7, 2013, the Court entered the Confirmation Order which, among other

things: (a) designated the Trustee as the post-confirmation estate representative for the Legacy

Debtors; (b) approved the Liquidating Trust Agreement for the Legacy Trust; (c) appointed the

Trustee as the Liquidating Trustee for the Legacy Trust; and (d) authorized the Trustee to

administer the Legacy Debtors' post-confirmation estates pursuant to the Confirmed Plan.

8.     Property of the Legacy Debtors and Legacy Trust includes certain real property

located in Mohave County, Arizona, including interests related to such land, which is referred to

in the Legacy Debtors' consolidated case as the "Kingman Property."  Upon the Effective Date of

the Confirmed Plan, the Kingman Property, including all interests related thereto, were

transferred to the Legacy Trust to be administered by the Trustee.

9.     By this Motion, the Trustee seeks to sell a portion of the Kingman Property

comprising approximately 236.57 acres, as more fully described in the *Real Estate Purchase and

Sale Agreement*, attached hereto as Exhibit A (the "Purchase Agreement"), to UNS Electric, Inc.

or an appropriate assignee thereof (the "Buyer"), or to the person making the highest and best

offer.  A full description of the portion of the Kingman Property and related interests being sold

under the Purchase Agreement is set forth in Section 2 of the Purchase Agreement and is referred

to in this Motion as the "Property."  The description of the transaction provided in this Motion is

qualified by the more detailed provisions of the transaction set forth in the Purchase Agreement,

the terms of which control in the event of any conflict between the two.

*Marketing of the Property*

10.     On or about June 19, 2012, the Trustee caused to be filed his *Application of D.*

*Ray Strong, Chapter 11 Trustee of Castle Arch Real Estate Investment Company, LLC, for Entry*

*of an Order Authorizing the Employment of Commerce Real Estate Solutions as Real Estate*

*Broker* [Docket No. 252] ("Employment Application"), and on July 26, 2012, the Court entered

-4-

an *Order* approving the Employment Application and authorizing the Trustee's employment of

Commerce Real Estate Solutions ("Commerce") as real estate broker to sell the Property

pursuant to the terms of the Listing Agreement referenced therein [Docket No. 276].

11.    Commerce, principally through broker Dell S. Nichols ("Nichols"), marketed the

Kingman Property for sale since June 29, 2012.[1]  In approximately November 2013, after entry

of the Confirmation Order, Nichols left Commerce and formed his own firm, Dell Nichols Realty

& Development, LLC ("Nichols Realty").[2]  In February of 2014, the Trustee, as the Trustee of

the Legacy Trust, entered into a new Listing Agreement with Nichols Realty for the sale of the

Property, which was retroactive to December 3, 2013, a copy of which is attached hereto as

Exhibit B.[3]

12.    Pursuant to the Listing Agreement, the Trustee has agreed to pay Nichols Realty a

standard commission of no more than 6% of the Property's gross sales price, which Nichols

Realty will share with any agent representing a purchaser.[4]  The terms of this Listing Agreement

are materially similar to those of the Listing Agreement that was previously disclosed as part of

the Employment Application, except that Nichols Realty, not Commerce, is now employed and

will be paid a commission upon the sale of the Property.[5]  The Trustee understands that the

Legacy Trust has no further obligations to Commerce.[6]

---

[1]    Nichols Declaration ¶ 3.

[2]    *Id.* ¶ 2.

[3]    Strong Declaration ¶ 4; Nichols Declaration ¶ 4.

[4]    *See* Exhibit B.

[5]    Strong Declaration ¶ 4; Nichols Declaration ¶ 4.

[6]    Strong Declaration ¶ 4; Nichols Declaration ¶ 4.

13.     Since June 29, 2012, Commerce, and then Nichols Realty, has continuously and actively marketed the Kingman Property for sale pursuant to industry standards, including by: (a) creating marketing flyers and postcards; (b) HTML email broadcasts; (c) posting on national real estate website; (d) launching campaigns to real estate brokers and national home builders; (e) engaging the regional economic development community; (f) soliciting targeted category buyers; and (g) otherwise promoting the Property's availability to the national marketplace.[7]

14.     Other than the current offer received from the Buyer, the Trustee has received offers from Lingenfelter Investments, Ltd. and Greenstone AZ Land I, LLC, but the Trustee has not accepted the offers from these entities.[8]

15.     Nichols Realty has continued to market the Property for sale since receiving the offer from the Buyer, and will continue to do so through the Higher and Better Bid Deadline (defined below) by: (a) providing notice of the proposed sale to any parties who have expressed an interest in the Property; (b) posting on national real estate websites; and (c) soliciting national and regional homebuilders, large tract land owners in surrounding areas, and local real estate brokerage companies.[9]

*The Purchase Agreement*

16.     On January 28, 2015, the Trustee, as Liquidating Trustee of the Legacy Trust, entered into the Purchase Agreement with the Buyer, a copy of which is attached hereto as Exhibit A.[10]

---

[7]   Nichols Declaration ¶ 5.

[8]   *Id.* ¶ 6; Strong Declaration ¶ 5.

[9]   Nichols Declaration ¶ 7.

[10]   Strong Declaration ¶ 6; Buyer's Declaration ¶ 3.

17.     While the Purchase Agreement must be reviewed to obtain full disclosure of all

its material terms, the following is a summary of the terms most relevant to this Motion, with

capitalized terms being defined in the Purchase Agreement:

(a)     The purchase price for the Property will be $413,058.00 (the "Purchase Price"), which is not subject to any survey of the Property.[11]

(b)     The Buyer will make a Deposit in the amount of $25,000.00 upon the Opening of Escrow.[12]

(c)     The Deposit will be applied to the Purchase Price, and the Purchase Price will be paid in cash at Closing.[13]

(d)     From January 28, 2015 until the later of (i) ninety (90) days after entry of the Sale Order, and (ii) June 1, 2015 (the later of such duration being called the "Due Diligence Period"), the Buyer may conduct such studies and investigations of the Property as it deems desirable.[14]

(e)     At any time prior to the termination of the Due Diligence Period, Buyer may, in its sole discretion, terminate the Purchase Agreement for any reason, in which event the Deposit will be returned to Buyer, and Buyer will compensate the estate for its costs in bringing this Sale Motion up to $10,000.00.[15]

(f)     If the Buyer has not terminated the Purchase Agreement prior to the end of the Due Diligence Period, the Deposit is non-refundable (provided that no higher and better offer is accepted by the Trustee), and Closing of the sale will occur within thirty (30) days following the later of (i) the expiration of the Due Diligence Period; and (ii) entry of the Sale Order.[16]

(g)     The sale is subject to approval by the Court, and the sale is subject to higher and better offers, to be determined by the Trustee, in his sole discretion, at any time prior to the date set forth in the Notice of this Motion.  If the Trustee receives a

---

[11]   Exhibit A (Purchase Agreement, p. 1).

[12]   *Id.*, p. 2, §§ 3.2 and 4.2.

[13]   *Id.*, § 4.2.

[14]   *Id.*, p. 2, §§ 5.2 and 5.3.

[15]   *Id.*, §§ 5.1 and 13.2.

[16]   *Id.*, p. 2 and § 5.1.

higher and better offer and sells the Property to another party, then the Deposit will be refunded to Buyer.[17]

(h)  The Property is being sold free and clear of Financial Encumbrances pursuant to 11 U.S.C. §§ 363(b) and (f).[18]

(i)  The sale is "AS IS" and "WHERE IS," subject to the very limited representations and warranties set forth in the Purchase Agreement.[19]

18.  In his business judgment, the Trustee believes that the sale of the Property as set forth in the Purchase Agreement is fair, reasonable, and in the best interests of the Legacy Trust and its beneficiaries.[20]

*Proposed Sale Procedures*

19.  The sale of the Property is subject to higher and better offers.

20.  The Trustee will consider all written offers for the purchase of the Property prior to the expiration of the deadline set forth in the Notice of Hearing filed concurrently herewith (the "Higher and Better Bid Deadline").[21]

21.  Whether an offer is a higher and better offer will be determined by the Trustee in his sole discretion.[22]

22.  A "Qualified Bid" will only be one which is in writing, submitted prior to the Higher and Better Bid Deadline, and which is accompanied by a cash deposit in the amount of $25,000.00 and evidence of ability to perform.  In the event that a Qualified Bid is determined to be the highest and best offer, the $25,000.00 will be applied to the purchase price.  In the event

---

[17]  *Id.*, p. 2, §§ 6.5 and 6.6.

[18]  *Id.*, § 5.3(d).

[19]  *Id.*, p. 2 and § 6.

[20]  Strong Declaration ¶ 7.

[21]  *Id.* ¶ 8.

[22]  *Id.*

that a Qualified Bid is determined not to be the highest and best offer, the $25,000.00 will be returned to the person submitting the Qualified Bid.[23]

23.     In the event that Qualified Bids are submitted, the Trustee will provide copies of the Qualified Bids to the Buyer and all other persons submitting Qualified Bids.[24]

24.     If the Trustee determines that it is appropriate, the Trustee may conduct an auction prior to the date of the hearing on the Motion, inviting the Buyer and all those who have submitted Qualified Bids to participate.[25]

25.     Whether an offer is a higher and better offer, regardless of his decision to conduct an auction, will be determined by the Trustee in his sole discretion.

26.     Upon closing of the sale, whether to the Buyer or to a person who has submitted a Qualified Bid that is determined to be a higher and better offer, the Trustee will file a Notice of Sale with the Court that provides information typically required under Federal Rule of Bankruptcy Procedure 6004(f).[26]

27.     In the event that a higher and better offer is received and accepted for the sale of the Property, approval of the sale to the Buyer herein will be deemed to be approval of the sale to the person submitting the higher and better offer, with the Notice of Sale providing an itemization of amounts obtained by the Legacy Trust, as well as all refunds to the Buyer under § 6.6 of the Purchase Agreement.

---

[23]    *Id.*

[24]    *Id.*

[25]    *Id.*

[26]    *Id.* ¶ 9.

*Interests in the Property*

28.    A preliminary title commitment was obtained for the Property in connection with the sale contemplated herein, a true and correct copy of which is attached hereto as Exhibit C (the "Preliminary Title Commitment"), of which Buyer has received a copy.[27]

29.    The Trustee is providing notice of this Motion to all persons and entities listed on the Preliminary Title Commitment whose interests in the Property may be affected by any Order granting this Motion pursuant to 11 U.S.C. § 363(b) and (f).[28]

**RELIEF REQUESTED**

30.    By this Motion, the Trustee seeks entry of an Order authorizing: (a) the sale of the Property pursuant to the Purchase Agreement out of the ordinary course of business, free and clear of interests, and subject to higher and better offers, with valid liens, claims, encumbrances and interests in the Property, if any, attaching to the proceeds of the sale, after the deduction of the costs of sale, including Nichols Realty's commission, outstanding property taxes and assessments, and any costs that the Legacy Trust or the Legacy Debtors have incurred in relation to the Property and the sale thereof (the "Net Sale Proceeds"); (b) the sale procedures noted in ¶¶ 19–27 above; and (c) the payment of actual and necessary costs of sale from the gross sale proceeds, including the real estate commission to Nichols Realty pursuant to the Listing Agreement and the Seller's share of closing costs as agreed to in the Purchase Agreement.

31.    In addition to authorizing the sale of the Property as set forth above, Section 6.7 of the Purchase Agreement expressly requires that the Sale Order will include: (a) a finding that

---

[27]    *Id.* ¶ 10; Buyer Declaration ¶ 4.

[28]    Strong Declaration ¶ 11.

the notice and opportunity for hearing on this Motion was appropriate and sufficient; (b) the

Property will be transferred to Buyer free and clear of Financial Encumbrances, but specifically

excluding Permitted Encumbrances; (c) a finding that the Buyer is purchasing the Property in

good faith pursuant to 11 U.S.C. § 363(m); (d) a finding that the sale is not avoidable under 11

U.S.C. § 363(n); (e) a finding that the Sale Order will be immediately effective and enforceable

upon entry, and its provisions will be self-executing, subject to any stay imposed by Federal Rule

of Bankruptcy Procedure 6004(h);  and (f) the Court will retain jurisdiction to enforce the

Purchase Agreement in all respects.

32.    For the reasons set forth below, the relief sought herein is appropriate, and the

Motion should be granted.

**A.    The Proposed Sale of the Property Should be Authorized Under 11 U.S.C. § 363(b) and (m), and the Sale Is Not a Sale to Which 11 U.S.C. § 363(n) Applies**

33.    11 U.S.C. § 363(b)(1) provides: "The trustee, after notice and a hearing, may use,

sell, lease, other than in the ordinary course of business, property of the estate[.]"

34.    In order to approve a sale of assets outside the ordinary course of business, the

Trustee must show that:

    a.    a sound business reason exists for the sale;

    b.    there has been adequate and reasonable notice to interested parties, including full disclosure of sale terms and any relationship with the buyer;

    c.    the sale price is fair and reasonable; and

    d.    the proposed buyer is proceeding in good faith.[29]

---

[29]    *See In re Medical Software Solutions*, 286 B.R. 431, 439–40 (Bankr. D. Utah 2002).

35.     The Trustee has met all four parts of this test and, accordingly, he respectfully requests that the Court grant this Motion, thereby entering an Order authorizing: (a) the proposed free and clear sale of the Property to Buyer, as set forth in the Purchase Agreement, or to any person making a higher and better offer; and (b) the Trustee to pay taxes and costs of sale from the gross sale proceeds, subject to 11 U.S.C. § 363(b).  As part of this determination, the Trustee also requests the Court to order that the sale of the Property is made upon appropriate notice, is proper under 11 U.S.C. § 363(m), and is not a sale to which 11 U.S.C. § 363(n) applies.

### *Sound Business Purpose*

36.     Courts show great deference to a trustee's decision-making.[30]  Once a trustee articulates a valid business judgment for a sale, "a presumption of reasonableness attaches to a trustee's management decisions."[31]

37.     In his business judgment, the Trustee believes that the sale of the Property under the Purchase Agreement is fair, reasonable and will maximize the value of the Property, minimize the costs to the Legacy Trust, and produce a good-faith purchaser.  The Trustee's opinion is based on several factors, including but not limited to the following:

        a.      the length of time the Property has been marketed for sale;

        b.      the advice of Nichols and those acting under his direction, who have extensive experience in selling real estate similar to the Property at issue;

        c.      the extensive and arm's-length nature of the negotiations related to the terms of the Purchase Agreement that were engaged in by the parties;

---

[30]    *See Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981).

[31]    *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986).

       d.      the cash nature of the sale and the Buyer's representations that it has the financial ability to pay the Purchase Price at Closing, which has been verified; and

       e.      the ability of the Trustee under the Purchase Agreement to accept higher and better offers for the Property.[32]

<u>*Notice of the Proposed Sale and Higher and Better Offers*</u>

38.     Adequate and reasonable notice of this Motion and the proposed sale of the Property will be made to interested parties.

39.     Concurrent with the filing of this Motion, the Trustee will serve a Notice of Hearing upon all creditors and parties-in-interest in the above-captioned bankruptcy case and all parties whose interests might be affected by the sale contemplated herein, which Notice will provide, among other things: (a) a general description of the Property; (b) the price that is offered by the Buyer; (c) a statement that the Trustee will accept higher and better offers for the Property, as well as the procedures for submitting a higher and better offer prior to expiration of the Higher and Better Bid Deadline; (d) procedures and the deadline for objecting to the sale of the Property; and (e) the date and time of any hearing on this Motion, to the extent any party objects to this Motion or a higher and better offer is received prior to the expiration of the Higher and Better Bid Deadline.[33]

---

[32] Strong Declaration ¶ 12; Nichols Declaration ¶ 10.

[33] Strong Declaration ¶ 13.

40.    The Trustee will also post a copy of this Motion on his website,[34] and Nichols Realty will provide notice of the proposed sale to any parties who have expressed an interest in the Property.[35]

41.    As set forth in ¶ 15 above, Nichols Realty will continue to market the Property for sale through the Higher and Better Bid Deadline,[36] and the Trustee will consider competing offers for the Property prior to the expiration of the Higher and Better Bid Deadline.[37]

42.    Whether an offer is higher and better will be determined by the Trustee in his sole and absolute discretion, and to the extent the Trustee receives a competing offer for the Property prior to the Higher and Better Bid Deadline that he considers higher and better, the Trustee will provide notice to the Buyer of the higher and better offer.[38]

43.    Such procedures are fair, reasonable and afford notice as required under 11 U.S.C. § 363 and Federal Rules of Bankruptcy Procedure 2002 and 6004.

### *Fair and Reasonable Price*

44.    For the reasons set forth in ¶ 37 above, as well as the fact that the Trustee can accept higher and better offers for the Property prior to the expiration of the Higher and Better Bid Deadline, the Trustee respectfully submits that the proposed sale price for the Property is fair and reasonable.[39]

---

[34]   *Id.* ¶ 14.

[35]   Nichols Declaration ¶ 8.

[36]   *Id.* ¶ 7.

[37]   Strong Declaration ¶ 8.

[38]   *Id.*

[39]   *Id.* ¶ 15.

*Good Faith Purchaser*

45.     The parties' negotiation of the Purchase Agreement has been at arms' length and in good faith.  The parties agree that all acts culminating in the Closing of the Purchase Agreement will likewise be negotiated and conducted through arms' length transactions and in good faith.[40]

46.     Although the Bankruptcy Code does not define "good faith," the Tenth Circuit has determined in the context of 11 U.S.C. § 363(m) that a "good faith" purchaser is "one that buys in good faith, and for value."[41]  Actions that destroy a purchaser's good faith include "fraud, collusion between the purchaser and other bidders or trustee, or an attempt to take grossly unfair advantage of other bidders."[42]

47.     Here, the good faith standard has been met because the Property is being purchased by the Buyer in good faith and for fair value as part of a transparent process that affords all parties in interest and potential purchasers the opportunity to make a higher and better offer for the purchase of the Property.  Additionally, the Buyer is an independent third party that has no connections to the Trustee, the Debtors or the Trusts, and there has been no fraud or collusion between the Buyer and the Trustee.[43]

48.     Specifically, the Property has been publicly marketed by Commerce and Nichols Realty pursuant to industry standards since June 29, 2012.[44]  Since the Buyer first expressed an interest in purchasing the Property, the parties entered into good-faith negotiations relating to the

---

[40]    *Id.* ¶ 16; Nichols Declaration ¶ 9; Buyer's Declaration ¶ 5.

[41]    *Tompkins v. Frey (In re Bel Air Assocs., Ltd.)*, 706 F.2d 301, 304 (10th Cir. 1983).

[42]    *Id.* at 305 n.11 (citation omitted); s*ee also In re Lotspeich*, 328 B.R. 209 (10th Cir. BAP 2005).

[43]    Strong Declaration ¶ 17; Nichols Declaration ¶ 12; Buyer's Declaration ¶ 6.

[44]    Nichols Declaration ¶ 5.

terms of the Purchase Agreement.[45]  As a result of such negotiations, as well as other factors

discussed in ¶ 37 above, the Purchase Price represents a fair and reasonable value for the

Property.  Finally, the material terms of the sale are being fully disclosed to the Court and parties

in interest, and to the extent any party submits a higher and better offer for the Property prior to

the expiration of the Higher and Better Bid Deadline, the Trustee is able to accept such offer.[46]

Accordingly, the Trustee submits that the proposed sale is an arm's length transaction made to a

good faith purchaser and requests that any order authorizing this sale so provide.[47]

49.      To the best of the Trustee's knowledge and belief, and based on the

representations of the Buyer, there are no circumstances giving rise to claims under 11 U.S.C.

§ 363(n).[48]

50.      Accordingly, the Trustee requests that the Court enter an Order granting this

Motion, with any Order: (a) approving the sale under 11 U.S.C. § 363(b) and (m); (b) finding

that 11 U.S.C. § 363(n) does not apply; and (c) finding that notice of the Motion has been proper.

**B.      The Sale of the Property Free and Clear of the Financial Encumbrances Pursuant to
11 U.S.C. § 363(f) Is Warranted**

51.      11 U.S.C. § 363(f) states that a trustee may sell estate property free and clear of

interests, if:

(1)      applicable non-bankruptcy law permits the sale of such
property free and clear of such interest;

(2)      such entity consents;

---

[45]   Strong Declaration ¶ 16; Buyer's Declaration ¶ 7; Nichols Declaration ¶ 9.

[46]   *See* Exhibit A (Purchase Agreement, § 6.5).

[47]   Strong Declaration ¶ 16.

[48]   *Id.* ¶ 17; Nichols Declaration ¶ 13; *see* Buyer's Declaration ¶ 8.

       (3)        such interest is a lien and the price at which such property
is to be sold is greater than the aggregate value of all liens
on such property;

       (4)        such interest is in bona fide dispute; or

       (5)        such entity could be compelled, in a legal or equitable
proceeding, to accept a money satisfaction of such interest.

52.      Because Section 363(f) is in the disjunctive, the satisfaction of any one of the alternative requirements enumerated therein will warrant the Trustee's proposed sale of the Property free and clear of interests.

53.      Pursuant to § 5.3(d) of the Purchase Agreement, the Trustee is seeking to sell the Property free and clear of any financial liens, security interests, mortgages, deeds of trust, and other financial encumbrances, any judgment liens, any accrued and unpaid taxes and assessments constituting a lien (or which may lead to the imposition of a lien) which is due and payable as of the Close of Escrow in connection with the Property, and any mechanics' or materialmen's liens (collectively, the "Financial Encumbrances").

54.      Other than taxes that will be paid from the sale proceeds of the Property at Closing, the Trustee knows of no other valid Financial Encumbrances on the Property.  To the extent any such interests are asserted as being valid, such interests are adequately protected because they will attach to the Net Sale Proceeds.[49]

55.      Accordingly, the Trustee requests that the Court grant this Motion, including by authorizing the sale of the Property free and clear of the Financial Encumbrances pursuant to 11 U.S.C. § 363(f), with any interest that might be asserted in the Property attaching to the Net Sale

---

[49]    Strong Declaration ¶ 19.

Proceeds, subject to any claims and defenses that the Trustee, Legacy Trust or Legacy Debtors possess with respect thereto.

**C.      The Proposed Sale Procedures Are Appropriate**

56.      The proposed sale procedures set forth in ¶¶ 19–27 above are designed to obtain the highest and best offer for the Property.

57.      The Trustee submits that the procedures are appropriate and should be approved.

**D.      The Trustee's Payment of Real Estate Commissions and Customary Closing Costs Is Appropriate**

58.      The Trustee believes that the employment of Commerce and subsequently Nichols Realty to list and sell the Property was in the best interests of all parties in interest. Nichols Realty's services were an important and necessary component in obtaining the proposed terms for the sale of the Property.[50]

59.      Nichols Realty has informed the Trustee that it does not have any connection with the Buyer, the Trustee, the United States Trustee, the Debtors, their creditors, or any party in interest or their professionals, which have not been previously disclosed to the Court.[51]

60.      The Trustee believes that the payment of sales commission to Nichols Realty under the Listing Agreement is proper and requests any Order granting this Motion so provide.

61.      The Trustee may also be required to pay property taxes and customary closing costs in relation to the sale and requests that any Order granting this Motion authorize such costs.

---

[50]    *Id.* ¶ 20.

[51]    *Id.* ¶ 21; Nichols Declaration ¶ 14.

## <u>CONCLUSION</u>

WHEREFORE, the Trustee respectfully requests that the Court enter an Order granting

this Motion as set forth herein.

DATED this 19th day of February, 2015.

**DORSEY & WHITNEY LLP**

___*/s/ Peggy Hunt*_____
Peggy Hunt
Nathan S. Seim
*Attorneys for D. Ray Strong, Trustee*

# EXHIBIT A

## REAL ESTATE PURCHASE AND SALE AGREEMENT

### CASTLE ARCH
### 236.57 ACRES MOHAVE COUNTY, ARIZONA

This REAL ESTATE PURCHASE AND SALE AGREEMENT (this "*Agreement*") is made and entered into as of _JANUARY 28_, 2015 (the "*Effective Date*"), by and between UNS Electric, Inc., an Arizona corporation (the "*Buyer*") and **The Liquidating Trust of the Consolidated Legacy Debtors Dated July 22, 2013,** as a successor in interest to Castle Arch Real Estate Investment Company, LLC and Castle Arch Kingman, LLC (the "*Seller*") (each a "*Party*", collectively, the "*Parties*"). Capitalized terms used in the Agreement shall have the meanings given to them in the Summary of Terms or in the Standard Terms and Conditions.  This Agreement consists of the Summary of Terms, the Standard Terms and Conditions, and all Exhibits attached hereto (each of which are incorporated herein by reference).

### SUMMARY OF TERMS

| | |
|---|---|
| **BUYER:** | UNS Electric, Inc.<br>88 E. Broadway Blvd.<br>Tucson, AZ 85701<br>Attn: Amy Welander, Esq.<br>Phone: 520 884 3655<br>Fax: 520 545 1477<br>Email: awelander@tep.com |
| **SELLER :** | The Liquidating Trust of the Consolidated Legacy Debtors Dated July 22, 2013 (the "*Legacy Trust*") in the Debtors' Chapter 11 case, styled as *In re Castle Arch Real Estate Development Company, LLC,* Case No. 11-35082 (the "*Bankruptcy Case*"), filed in the United States Bankruptcy Court for the District of Utah (the "*Bankruptcy Court*")<br>c/o Dorsey & Whitney LLP<br>Attention : Peggy Hunt<br>136 South Main Street, Suite 1000<br>Salt Lake City, Utah 84103<br>Phone: (801) 933-7360<br>Fax : (801) 933-7373<br>Email : hunt.peggy@dorsey.com |
| **PROPERTY:** | The "*Property*" consists of 236.57 acres located in Mohave County, Arizona and is more particularly described or depicted in Section 2 of this Agreement and on **Exhibit A**. |
| **PURCHASE PRICE:** | The "*Purchase Price*" of the Property shall be Four Hundred Thirteen Thousand and Fifty-Eight Dollars ($413,058.00), and is not contingent on any survey of the Property. |

- 1 -

| DEPOSIT: | The *"Deposit"* shall be Twenty-five Thousand Dollars ($25,000.00). |
|---|---|
| DUE DILIGENCE PERIOD: | The *"Due Diligence Period"* shall commence upon the **Effective Date** and expire upon the later to occur of (a) the date that is ninety (90) days after the date that the **"Sale Order"** (defined below) is entered by the Bankruptcy Court; or (b) June 1, 2015. |
| BANKRUPTCY SALE | The sale of the Property is "AS IS WHERE IS," and expressly contingent on the entry of an Order by the Bankruptcy Court approving this Agreement and the sale (the *"Sale Order"*) pursuant to the applicable provisions of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the *"Bankruptcy Code"*). Pursuant to bankruptcy law, the sale is subject to higher and better offers prior to entry of the Sale Order. |
| CLOSING: | A *"Closing"* of the Property shall take place within thirty (30) days following the later of (a) the expiration of the Due Diligence Period, and (b) the date the Bankruptcy Court enters a final Sale Order approving the sale and the Agreement. |
| TITLE COMPANY AND ESCROW AGENT: | Pioneer Title Agency, Attn: Storm Hargrave, 2331 Hualapai Mountain Rd., Kingman, AZ 86401 Phone: (928) 753-8238 |
| REAL ESTATE COMMISSIONS: | Seller shall pay a brokerage as outlined in the Orders entered by the Bankruptcy Court employing Dell Nichols Realty (the *"Broker"*) and as set forth in the Sale Order. |

# REAL ESTATE PURCHASE AND SALE AGREEMENT

## 236.57 ACRES

## MOHAVE COUNTY, ARIZONA

## STANDARD TERMS AND CONDITIONS

1.        **Purchase and Sale.** Buyer agrees to purchase from Seller, and Seller agrees to sell, grant, convey and assign to Buyer, the Property, upon the terms and conditions of this Agreement.

2.        **Property Defined.** The "*Property*" consists of the following:

2.1     All right, fee simple title and interest in and to three parcels of approximately 155.29, 60.00 and 21.28 acres, also known as Mohave County APN 310-30-006, 310-15-018 and 310-28-019, respectively, as depicted and legally described on **Exhibit A** attached hereto and incorporated herein by this reference, together with (a) all of the improvements, structures and fixtures located thereon and owned by Seller; (b) all right, title and interest of Seller in all adjacent and/or contiguous streets, roads, avenues, alleys, and rights of way; (c) all right, title and interest of Seller in rivers, streams, and strips and gores of land adjoining, adjacent and/or contiguous thereto; (d) all easements, rights of ingress and egress, rights of way, and rights under any covenants, conditions and/or restrictions appurtenant thereto or affecting any portion thereof; (e) all contract rights, if any, relating to the operation thereof or any improvements thereon, including all of Seller's right, title and interest in and to all agricultural leases affecting any portion thereof, upon Buyer's approval of same; (f) all riparian rights, surface and underground water rights, and any and all other water rights pertaining thereto; (g) all right title, and interest of Seller in and to all oil, gas, coal, and other minerals, whether hydrocarbon or not, in, on or under or that may be produced therefrom; and (h) all rights and interests appurtenant thereto. The real property described above and the above-listed items are herein collectively called the "*Real Property*"; and

2.2     All right, title and interest in and to all of the following, to the extent they exist and are expressly assumed by Buyer at the Closing (defined below): (a) all leases, easements, licenses, permits, entitlements, subdivision agreements, development agreements and other agreements relating to or benefitting the Real Property; (b) all plats, plans, specifications, maps, drawings and other renderings relating to or benefitting the Real Property; (c) all reports, studies, contracts, warranties and any similar rights relating to or benefiting the Real Property; (d) all intangible rights, goodwill and similar rights relating to or benefiting the Real Property; (e) all development rights, permits, approvals and privileges relating to or benefiting the Real Property, including, without limitation, any annexation and/or development agreements related to the Real Property and that any wastewater discharge permits related to the Real Property; (f) all rights, claims and awards relating to or benefiting the Real Property; (g) all rights to receive a reimbursement, credit or refund from any applicable agency or entity of any deposits or fees paid in connection with the development of the Real Property; and (h) all irrigation district rights and

- 3 -

utilities attached or appurtenant to the Real Property (collectively, the "***Personal Property and Intangible Rights***"); and

2.3     Any and all guaranties and warranties in effect with respect to any of the foregoing; and

2.4     Any and all licenses, permits and other written authorizations necessary for the use, operation or ownership of any of the foregoing; and

2.5     Except as stated herein, any and all of Seller's claims, rights to receive, rights to recover, things in action, choses in action and causes of action in any way relating to the Property, including but not limited to rights, claims and causes of action: (a) for defense or indemnification, whether pursuant to contract or otherwise; (b) arising from or related to violations of Hazardous Waste Law, Hazardous Materials, releases (as such terms are hereinafter defined) or other environmental conditions at, on or emanating from or moving toward, through or under the Real Property; (c) for recovery of attorneys' fees and costs, litigation costs, administrative costs, and punitive or exemplary damages; (d) under any and all current and prior policies of insurance, whether or not still in force and effect, and for subrogation under any and all current and prior policies of insurance and leases, whether or not still in force and effect; and (e) as "lessor," "landlord," or similar designation in Seller's capacity as owner or lessor of the Real Property under any leases affecting the Real Property, whether or not still in force and effect; (collectively, the "***Additional Assets***").  For purposes of clarity, Additional Assets does not include the Seller's claims, rights to receive, rights to recover, things in action, choses in action and causes of action that relate to the Property and are claims and causes of action against former management of Castle Arch Real Estate Investment Co., LLC, a California limited liability company, or any affiliate thereof.

3.          **Opening of Escrow; Close of Escrow.**

3.1     Escrow.     Promptly following the Effective Date, Buyer and Seller shall establish an escrow account (the "***Escrow***") with the Escrow Agent designated by Buyer herein ("**Escrow Agent**"), and shall provide Escrow Agent with a fully executed copy of this Agreement. This Agreement and the General Escrow Provisions (defined below) shall constitute escrow instructions to Escrow Agent, as well as the agreement of Seller and Buyer.  Escrow Agent is hereby appointed and designated to act as Escrow Agent and instructed to deliver, pursuant to the terms of this Agreement, the documents and funds to be deposited into Escrow as herein provided. In the event of any inconsistency between this Agreement and such additional escrow instructions, the provisions of this Agreement shall govern. The foregoing to the contrary notwithstanding, title insurance services, including the provision of the Buyer's title commitment and owner's title insurance policy (collectively (a) such services, (b) the commitment, and (c) the policy, are referred to as the "***Title Policy***") will be provided by the Title Company; however, the Escrow Agent also may be the title agent for the Title Company.  Seller shall pay the cost of a standard coverage Title Policy.  Buyer shall pay that portion of the cost of an extended coverage Title Policy that exceeds the cost of standard coverage, together with any requisite or Buyer desired endorsements, if any, inasmuch as the Seller is obtaining the Approval Order (as defined below).

- 4 -

3.2    Opening of Escrow. The opening of Escrow (the "*Opening*" or the "*Opening of Escrow*") shall be deemed to be the date on which Escrow Agent is provided a fully executed copy of this Agreement and Buyer's Deposit.

3.3    Close of Escrow. Provided all conditions to Closing are met, the Closing of the Property shall take place within thirty (30) days following the later of (a) the expiration of the Due Diligence Period, and (b) the date the Bankruptcy Court enters a final, non-appealable Order approving the sale and the Agreement. If the date established for Closing is not a Business Day or would occur on a Monday or Friday, the Closing will be adjusted to be the next day that is a Business Day and that is not a Monday or Friday.

4.    **Purchase Price.**

4.1    Defined. The Purchase price to be paid to Seller by Buyer for the Property is set forth in the Summary of Terms.

4.2    Payment of the Purchase Price. Buyer shall pay the Purchase Price as follows:

(a)    Deposit. By 5:00 p.m. Mountain Standard Time no later than three (3) Business Days after the Opening, Buyer shall deposit the Deposit as set forth in the Summary of Terms into Escrow. The Deposit shall be fully refundable to Buyer prior to expiration of the Due Diligence Period. Upon the expiration of the Due Diligence Period, the Deposit shall be non-refundable to Buyer except in the event of a default by Seller or a failure of any of the Conditions to Close of Escrow under this Agreement. For purposes of this Agreement, interest earned (if any) on the sums deposited with the Escrow Agent shall accrue to the benefit of the Party entitled to the Deposit in accordance with the terms and conditions of this Agreement. At the Close of Escrow, the Deposit shall be applied to the payment of the Purchase Price.

Notwithstanding the foregoing, Buyer may in its sole and absolute discretion deposit into Escrow prior to Closing an amount exceeding the Deposit and up to the full amount of the Purchase Price (the "Additional Deposit"). In no event shall the Additional Deposit be considered a part of the Deposit or become nonrefundable to Buyer unless and until all Conditions to Close of Escrow under this Agreement have been satisfied, Seller is not otherwise in default under this Agreement, and the Closing occurs. In the event of any termination of this Agreement prior to Closing, the Additional Deposit, together with any interest earned thereon, shall be refunded to Buyer, whether or not such termination is the result of a default by Buyer under this Agreement.

(b)    Cash at Close of Escrow. At or before the Close of Escrow, Buyer shall deposit into Escrow, in cash or other immediately available funds, the balance of the Purchase Price, adjusted for pro-rations and other credits as hereinafter provided.

(c)    Allocation of Purchase Price. Provided that the total Purchase Price paid to Seller as calculated pursuant to the Summary of Terms remains unchanged, Buyer shall have the right to allocate the Purchase Price among specific lots or parcels within the Real Property

pursuant to a schedule to be provided by Buyer to Seller and Escrow Agent on or before the Closing, in which case Seller shall deliver to Buyer one Deed for each specific lot or parcel identified by Buyer.

.

**5.**        **Due Diligence Period; Due Diligence Review; Title Review.**

5.1    Due Diligence Period and Termination Thereof.

(a)    Buyer shall have until the expiration of the Due Diligence Period as defined in the Summary of Terms to conduct such studies and investigations of the Property as Buyer deems desirable. The Due Diligence Period may not be extended by the Buyer without express written consent by the Seller. Time is of the essence for this sale, and Seller has no obligation to extend the Due Diligence Period.

(b)    During the Due Diligence Period, including any extensions thereof, Buyer, acting in Buyer's sole and absolute discretion, shall have the absolute right to cancel the Escrow and terminate this Agreement for any reason or no reason, by giving written notice thereof to Seller and Escrow Agent at any time on or before 5:00 p.m. Mountain Standard Time on the last day of the Due Diligence Period. If the Buyer cancels the Agreement prior to the expiration of the Due Diligence Period in accordance herewith, the Deposit as set forth in the Summary of Terms shall be returned to Buyer.

(c)    If written notice to cancel the Agreement is not made by the Buyer and received by the Seller by 5:00 p.m. Mountain Standard Time on the last day of the Due Diligence Period, the Deposit set forth in the Summary of Terms shall become non-refundable except in the event of a Seller default or failure of any of the Conditions to Close of Escrow under this Agreement. Otherwise, any failure of the Buyer to close the Agreement after expiration of the Due Diligence Period is a material breach of this Agreement and the Deposit shall then be released to Seller.

5.2    Due Diligence Review.

(a)    Site Access. Seller hereby grants to Buyer from the Opening and continuing until the Close of Escrow or sooner termination of this Agreement, a license, terminable only upon the termination of this Agreement, for Buyer and its agents, contractors and authorized representatives to enter the Property to conduct such investigations, inspections, studies, surveys, sampling, tests, design of improvements and other actions as Buyer deems appropriate or necessary in its reasonable discretion (including, without limitation, "Phase I" and "Phase II" environmental site assessments, soil borings and water sampling, conducting tenant and property manager interviews). Buyer shall undertake commercially reasonable efforts to avoid or minimize damage to the Property and shall repair or restore damage to the Property caused by Buyer, or its agents, employees or contractors, to its condition prior to the inspection. Subsequent to Buyer's investigation Buyer shall return the Property to the original condition at Buyer's sole cost if this Agreement is terminated for any reason. Buyer hereby indemnifies, defends Seller

against, and agrees to hold Seller harmless from, all claims, costs, fees (including witness and reasonable attorneys' fees), fines, penalties, expenses, loss, damage and liability of any kind which may be asserted against Seller or the Property arising out of or resulting from Buyer's investigations of the Property prior to Closing and to pay Seller all costs and expenses, including reasonable attorneys' fees and expenses, incurred in defending any such matter. Notwithstanding any other terms and provisions of this Agreement to the contrary, this indemnification obligation of Buyer shall survive any termination of this Agreement.

(b)    Property Documents. By 5:00 p.m. Mountain Standard Time on the third (3rd) Business Day after the Opening, or as may be extended by agreement of the Buyer, Seller shall make available to Buyer via drop box, shared file, or other electronic means, true and accurate copies of the following documents and materials (only to the extent the same are known to the Seller to be in Seller's possession or control) (collectively, the "*Property Documents*"):

(i)    all environmental, mechanical, structural, soil, inspection, and engineering reports prepared with respect to all or any portion of the Property;

(ii)    copies of all existing contracts, leases and agreements in effect for all or any portion of the Property;

(iii)    copies of any and all of the following documents relating to, benefiting or burdening the Property (collectively, "*Development Documents*"): (a) agreements, petitions and ordinances relating to annexation and/or disconnection of the Real Property; (b) development agreements; (c) petitions, agreements and approvals relating to zoning, including, without limitation, zoning map amendments, planned unit developments, special use permits and variations; (d) agreements and commitments relating to the construction or installation of on-site and off-site subdivision improvements and public improvements, including, without limitation, agreements relating to sanitary sewer, potable water, storm water drainage, roadways and other utilities and infrastructure and agreements relating to connection and tap-on fees and rebates; (e) agreements with local taxing districts and other stakeholders including, without limitation, impact fee and contribution agreements; (f) agreements and ordinances relating to recapture, whether benefiting or burdening the Property; (g) ordinances, agreements, approvals and other documents relating to any special service areas and any TIF or other public financing; (h) settlements or stipulations relating to land use disputes or litigation affecting the Property; (i) any other documents evidencing rights benefiting or obligations burdening the Property or the owner/developer thereof; (j) plats and plans of subdivision; (k) building permits; (l) certificates of occupancy; and (m) all maps, plats, plans exhibits and attachments referenced in any of the foregoing;

(iv)    a list of all pending litigation and/or administrative proceedings which relate to all or any portion of the Property, identifying the general nature of such litigation and proceedings and the legal counsel representing Seller in the same;

(v)    copies of all historical and current notices concerning all or any portion of the Property from any governmental instrumentality, including, without limitation, notices of any alleged violation of any federal, state, county, or city statute, ordinance, code, rule

- 7 -

or regulation or stating that any investigation has commenced or is contemplated regarding any such violation;

(vi)    copies of any and all materials related to any current or future obligations related to the ownership, use and/or development of the Property;

(vii)   copies of any and all documents and materials related to any homeowners' association or other owners' association affecting the Property, including, without limitation, all documents and materials related to the formation, existence and operation of any such association(s);

(viii)  copies of any existing survey of the Property; and

(ix)    all other documents and materials pertaining to the ownership, use and/or maintenance of all or any portion of the Property.

Seller shall promptly advise Buyer in writing if Seller becomes aware that any of the information furnished by Seller to Buyer is materially incorrect. Buyer acknowledges, understands and agrees that the Property Documents may have been prepared by parties other than Seller and that Seller makes no representation or warranty whatsoever, express or implied, as to the completeness, content or accuracy of the Property Documents.

(c)    Cooperation. Seller and Buyer will reasonably cooperate with each other during the Due Diligence Period with the goal of causing the due diligence process to proceed and be completed as expeditiously and as efficiently as reasonably possible, so long as such cooperation is at no expense or liability to Seller.

(d)    Confidentiality.  Buyer also agrees that, pending the Close of Escrow and thereafter if Close of Escrow fails to occur and this Agreement is terminated, Buyer shall keep confidential the Property Documents or any other documentation, results or information provided to or discovered by it during the course of and in connection with Buyer's examination, inspection, measurement, testing, review or access to the Property and the books and records thereof as provided in this Agreement, including, without limitation, any environmental assessments (collectively, the "*Reports*"), and Buyer will not disclose the same to any third party other than persons within Buyer's organization, assignees of Buyer, or any persons or entities who have, will or may render services to Buyer in connection with the transactions contemplated under this Agreement, including, without limitation, attorneys, engineers, accountants, contractors, business partners and prospective lenders (collectively, the "*Permitted Parties*"), provided that Buyer shall be responsible for causing each of the Permitted Parties to keep the Reports confidential in accordance with this Section 5.2. Notwithstanding any provision to the contrary herein, Buyer may disclose any Report to a third party (i) if the information is already a matter of public record or public knowledge; (ii) in connection with any litigation with Seller regarding this Agreement; or (iii) if required by law or court order or other legal duty. Buyer and Seller acknowledge and agree that consultants engaged by Buyer may develop information concerning the Property which is not objective or complete and that Seller does not wish to be informed of the contents of any report, whether positive or negative, because of the difficulty and expense of correcting any opinion or conclusion which is erroneous or incomplete. Notwithstanding any provision to the contrary

herein, Buyer may disclose any Report to Seller if required by law or court order or other legal duty. Buyer shall indemnify, defend, protect and hold Seller harmless from all claims to the extent arising out of any violation by Buyer of the terms and conditions of this Section 5.2. The provisions of this Section 5.2 shall survive termination of this Agreement.

(e)   Rezoning. During the Due Diligence Period, Buyer shall have the right to seek, and Seller hereby consents to and authorizes Buyer to seek, a rezoning of the Property, at Buyer's expense, to allow for the construction, operation and maintenance of a solar generating facility and related facilities, including, but not limited to transmission and/or distribution lines, transformers, and/or other facilities up to and including a substation and related appurtenances on the Property, subject only to stipulations and conditions acceptable to Buyer in its sole and absolute discretion. Seller agrees to cooperate with Buyer to obtain such rezoning of the Property, including, without limitation, granting any authorizations necessary to allow Buyer to sign necessary applications and documents on behalf of Seller as Seller's agent, and consenting to and signing any and all necessary applications, authorizations and/or stipulations necessary to obtain the rezoning, including consenting to any dedications or exactions required for public rights of way, easements, and other matters required to obtain the rezoning.

5.3   Title Review.

(a)   Title Report. Promptly following the Opening, Buyer shall cause the Title Company designated herein to issue and deliver to Buyer and Seller a title commitment for the Property and all easements benefiting the Property issued by Title Company, binding the Title Company to issue to Buyer at Close of Escrow an extended coverage American Land Title Association ("**ALTA**") owner's title insurance policy (or equivalent) in the amount of the Purchase Price, together with legible copies of all matters of record referred to in Schedule B and Schedule C thereof and Title Company's requirements for issuing an extended coverage ALTA owner's title insurance policy (the "**Title Report**").

(b)   Survey. During the Due Diligence Period, Buyer may obtain an updated survey of the Property (the "**Survey**"). The legal description of the Property contained in the Title Report (and the Survey, if applicable), upon review and acceptance by Buyer and Seller, shall be inserted for (or replace, as applicable) the description of the Property contained in **Exhibit A** hereto, without the necessity of the Parties executing any further amendment to this Agreement. In addition, such description of the Property shall be attached to the Deed (as defined below) conveying the Property to Buyer pursuant to this Agreement, the Affidavit of Property Value, and the Affidavit of Disclosure (as those latter two terms are defined below).

(c)   Objection and Cure. The Parties agree that this is an AS-IS WHERE IS sale as set forth in Section 6 of this Agreement. Buyer may object to any matters disclosed by the Title Report and/or the Survey in Buyer's sole and absolute discretion, by giving written notice to Seller and Escrow Agent on or prior to the expiration of the Due Diligence Period, or five (5) business days following Buyer's receipt of any amended Title Report received following the expiration of the Due Diligence Period, together with legible copies of any new document(s) referenced therein (the "**Objection Notice**"). If Buyer fails to deliver the Objection Notice on or prior to expiration of the Due Diligence Period, then Buyer shall be deemed to have approved the

Title Report and Survey. Seller shall provide written notice to Buyer and Escrow Agent on or before five (5) Business Days after receipt of the Objection Notice (but in any event, prior to the expiration of the Due Diligence Period) identifying the matters that Seller is unwilling or unable to remove prior to or at the Close of Escrow (the "*Objection Response*"). If the Objection Response identifies matters which Seller is unable or unwilling to cure prior to or at the Close of Escrow, or if Seller fails to timely deliver the Objection Response, then, within five (5) Business Days of Buyer's receipt (or Seller's failure to timely deliver) the Objection Response, Buyer shall elect, as its sole and exclusive remedy therefor, either to: (i) waive those matters that Seller has indicated that Seller is unable or unwilling to remove by delivering written notice to Seller and Escrow Agent, whereupon this Agreement shall remain in full force and effect; or (ii) terminate this Agreement by written notice to Seller and Escrow Agent, whereupon the Deposit shall be returned to Buyer. If Buyer fails to timely give such notice, Buyer shall be deemed to have elected option (i) above. The foregoing objection and notice procedure, and the rights of Buyer to exercise remedies, shall apply to any title matters, requirements or conditions not identified in the Title Report or Survey but identified on any subsequent amendment, revision or supplement thereto; provided, however, that the Closing date shall be extended if and to the extent required so as to afford the Parties the benefit of the full time periods set forth in this paragraph.

(d)    Financial Encumbrances. The sale of the Property shall be free and clear of any financial liens, security interests, mortgages, deeds of trust, and other financial encumbrances, any judgment liens, any accrued and unpaid taxes and assessments constituting a lien (or which may lead to the imposition of a lien) which is due and payable as of the Close of Escrow in connection with the Property, and any mechanics' or materialmen's liens (collectively, the "*Financial Encumbrances*") pursuant to Section 363(b) and (f) of the Bankruptcy Code, and the Sale Order (as defined below) will so state.

(e)    Final Title Report. It is understood by the Parties that the Buyer will obtain a "Final Title Report" prior to Closing so as to update the Title Report provided for in subparagraphs (a) and (c) herein. To the extent any Financial Encumbrances have arisen against the Property, those Financial Encumbrances will attach the sale proceeds, but in no event shall become Permitted Encumbrances. To the extent any new non-Financial Encumbrances appear on any amended Title Report following the expiration of the Due Diligence Period and Seller provides an Objection Response in accordance with Section 5.3(c), above, indicating that Seller is unable or unwilling to remove such new non-Financial Encumbrances (or if Seller fails to timely deliver an Objection Response), such encumbrances shall be deemed Permitted Encumbrances, provided that they do not materially impair the Buyer's proposed re-zoned use of the Property or the value of the Property.

6.        **AS IS WHERE IS Sale Made Pursuant to Section 363 of the Bankruptcy Code; Sale Motion, Limitation of Liability**

6.1    Nature of Sale. Notwithstanding Exhibit D hereto, the sale of the Property is expressly "AS IS WHERE IS," free and clear of interests as provided for in Section 363(b) and (f) of the Bankruptcy Code, and subject to higher and better offers received and approved by Seller prior to entry of the Sale Order. Except as expressly set forth herein, Seller has not made, and Buyer acknowledges that Seller has not made, any warranty or representation, express or implied,

- 10 -

written or oral, statutory or otherwise concerning the Property or any uses to which the Property may or may not be put, including, but not limited to, the following: (a) the condition of title; (b) the nature, physical condition or other aspect of the Property; (c) the income or expense as generated, paid or incurred in connection with the Property; (d) the suitability of the Property for any intended use or development; (e) the dimensions of the Property, (f) the ability of Buyer to obtain any and all necessary zoning, variances, governmental approvals or permits for Buyer's intended use and development of the Property; (g) the status of the current zoning or governmental approvals of the Property; (h) the existence of Hazardous Materials in, on, about, under or affecting the Property; or (i) the compliance of the Property with Hazardous Waste Laws or any other federal, state or local laws, ordinances, statutes, rules or regulations. "*Hazardous Materials*" are defined herein as any substance, chemical, waste or material that is or becomes regulated by any federal, state or local governmental authority because of its toxicity, infectiousness, radioactivity, explosiveness, ignitability, corrosiveness or reactivity, including without limitation those substances regulated by any "Hazardous Waste Laws." For purposes of this Agreement, "*Hazardous Waste Laws*" means any local, federal or state statute, ordinance, code, law, rule or regulation relating to environmental contamination, petroleum products, asbestos and pollutants.

6.2 <u>ACCEPTANCE</u>. SUBJECT TO THE EXPRESS TERMS OF THIS AGREEMENT, BUYER ACKNOWLEDGES FOR BUYER AND BUYER'S SUCCESSORS AND ASSIGNS THAT BUYER WILL BE ACQUIRING THE PROPERTY BASED UPON BUYER'S OWN INVESTIGATION AND INSPECTION THEREOF. SELLER AND BUYER AGREE THAT THE PROPERTY SHALL BE SOLD AND THAT BUYER SHALL ACCEPT TITLE AND POSSESSION OF THE PROPERTY ON THE CLOSING "AS IS, WHERE IS, WITH ALL FAULTS" WITH NO RIGHT OF SET-OFF OR REDUCTION IN THE PURCHASE PRICE, AND THAT, EXCEPT AS EXPLICITLY SET FORTH IN THIS AGREEMENT, SUCH SALE SHALL BE WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, ORAL OR WRITTEN. BUYER SPECIFICALLY ACKNOWLEDGES, THAT EXCEPT AS EXPLICITLY SET FORTH IN THIS AGREEMENT, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, FROM SELLER OR ANY REPRESENTATIVE OR AGENT OF SELLER AS TO ANY MATTER CONCERNING THE PROPERTY, INCLUDING WITHOUT LIMITATION THE SUITABILITY OF THE PROPERTY FOR A PARTICULAR PURPOSE.

6.3 <u>Indemnity and Release</u>. Buyer, for itself and its successors and assigns, releases Seller, its successors and assigns, from any and all claims and liability against Seller, occurring by, through or under Buyer with respect to any physical or environmental condition at the Property. Buyer takes responsibility and liability for any Hazardous Materials placed upon the Property or caused by Buyer, but not otherwise, and agrees to indemnify, defend, protect and hold Seller harmless from and against any and all liens, claims, losses, liabilities, damages, costs, expenses, causes of action and expenses for matters caused by Buyer, but not otherwise, and provided, however, that Buyer shall not indemnify Seller from the results of Seller's own fraud, actions or omissions. The foregoing release shall be construed as a release of all claims relating to the subject matters described in this paragraph, whether known or unknown, suspected or unsuspected, past, present, or future, accrued or contingent.

6.4    Sale Motion. Provided that the Agreement is not first terminated by the Seller pursuant to Section 13, no later than five (5) Business Days after the Effective Date, Seller shall file a motion in the Bankruptcy Court seeking entry of the Sale Order (the "*Sale Motion*"). The Sale Motion must seek approval of this Agreement, approval of the sale of the Property to the Buyer or to any higher and better offer that is received by Seller prior to entry of the Sale Order (but not thereafter), free and clear of interests as provided for in Section 363(b) and (f) of the Bankruptcy Code, and approval of bidding procedures for the submission of higher and better offers for the purchase of the Property. The Seller will undertake to proceed in good faith to obtain entry of the Sale Order within thirty (30) days after submittal of the Sale Motion; *however*, it is stipulated and agreed by the Parties that the Bankruptcy Court's refusal or delay to enter the Sale Order shall not constitute grounds for breach of this Agreement by either Party; however, if the Sale Order is not entered within the time limit set forth above, Buyer shall have the right, at its sole election, to withdraw Buyer's offer and to receive an immediate return of Buyer's Deposit. Seller shall copy Buyer on: (a) all relevant communications regarding the Property between and/or among Seller and the creditors holding secured claims relating to the Property and/or the proceeds from the sale of the Property; and (b) all filings with the Bankruptcy Court concerning the Property, including any other offers received by Seller after the Effective Date.

6.5    Higher and Better Offer. Seller reserves the right to accept higher and better offers at any time prior to the entry of the Sale Order. Whether an offer is a higher and better offer is to be determined by the Seller in his sole discretion with such offer being approved by the Bankruptcy Court. The Parties agree that in the event of the operation of this Section 6.5 results in someone, other than Buyer, having the right to purchase the Property, or any portions thereof, the provisions of Section 6.6 apply. Notwithstanding the foregoing, in the event Seller receives a higher and better offer, Seller shall notify Buyer so that Buyer may have the opportunity to submit another offer to Seller should it choose to do so in its sole and absolute discretion.

6.6    Reimbursements and Refunds. In the event of any "higher and better offers" under Section 6.5, and if, as a consequence thereof, others outbid Buyer, or if Seller determines that another offer is a "higher and better offer", then Seller or such other buyer, as the Bankruptcy Court shall order, will pay to Buyer a full refund of the Deposit.

6.7    Sale Order. The "*Sale Order*" shall mean entry on the docket in the Bankruptcy Case of an Order by the Bankruptcy Court in form and content reasonably satisfactory to Buyer and Seller which is final, under applicable law, non-appealable, not subject to stay and which shall not have been vacated or modified prior to Closing, except with the written consent of Buyer. The Sale Order will include the following provisions:

(a)    Approval of this Agreement;

(b)    A finding that the notice and opportunity for hearing on the Sale Motion were appropriate within the meaning of Section 363(b)(1) of the Bankruptcy Code and the applicable Rules of the Federal Rules of Bankruptcy Procedure and that such notice was good and sufficient in the circumstances;

(c)     That the Property is transferred to Buyer free and clear of Financial Encumbrances, but specifically excluding the *"Permitted Encumbrances,"* which are encumbrances that the Buyer agrees to take the Property subject to;

(d)     A finding that the Buyer is purchasing the Property in good faith within the meaning of Section 363(m) of the Bankruptcy Code;

(e)     A finding that the sale and transfer of the Property pursuant to this Agreement is not subject to avoidance pursuant to Section 363(n) of the Bankruptcy Code;

(f)     A finding that the Sale Order shall be effective and enforceable immediately upon entry and its provisions self-executing, subject to any stay imposed under Federal Rule of Bankruptcy Procedure 6004(h) (to the extent not waived by the Bankruptcy Court); and

(g)     That the Bankruptcy Court shall retain jurisdiction to enforce this Agreement in all respects.


6.8     No Personal Liability.  Seller is selling the Property solely in his capacity as a Chapter 11 Trustee for the Debtors, Estate Representative of the same and as Liquidating Trustee of Legacy Trust in the Bankruptcy Case currently pending in the Bankruptcy Court.  Neither the Seller nor its agents shall have any personal liability for the sale contemplated herein.  To the extent that there is any breach of this Agreement, any and all claims of Buyer shall be limited to claims against the Debtors' estate or the Legacy Trust, or the Deposit, as applicable.


6.9     Limited Representations and Warranties.  The Parties expressly agree that the sale of the Property shall be made by Seller with no representations or warranties of any kind, except that: (a) Seller has full right, power and authority to enter into and consummate this Agreement on behalf of the Debtors and the Legacy Trust, including the transactions and conveyances contemplated herein, subject to Bankruptcy Court approval; (b) Seller will seek approval of the Bankruptcy Court as provided for in this Section 6; and (c) Seller is not, and as of the Closing will not be, a foreign entity subject to withholding pursuant to Internal Revenue Code Section 1445, and Seller shall deliver to Buyer at Closing a Non-Foreign Affidavit pursuant to Section 1445(b)(2) of the Internal Revenue Code.  With the sole exception of the representations set forth in this Section 6.9, this Agreement is made without representation or warranty of any kind by Seller.

- 13 -

7. **Conditions of Sale**. It is expressly agreed and understood that the sale of the Property, including the Real Property, contemplated herein is conditioned on the entry of the Sale Order by the Bankruptcy Court approving the sale and this Agreement after notice of the sale and the material terms of this Agreement being provided as required under applicable bankruptcy law in the Bankruptcy Case. The effectiveness of this Agreement is expressly conditioned upon the entry of such Sale Order, and absent entry of the Sale Order this Agreement shall be void and of no effect.

8. **Conditions to Close of Escrow.** The Close of Escrow is subject to and contingent upon the satisfaction and/or completion of each of the following conditions precedent, or the written waiver thereof by Buyer, together with such other conditions to Buyer's obligation to consummate the Close of Escrow elsewhere provided in this Agreement (collectively, the "***Conditions to Close of Escrow***"):

8.1    Seller Closing Documents in Escrow. Seller shall have provided Escrow Agent with all documents and other materials required of Seller for the Close of Escrow;

8.2    No Material Change. There shall have been no material change in the physical condition of or title to the Property, other than as may be contemplated hereby;  and

8.3    Title.

(a)    Condition of Title. Fee simple, marketable and insurable title to the Property shall be sold, granted, conveyed and assigned to Buyer free and clear of all liens and encumbrances (including, without limitation, the Financial Encumbrances) excepting only the following (collectively, the "***Permitted Encumbrances***"):

(i)    General real estate taxes and any special assessments not yet due and payable, subject to pro-rations as provided in this Agreement;

(ii)    All exceptions approved by Buyer in accordance with Section5.3(c) and (e) above; and

(iii)    Any other exceptions which Buyer may, in its sole discretion, waive or approve in writing.

(b)    Closing Statement. The closing statement issued by the Escrow Agent shall be in a form and substance reasonably acceptable to the Parties;

(c)    Representations and Warranties. Seller's limited representations and warranties set forth in this Section 6.9 of this Agreement shall be true and correct in all material respects as of the Closing; and

(d)    Sale Order and Authorizing Resolutions/Documents. The Sale Order shall have been entered on terms deemed sufficient by the Title Company to insure title to the Property in favor of Buyer, and any authorizing resolutions, affidavits or other documents reasonably required by the Title Company from the Seller or Buyer in order to consummate the

- 14 -

Closing and insure title to the Property in favor of Buyer, shall have been provided to the Title Company.

**9.**         **Close of Escrow Deliverables.**

9.1     Seller Obligations.  On or before the Close of Escrow, Seller shall deliver to Escrow Agent:

(a)     A certified copy of the Order approved by the Bankruptcy Court, with a copy of such order also delivered to Buyer;

(b)     A Trustee Deed conveying fee simple title to the Property to Buyer, duly authorized, properly executed and notarized, and in the form attached hereto as **Exhibit B** (the "*Deed*"), to be recorded in the Official Records of Mohave County, Arizona, together with an Affidavit of Property Value, as required by Arizona law, duly authorized and properly executed and notarized on behalf of Seller and Buyer (the "*Affidavit of Property Value*") to be delivered with the Deed;

(c)     A General Assignment, duly authorized, properly executed by the Seller, and in the form attached hereto as **Exhibit C** (the "*General Assignment*"), which shall include an assignment of Seller's interest in the Personal Property, Intangible Rights and the Additional Assets;

(d)     Keys to all locks to all fences and improvements on the Property in Seller's possession, and originals or, if originals are not available, copies, of all of the Property Documents, to the extent not previously delivered to Buyer;

(e)     An affidavit of disclosure as required by A.R.S. § 33-422 in the exact form attached hereto as **Exhibit D** (the "*Affidavit of Disclosure*").  The Affidavit of Disclosure shall be duly authorized, properly executed and sworn to before a notary on behalf of Seller.  Escrow Agent shall cause the fully executed Affidavit of Disclosure to be recorded in the Official Records of Mohave County, Arizona.

(f)     A Non-Foreign Affidavit duly authorized and properly executed by Seller, as described in Section 6.9.

(g)     Seller's payment of all closing costs, proratable items and other charges, costs and expenses to be borne by Seller pursuant to this Agreement.

(h)     Any and all other documents, instrument, affidavits and undertakings reasonably required by Escrow Agent for the Close of Escrow in order to complete the transaction contemplated hereby and to carry out the intent and purposes of this Agreement.

9.2     Buyer Obligations.  On or before the Close of Escrow, Buyer shall deliver to Escrow Agent:

- 15 -

(a)     The amount required to be deposited into Escrow at the Close of Escrow pursuant to <u>Section 4.2</u> above, and other obligations then due and payable by Buyer pursuant to this Agreement;

(b)     The General Assignment executed by Buyer;

(c)     Upon Seller's delivery of the originally executed and sworn to Affidavit of Disclosure to Buyer, the acknowledgement of receipt of the Affidavit of Disclosure, executed on behalf of Buyer and acknowledged before a notary public; and

(d)     Any and all other documents, instruments, affidavits and undertakings reasonably required by Escrow Agent or Seller for the Close of Escrow as may be reasonably necessary in order to complete the transaction contemplated hereby and to carry out the intent and purposes of this Agreement.

9.3     <u>Authorization to Close Escrow</u>.  When all Conditions to Close of Escrow have been satisfied or waived as permitted under this Agreement and provided that Escrow Agent has not received written notice from Buyer or Seller of the failure of any Conditions to Close of Escrow or of the termination of the Escrow or this Agreement, Escrow Agent shall:

(a)     Disburse the funds in Escrow representing the Purchase Price (after adjustments and pro-rations required under this Agreement) to the Seller;

(b)     Cause the Affidavit of Disclosure, Deed and Affidavit of Property Value, in that order, and any other documents that Seller and Buyer may mutually direct (collectively, the "**_Recordable Documents_**"), to be recorded in the recorder's office of the county where the Property is located ("**_Recorder's Office_**") and obtain conformed copies thereof and distribute the same to Buyer and Seller;

(c)     Cause the Title Company to issue the Owner's Title Policy to Buyer; and

(d)     Deliver to Buyer and Seller at least one fully executed original of all documents deposited into Escrow, other than any Recordable Documents, for which Escrow Agent shall deliver conformed as-recorded copies, by the Close of Escrow.

**10.        Pro-rations; Closing Costs.**

10.1     <u>Pro-rations</u>.  The following costs and expenses shall be prorated and adjusted between Seller and Buyer as of the Close of Escrow.  The date upon which the Close of Escrow occurs shall be attributed to Buyer.  All pro-rations shall be on the basis of the actual number of days in each month and year applicable to such calculation.

(a)     <u>Real Estate Taxes</u>.  General real estate taxes and assessments not yet due and payable as of the Close of Escrow shall be prorated.  Buyer shall receive a credit for taxes assessed but not yet due and payable as of the Close of Escrow, subject to proration on the basis of the last full-year real estate tax bill.  There shall be no re-pro-rations of real estate taxes and assessments.  If the Property has been assessed for property tax purposes at such rates as would

- 16 -

result in "roll back" taxes upon the change in land usage or ownership of the Property, Buyer shall be responsible for the payment of such roll back taxes, and shall indemnify, defend and hold Seller harmless for, from and against any roll-back liability. In the event roll back taxes will be assessed, Buyer shall pay or escrow with the Escrow Agent for payment to the applicable taxing authority an amount determined by the Escrow Agent to be sufficient for payment in full of the roll back taxes assuming a change in use of the Property by Buyer at the Close of Escrow. The foregoing obligations shall survive the Close of Escrow and shall not be limited by any limitation on remedies set forth herein; provided, however, that Buyer reserves the right during the Due Diligence Period to determine (i) whether such roll-back provision applies to the Property and (ii) if so, the amount of such potential tax increase to Buyer.

(b)    Other Items. Any other income or expenses of the Property not specifically allocated under this Agreement shall be pro-rated as of the Closing Date.

10.2    Costs and Expenses Related to Closing. Seller and Buyer each shall pay fifty percent (50%) of any escrow fees. Seller shall pay all transfer taxes and recording fees incurred upon the recording of the Deed and Affidavit of Disclosure. Buyer shall pay the premium for the extended coverage of Owner's Title Policy. Any other costs of Escrow or of closing pertaining to the transaction contemplated herein not otherwise expressly allocated between Buyer and Seller under this Agreement shall be apportioned in the manner customary in the county where the Property is located. Seller will obtain and pay for the cost of obtaining the Sale Order. Each Party shall pay its own attorney fees, including fees associated with reviewing any papers filed by Seller to obtain the Sale Order.

**11.**    Representations, Warranties and Covenants.

11.1    Buyer's Representations, Warranties and Covenants. Buyer represents and warrants to Seller as follows:

(a)    Authority. Buyer has full right, power and authority to enter into this Agreement and the transactions and conveyances contemplated herein. All requisite action has been taken by Buyer in connection with the execution of this Agreement, the instruments referenced herein, and the consummation of the transactions contemplated hereby.

(b)    Consents; Binding Obligations. No third party approval or consent is required for Buyer to enter into this Agreement or to consummate the transactions contemplated hereby. This Agreement and all documents required hereby to be executed by Buyer are and shall be valid, legally binding obligations of and enforceable against Buyer in accordance with their terms.

(c)    Foreign Person. Buyer is not: (i) acting, directly or indirectly for, or on behalf of, any person, group, entity or nation named by any Executive Order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, or nation pursuant to any law that is enforced or administered by the Office

- 17 -

of Foreign Assets Control, and is not engaging in this transaction, directly or indirectly, on behalf of, or instigating or facilitating this transaction, directly or indirectly, on behalf of, any such person, group, entity or nation, nor (ii) engaged in any dealings or transactions, directly or indirectly, in contravention of any United States, international or other applicable money laundering regulations or conventions, including, without limitation, the United States Bank Secrecy Act, the United States Money Laundering Control Act of 1986, the United States International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001, Trading with the Enemy Act (50 U.S.C. § 1 et seq., as amended), or any foreign asset control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto.

(d)    Organization and Authority. Buyer is a validly existing corporation, organized and authorized to transact business under the laws of the State of Arizona.

(e)    It shall be a condition precedent for Seller's obligation to close that the above Buyer representations and warranties shall be true and correct when made and as of the Close of Escrow.

**12.    Casualty and Condemnation.** Except as set forth in Section 5.2(a) above, Seller shall bear the risk of loss to the Property until Closing of Escrow. If all or any material portion of the Property is damaged by casualty or taken, or threatened to be taken, by condemnation, eminent domain or other similar governmental or quasi-governmental action, Seller shall promptly notify Buyer ("***Seller's Loss Notice***") and Buyer shall have the option of (a) terminating this Agreement, in which case the provisions of Section 13 shall apply; or (b) proceeding with the transactions described herein without any reduction in the Purchase Price, in which case Seller shall assign all insurance or condemnation proceeds (as applicable) to Buyer at Closing of Escrow. Buyer shall elect either of the foregoing options by delivering written notice to Seller within ten (10) days of Buyer's receipt of Seller's Loss Notice. If Buyer fails to so elect, Buyer shall be deemed to have elected option (b).

**13.    Termination.**

13.1    Notice of Termination. Termination of this Agreement shall be by written notice in accordance with this Agreement.

13.2    Effect of Termination. If Buyer elects to terminate this Agreement pursuant to any provision of this Agreement granting Buyer the right to terminate, then (a) if Buyer is entitled to the return of the Deposit, the Deposit shall be returned to Buyer, less such amounts payable to the Seller equal to the Seller's actual, external costs (including external legal fees and expenses and the cost of notice mailings) incurred to bring on the Sale Motion, but in no event to exceed $10,000.00, without any consent or approval from Seller or the Bankruptcy Court within five (5) Business Days of termination, (b) all documents and funds deposited into Escrow shall be returned to the Party depositing the same, and (c) the Parties shall have no further rights, duties or obligations under the terms of this Agreement, except as expressly provided herein to the contrary. In the event the Seller elects to accept, or the Bankruptcy Court approves, another offer for the Property prior to entry of the Sale Order, the Deposit shall be paid to Buyer within said five (5) Business Days thereafter.

- 18 -

14.        **Notices.**

14.1    Form of Notice; Method of Delivery.  Any notices and demands required or permitted by this Agreement or by law shall be given in writing addressed to the Parties as set forth in the Summary of Terms, and delivered by (a) reputable overnight carrier (such as FedEx, DHL or UPS) for next Business Day receipt by the addressee, or (b) United States certified mail, postage prepaid, return receipt requested, or (c) fax, evidenced by the machine generated receipt from the sender's device, or (d) email.  Notice shall be deemed given on the next Business Day if sent in accordance with subpart (a) above, or two (2) Business Days following the date deposited in the United States mail if sent in accordance with subpart (b) above, or as of the machine-stamped date and time on the sent message if sent in accordance with subpart (c) or (d) above.  If a notice is sent in accordance with subpart (c) or (d) above, the notice shall also be sent by at least one of the other methods provided above, and in such case the date upon which the notice is deemed to be given shall be the date as determined under either subpart (c) or (d), as the case may be.

15.        **Default; Remedies.**

15.1    Buyer Default.  If Buyer shall breach any of the terms or provisions of this Agreement or any of Buyer's representations, warranties or covenants contained in this Agreement, including but not limited to the representation set forth in Section 4.2(d), and such breach is not cured within five (5) Business Days of receipt of written notice thereof to Buyer, Seller may as Seller's sole and exclusive remedy terminate this Agreement by written notice to Buyer and Escrow Agent, and retain the Deposit as liquidated damages. The Parties hereby agree that the amount of the Deposit is a fair and reasonable estimate of the total detriment that Seller would suffer in the event of Buyer's default and failure to duly complete the acquisition hereunder. The Parties agree that it would be impractical and extremely difficult to estimate the damages which Seller would suffer in the event of Buyer's default and failure to complete the purchase of the Property in accordance with the terms of this Agreement.  The Parties hereby agree that a reasonable estimate of the total net detriment that Seller would suffer in the event of Buyer's default and failure to complete the purchase of the Property is and shall be an amount equal to the Deposit.

15.2    Seller Default.  If Seller shall breach any of the terms of this Agreement or any of Seller's limited representations or covenants contained in this Agreement, and such breach is not cured within five (5) Business Days of receipt of written notice thereof from Buyer, Buyer may as Buyer's sole and exclusive remedies: (a) terminate this Agreement by written notice to Seller and Escrow Agent, whereupon the entire Deposit shall be returned to Buyer,  or (b) waive such default and enforce specific performance of this Agreement by Seller,  in accordance with the terms hereof.  Buyer expressly waives any right to seek damages from or against Seller for any breach by Seller prior to Closing. The failure by the Bankruptcy Court to enter the Sale Order shall not be deemed a default by Seller, but rather a failure of Condition to Close Escrow.

- 19 -

**16.**        **General Provisions**.

16.1    Time.  Time is of the essence in connection with this Agreement, and failure to timely comply with the provisions hereof shall be a material breach of this Agreement.

16.2    General Escrow Provisions.  Attached hereto as **Exhibit E**, and incorporated herein by this reference, are General Escrow Provisions to be used regarding the Escrow.  In the event of any inconsistency between this Agreement and the General Escrow Provisions, this Agreement shall control.

16.3    Assignment and Inurement.  Buyer may assign its rights under this Agreement to any affiliated entity of Buyer, but otherwise Buyer may only assign this Agreement with the prior written approval of Seller, which approval shall not be unreasonably withheld, conditioned or delayed.  For the purposes of this Agreement, "affiliated entity" shall mean any entity in which Buyer has an equity interest, or such entity is managed by an entity owned or controlled by Buyer or under common control with Buyer.   In no event shall Seller assign its rights, duties or obligations under this Agreement. This Agreement shall inure to the benefit of and be binding upon the Parties, their respective heirs, personal representatives, permitted assigns, and other successors in interest.

16.4    Interpretation.  Captions and Section headings are for convenience of reference only and shall not be used in construing meaning.  The words "including" and "includes" and terms of similar import shall be deemed to mean "including, without limitation." If the "Seller" under this Agreement is comprised of more than one person or entity, the obligations of Seller and each of them under this Agreement shall be joint and several.

16.5    Entire Agreement.  This Agreement and any exhibits attached hereto contain the entire agreement between the Parties regarding the subject matter hereof.  No modification or amendment of this Agreement shall be of any force or effect unless made in writing and executed by both Buyer and Seller.

16.6    Attorneys' Fees.  In the event any action (whether judicial [with or without jury], mediation or arbitration) is filed, as between Buyer and Seller, the "substantially prevailing" (defined below) party therein shall be entitled to recover, as an element of its costs of suit and not as damages, reasonable attorneys' fees and costs from the party not prevailing.  The "*substantially prevailing*" party shall be the party who is entitled to costs of suit, whether or not the suit proceeds to final judgment.

16.7    Waiver of Covenants, Conditions, Remedy.  No waiver of any provision of this Agreement shall be effective unless in writing and duly executed by the Party against whom the waiver is being asserted.   The waiver by one Party of the performance of any covenants, conditions, undertakings, or promises shall not invalidate this Agreement, nor shall it be considered a waiver by it of any other covenant, condition, undertaking, or promise. The exercise of any remedy provided in this Agreement shall not be a waiver of any consistent remedy provided by law, and the provisions in this Agreement for any remedy shall not exclude other consistent remedies unless expressly excluded.

- 20 -

16.8    Survivability of this Agreement.    All representations and warranties, and obligations and other agreements that are performable or relate to a period after the Close of Escrow, shall survive the Close of Escrow and the execution and delivery of the Deed for a period of six (6) months, and shall not be merged therein.

16.9    Partial Invalidity.  If any term, covenant, or provision in this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the provisions shall remain in full force and effect and shall in no way be affected, impaired, or invalidated, provided the material benefit of the Party's bargain intended under this Agreement is still obtainable by such Party after giving effect to the application of such determination.

16.10   Applicable Law.  This Agreement shall be interpreted and construed according to the laws of the State of Arizona, where the Property is located, without regard or reference to the application of its rules, and determinations or application of its conflicts of law.

16.11   No Joint Venture.  Nothing contained herein shall be construed to create, either explicitly or by implication, any manner of co-ownership, partnership or joint venture, between Buyer and Seller.

16.12   Calculation of Dates and Times.  Unless otherwise specified, in computing any period of time described in this Agreement, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included, unless such last day is a Saturday, Sunday or legal holiday under the laws of the State of Arizona, in which event the period shall run until the end of the next day which is neither a Saturday, Sunday or legal holiday ("***Business Day***"). The final day of any such period shall be deemed to end at 5:00 p.m., Mountain Standard Time.

16.13   Recordation.  Buyer shall not have the right to record a memorandum of this Agreement in the real property records of the county in which the Property is located.

16.14   Execution and Delivery.  This Agreement is being entered into and signed by the Buyer in the United States of America.

16.15   No Third Party Beneficiaries.  This Agreement is solely for the benefit of the Parties hereto and their successors and permitted assigns, and this Agreement shall not be deemed to confer upon or give to any other third party any remedy, claim, liability, reimbursement, cause of action or other right, other than the Parties' respective successors and permitted assigns.

16.16   Brokers.  Except for Broker, Seller and Buyer each represents and warrants to the other that it has dealt with no broker or other intermediary in connection with this transaction If any broker or other intermediary other than the Broker claims to be entitled to a fee or commission by reason of having dealt with Seller or Buyer in connection with this transaction, or having introduced the Property to Buyer for sale, or having been the inducing cause to the sale, the Party with whom such broker claims to have dealt shall indemnify, defend and save harmless the other Party of and from any claim for commission or compensation by such broker or other

- 21 -

intermediary.

16.17  <u>Counterpart Execution</u>.   This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.  Facsimile and .pdf signatures to this Agreement shall be acceptable and binding.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF,** each Party hereto has caused this Agreement to be duly executed as of the date(s) set forth below to be effective as of the day and year first above written.

**BUYER:**

**UNS Electric, Inc., an Arizona corporation**

By: _____

Name: _____ THOMAS A. McKENNA

Title: _____ VICE PRESIDENT

**SELLER:**

**The Liquidating Trust of the Consolidated Legacy Debtors Dated July 22, 2013**

By: _____

Name: _____ D. RAY STRONG

## ACKNOWLEDGMENT AND ACCEPTANCE

Receipt of an original of the foregoing Agreement and its Exhibits is acknowledged, and we agree to act as Escrow Agent under and pursuant to the terms and conditions of the Agreement.

Dated: _____, 2015

**Pioneer Title Agency**

By: _____

Name: _____

Title: _____

## EXHIBIT A

*(to Real Estate Purchase and Sale Agreement)*

## DEPICTION AND DESCRIPTION OF THE LAND

THE LEGAL DESCRIPTION ATTACHED HERETO MAY BE AMENDED PURSUANT
TO A TITLE REPORT OBTAINED UNDER SECTION 5.3 OF REAL ESTATE PURCHASE
AND SALE AGREEMENT MUTUALLY AGREEABLE TO ALL PARTIES

**[See pink shaded parcels below]**



Exhibit A – Page 1

**Parcel 1 (Tax ID 310-30-006 -- 155.29 acre parcel)**

That portion of Parcel "C1", as shown on record of Survey Plat recorded June 6, 2005, in Book 28 of Records of Surveys, page 60, records of Mohave County, Arizona, and being a division of Section 15, Township 22 North, Range 16 West of the Gila and Salt River Base and Meridian, Mohave County, Arizona and being more particularly described as follows:

Beginning at the Southwest Section Corner of said Section 15 and running thence, North 00 degrees 10 minutes 00 seconds East, along the West line of said Section 15, a distance of 2640.81 feet to the West one- quarter Section Corner of said Section 15;

Thence South 89 degrees 49 minutes 06 seconds East along the East-West Center Line of said Section 15, a distance of 2643.25 feet to the Northeast corner of the Southwest quarter of said Section 15;

Thence South 00 degrees 09 minutes 54 seconds West, along the North-South Center Line of said Section 15, a distance of 2640.91 feet to South one-quarter Section Corner of said Section 15;

Thence North 89 degrees 48 minutes 58 seconds West, along the South line of said Section 15, a distance of 2643.34 feet to the True Point of Beginning; and

EXCEPT that parcel of land located within the parcel of land described above and being described as follows:

Commencing at the Southwest Section Corner of said Section 15 and running thence, North 00 degrees 10 minutes 00 seconds East, along the West line of said Section 15, a distance of 42.00 feet;

Thence South 89 degrees 48 minutes 58 seconds East, 42.00 feet to the True Point of Beginning;

Thence North 00 degrees 10 minutes 00 seconds East, along a line lying 42.00 feet East of and parallel with the West line of said Section 15, a distance of 465.00 feet;

Thence South 89 degrees 48 minutes 58 seconds East, 465.00 feet;

Thence South 00 degrees 10 minutes 00 seconds West, 465.00 feet;

Thence North 89 degrees 48 minutes 58 seconds West, along a line lying 42.00 feet North of and parallel with the South line of said Section 15, a distance of 465.00 feet to the Point of Beginning.


**Parcel 2 (Tax ID 310-15-018 -- 60 acre parcel)**

That portion of Parcel "D", as shown on record of Survey Plat recorded November 14, 2005, in Book 29 of Records of Surveys, page 98-98A, records of Mohave County, Arizona, and being a division of Section 22, Township 22 North, Range 16 West of the Gila and Salt River Base and Meridian, Mohave County, Arizona and being more particularly described as follows:

Beginning at the Northwest Section Corner of said Section 22 and running thence, South 89 degrees 48 minutes 58 seconds East, along the North line of said Section 22, a distance of 1883.92 feet;

Exhibit A – Page 2

Thence South 00 degrees 08 minutes 31 seconds West, 1271.71 feet;

Thence South 89 degrees 48 minutes 58 seconds West, 1417.22 feet;

Thence South 00 degrees 08 minutes 31 seconds West, 466.68 feet;

Thence North 89 degrees 48 minutes 58 seconds West, 466.70 feet to a point on the West line of said Section 22;

Thence North 00 degrees 08 minutes 31 seconds East, along the West line of said Section 22, a distance of 1738.39 feet to the Point of Beginning;

EXCEPT an undivided ½ interest in and to all oil, gas, hydrocarbons, coal, minerals and mineral rights, as reserved in instrument recorded in Book 2512, page 68 of Official Records.


**Parcel 3 (Tax ID 310-28-019 -- 21.28 acre parcel)**

Parcel B2, as shown on Amended Record of Survey Plat recorded November 10, 2004, in Book 27 of Records of Surveys, page 16, records of Mohave County, Arizona, and being a division of Section 10, Township 22 North, Range 16 West of the Gila and Salt River Base and Meridian, Mohave County, Arizona.

**EXHIBIT B**
*(to Real Estate Purchase and Sale Agreement)*

**When recorded return to:**

UNS Electric, Inc.
2498 Airway Ave.
Kingman, AZ 86409
Attn: Michael Gibelyou, Senior Right-of-Way Agent

**TRUSTEE DEED**

D. Ray Strong, in his capacity as Chapter 11 Trustee for The Liquidating Trust of the
Consolidated Legacy Debtors Dated July 22, 2013 in the Chapter 11 case, styled as *In re Castle
Arch Real Estate Development Company, LLC,* Case No. 11-35082 filed in the United States
Bankruptcy Court for the District of Utah (hereinafter called "*Grantor*"), in consideration of the
sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration in
hand paid by UNS Electric, Inc., an Arizona corporation (hereinafter called "*Grantee*"), the
receipt and sufficiency of such consideration being hereby acknowledged and confessed,
Grantor does hereby GRANT, BARGAIN, SELL and CONVEY unto Grantee, and its
successors and assigns, FOREVER, the real property located in the County of Mohave and
State of Arizona, which is more particularly described on **Exhibit 1** attached hereto and made a
part hereof for all purposes (the "*Land*"), together with all right, title and interest of Grantor, if
any, in (i) all improvements and fixtures on the Land, (ii) all oil, gas, coal, and other minerals,
whether hydrocarbon or not, in, on or under or that may be produced from the Land
(collectively, the "*Minerals*"), (iii) all adjacent and/or contiguous streets, roads, avenues,
alleys, and rights of way, (iv) rivers, streams, and strips and gores of land adjoining, adjacent
and contiguous thereto, (v) all easements, rights of ingress and egress, rights of way, and
covenants appurtenant to the Land, (vi) all riparian rights, surface and underground water
rights, and any and all other water rights pertaining to the Land, and (vii) all permits, approvals,
licenses, rights, and authorizations and exemptions of any kind from governmental authorities
related to the ownership, maintenance, use, development or operation of the Land or any
improvements thereon (the Land together with such rights, titles, being collectively called the
"*Property*"), subject to, however, those exceptions and encumbrances set forth on **Exhibit 2**
attached hereto and made a part hereof for all purposes (said exceptions and encumbrances
being called the "*Permitted Exceptions*").

TO HAVE AND TO HOLD the Property, together with all and singular the rights and
appurtenances thereto in anywise belonging, unto Grantee, its successors and assigns
FOREVER, subject to the Permitted Exceptions.

**IN WITNESS WHEREOF**, the undersigned has made, executed and delivered this Trustee Deed as of this _____ day of _____, 20___.

**GRANTOR:**

By: _____

Name: _____

Title: _____

STATE OF _____           )
COUNTY OF _____           )

      Before me, the undersigned, a Notary Public of the State and County aforesaid, personally appeared _____, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged himself to be _____ of _____, the within named bargainor, a _____, and that he as such _____, being authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the _____ by himself as _____.

      WITNESS my hand and official seal at _____,_____ County, _____, this _____day of _____, 20_____.


_____
Notary Public

My Commission Expires:_____

Exhibit A – Page 5

STATE OF _____  )
COUNTY OF _____  )

The actual consideration or value, whichever is greater, for this transfer is $_____.

_____
Affiant

Subscribed and sworn to before me this _____ day of _____, 20____.

_____
Notary Public

My Commission Expires: _____

## EXHIBIT 1
*(to Trustee Deed)*

## PREMISES

[Legal Description to be added upon receipt of legal description]

**<u>EXHIBIT 2</u>**
*(to Trustee Deed)*

**PERMITTED EXCEPTIONS**

[to be attached after approval by the parties]

**EXHIBIT C**
*(to Purchase and Sale Agreement)*

## FORM OF GENERAL ASSIGNMENT

Reference is hereby made to that certain property located in Mohave County, State of Arizona and described in more detail on **Exhibit 1** attached hereto and made a part hereof and the improvements located thereon and the rights, privileges and entitlements incident thereto (the "*Property*").    For good and valuable consideration, receipt of which is hereby acknowledged, the undersigned ("*Seller*"), to the extent assignable, does hereby, sell, transfer, assign, convey and deliver to UNS Electric, Inc., an Arizona corporation ("*Buyer*"), all of Seller's right, title and interest in any and all assets, rights, materials and/or claims used, owned or held in connection with the use, management, development or enjoyment of the Property (collectively, the "*Rights and Assets*"), including, without limitation:

1.     All right, title and interest of Seller in and to all of the following, to the extent expressly assumed by Buyer at the Close of Escrow: (a) all leases, licenses, permits, entitlements, rights, approvals and privileges relating to or benefitting the Real Property; (b) all Development Documents (as hereinafter defined); (c) all plats, plans, specifications, maps, drawings and other renderings relating to or benefitting the Real Property; (d) all reports, studies, contracts, warranties and any similar rights relating to or benefiting the Real Property; (e) all intangible rights, goodwill and similar rights relating to or benefiting the Real Property; (f) all rights to receive a reimbursement, credit or refund from any applicable agency or entity of any deposits or fees paid in connection with the development of the Real Property; (g) all trade names, trademarks, service marks, domain names, domains, websites and other intellectual property relating to the Real Property and/or any contemplated development thereof; and (h) all water, sanitary sewer, roadway, irrigation and other rights and utilities attached or appurtenant to the Real Property; and

2.     Any and all of Seller's claims, rights to receive, rights to recover, things in action, chose in action and causes of action in any way relating to the Real Property and Personal Property and Intangible Rights, including but not limited to rights, claims and causes of action: (a) for monetary damages, lost profits and consequential damages; (b) for defense or indemnification, whether pursuant to contract or otherwise; (c) arising from or related to violations of Environmental Law, Hazardous Materials, Releases (as such terms are hereinafter defined) or other environmental conditions at, on or emanating from or moving toward, through or under the Real Property; (d) for recovery of attorneys' fees and costs, litigation costs, administrative costs, and punitive or exemplary damages; (e) under any and all current and prior policies of insurance, whether or not still in force and effect, and for subrogation under any and all current and prior policies of insurance and leases, whether or not still in force and effect; and (f) as "lessor," "landlord," or similar designation in Seller's capacity as owner or lessor of the Real Property under any leases affecting the Real Property, whether or not still in force and effect.

3.     THE RIGHTS AND ASSETS ARE BEING QUITCLAIMED "AS IS", "WHERE IS", AND "WITH ALL FAULTS" AS OF THE DATE OF THIS GENERAL ASSIGNMENT, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER AS TO ITS CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY OR

Exhibit C – Page 1

ANY OTHER WARRANTY, EXPRESS OR IMPLIED.   SELLER SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST OR PRESENT, EXPRESS OR IMPLIED, CONCERNING THE RIGHTS AND ASSETS OR SELLER'S TITLE THERETO.   BUYER IS HEREBY THUS ACQUIRING THE RIGHTS AND ASSETS BASED SOLELY UPON BUYER'S OWN INDEPENDENT INVESTIGATIONS AND INSPECTIONS OF THAT PROPERTY AND NOT IN RELIANCE UPON ANY INFORMATION PROVIDED BY SELLER OR SELLER'S AGENTS OR CONTRACTORS.

4.      Buyer hereby accepts the foregoing assignment of the Rights and Assets and hereby assumes all duties and obligations of Seller with respect to the Rights and Assets but only for the period on and after the date of this General Assignment.  Buyer shall defend, indemnify and hold harmless Seller from and against any and all "Claims" that arise from acts or omissions of Buyer which occur after the date of this General Assignment and which are asserted against or incurred by Seller in connection with (a) any acts or omissions, on or after the date of this General Assignment, with respect to the Rights and Assets, and/or (b) the deposits and interest assumed by Buyer hereunder.  "**Claims**" means claims, demands, causes of action, losses, damages, liabilities, judgments, costs and expenses (including attorneys' fees, whether suit is instituted or not).

Capitalized terms not defined herein shall have the meanings given to them in the Real Estate Purchase and Sale Agreement between Buyer and Seller dated _____, 20___, as amended (the "***Purchase Agreement***").

Seller hereby covenants that it will, at any time and from time to time upon written request therefor, execute and deliver to Buyer, its nominees, successors and/or assigns under the Purchase Agreement, any new or confirmatory instruments and do and perform any other acts which Buyer, its nominees, or such successors and/or assigns, may reasonably request in order to fully transfer possession and control of, and protect the rights of Buyer, its nominees, and such successors and/or assigns in, the Rights and Assets.

**[SIGNATURE PAGES FOLLOW]**

Exhibit C – Page 2

**IN WITNESS WHEREOF**, the undersigned has executed this General Assignment as of _____, 20\_\_\_.

**SELLER:**

The Liquidating Trust of the Consolidated Legacy Debtors Dated July 22, 2013

By: _____

Name: _____

**BUYER:**

UNS Electric, Inc., an Arizona corporation

By: _____

Name: _____

Title: _____

Exhibit C – Page 3

## **EXHIBIT 1**
*(to Form of General Assignment)*

### PREMISES

[Legal Description to be added upon receipt of legal description]

Exhibit C – Page 4

**EXHIBIT D**
*(to Real Estate Purchase and Sale Agreement)*

When recorded return to:

UNS Electric, Inc.
2498 Airway Ave.
Kingman, AZ 86409
Attn: Michael Gibelyou, Senior Right-of-Way Agent

**AFFIDAVIT OF DISCLOSURE
PURSUANT TO A.R.S. § 33-422**

I, _____ (Seller(s)) being duly sworn, hereby make this Affidavit of
Disclosure relating to the real property situated in the unincorporated area of Mohave County,
State of Arizona, located at: _____

_____legally described as:

(Legal Description attached hereto as Exhibit "A") ("Property")

     1.     There ☐ is ☐ is not legal access to the property, as defined in A.R.S. § 11-831
☐ Unknown
Explain: _____
_____
_____

     2.     There ☐ is ☐ is not physical access to the property. ☐ Unknown
Explain: _____
_____
_____

     3.     There ☐ is ☐ is not a statement from a licensed surveyor or engineer available
stating whether the property has physical access that is traversable by a two-wheel drive
passenger motor vehicle.

     4.     The legal and physical access to the property ☐ is ☐ is not the same ☐
Unknown ☐ not applicable.

Exhibit D – Page 1

Explain: _____

_____

_____

*If access to the parcel is not traversable by emergency vehicles, the county and emergency service providers may not be held liable for any damages resulting from the inability to traverse the access to provide needed services.*

     5.    The road(s) is/are ☐ publicly maintained ☐ privately maintained ☐ not maintained ☐ not applicable.  If applicable, there ☐ is ☐ is not a recorded road maintenance agreement.

*If the roads are not public maintained, it is the responsibility of the property owner(s) to maintain the roads and roads that are not improved to county standards and accepted for maintenance are not the county's responsibility.*

     6.    A portion or all of the property ☐ is ☐ is not located in a FEMA designated regulatory floodplain.  If the property is in a floodplain, it may be subject to floodplain regulation.

     7.    The property ☐ is ☐ is not subject to ☐ fissures or ☐ expansive soils ☐ unknown.
Explain: _____

_____

_____

     8.    The following services are currently provided to the property: ☐ water ☐ sewer ☐ electric ☐ natural gas ☐ single party telephone ☐ cable television services.

     9.    The property ☐ is ☐ is not served by a water supply that requires the transportation of water to the property.

     10.    The property is served by ☐ a private water company ☐ a municipal water provider ☐ a private well ☐ a shared well ☐ no well.  If served by a shared well, the shared well ☐ is ☐ is not a public water system, as defined by the safe drinking water act (42 United States Code § 300f).

*Notice to buyer: if the property is served by a well, private water company or a municipal water provider the Arizona department of water resources may not have made a water supply determination.  For more information about water supply, contact the water provider.*

Exhibit D – Page 2

11.    The property ☐ does have ☐ does not have an on-site wastewater treatment facility (i.e., standard septic or alternative system to treat and dispose of wastewater) ☐ unknown.  If applicable: a) the property ☐ will ☐ will not require installation of an on-site wastewater treatment facility; b) the on-site wastewater treatment facility ☐ has ☐ has not been inspected.

12.    The property ☐ has been ☐ has not been subject to a percolation test ☐ unknown.

13.    The property ☐ does ☐ does not meet the minimum applicable county zoning requirements of the applicable zoning designation.

14.    The sale of the property ☐ does ☐ does not meet the requirements of A.R.S. § 11-831 regarding land divisions.  If those requirements are not met, the property owner may not be able to obtain a building permit.  The seller or property owner shall disclose each of the deficiencies to the buyer.
Explain: _____
_____
_____

15.    The property ☐ is ☐ is not located in the clear zone of a military airport or ancillary military facility, as defined in A.R.S. § 28-8461.  (Maps are available at the state real estate department's web site.)

16.    The property ☐ is ☐ is not located in the high noise or accident potential zone of a military airport or ancillary military facility, as defined in A.R.S. § 28-8461.  (Maps are available at the state real estate department's web site.)

17.    Notice:  If the property is located within the territory in the vicinity of a military airport or ancillary military facility the property is required to comply with sound attenuation standards as prescribed by A.R.S. § 28-8482.  (Maps are available at the state real estate department's web site.).

18.    The property ☐ is ☐ is not located under military restricted airspace.  ☐ Unknown.  (Maps are available at the state real estate department's web site.)

19.    The property ☐ is ☐ is not located in a military electronics range as defined in A.R.S. §§ 9-500.28 and 11-818. ☐ unknown. (Maps are available at the state real estate department's website.)

20.     Use of the property ☐ is ☐ is not limited in any way relating to an encumbrance of title due to a *lis pendens*, a court order or a state real estate department order or a pending legal action.  If the use of the property is limited due to an encumbrance of title, the Seller or property owner shall disclose the limitations to the buyer.

Explain: _____

_____

_____

This affidavit of disclosure supersedes any previously recorded affidavit of disclosure.

I certify under penalty of perjury that the information contained in this affidavit is true, complete and correct according to my best belief and knowledge.

Dated this _____ day of _____, ____.

Seller's Name (print): _____     Signature:_____

STATE OF _____          )

                                                      ) ss.

County of _____          )

Subscribed and sworn to before me this _____ day of _____, ____.

_____

Notary Public

My commission expires:

_____

Exhibit D – Page 5

Buyer(s) hereby acknowledges receipt of a copy of this affidavit of disclosure this _____ day of _____, ____.

UNS Electric, Inc., an
Arizona corporation

By:_____
Name (print):_____
Title: _____

STATE OF ARIZONA              )
                             ) ss.
County of _____    )

      Subscribed and sworn to before me this _____ day of _____, ____.

_____
             Notary Public

My commission expires:
_____

EXHIBIT "A" TO AFFIDAVIT OF DISCLOSURE

[attach legal description of Property]

**EXHIBIT E**
*(to Real Estate Purchase and Sale Agreement)*

**GENERAL ESCROW PROVISIONS**

1.          Deposit of Funds.

1.1     All funds received by Escrow Agent, pursuant to this escrow, shall be deposited in one or more commercial checking accounts (whether interest-bearing or otherwise to be determined by Buyer from time to time in Buyer sole and absolute discretion) with one or more commercial banks, as directed by Buyer from time to time.

1.2     Any commitment made in writing to your company by a bank, trust company, insurance company, or savings and loan association, to deliver its check or funds into this escrow may, in the sole discretion of your company, be treated as the equivalent of a deposit in this escrow as provided therein.

1.3     The Deposit referred to in the Summary of Terms shall be handled as provided in the Agreement.

1.4     If for any reason the Close of Escrow does not occur, Escrow Agent shall deliver the Deposit to Seller or Buyer only upon receipt of a written demand therefor from such Party, subject to the following provisions of this Section. If for any reason the Close of Escrow does not occur and either Party makes a written demand upon Escrow Agent for payment of the Deposit, Escrow Agent shall give written notice to the other Party of such demand. If Escrow Agent does not receive a written objection from the other Party to the proposed payment within ten (10) days after the giving of such notice, Escrow Agent is hereby authorized to make such payment. If Escrow Agent does receive such written objection within such period, Escrow Agent shall continue to hold such amount until otherwise directed by written instructions signed by Seller and Buyer or a final judgment of a court.

2.          Prorations and Adjustments.

2.1     All prorations and/or adjustments called for in this escrow are to be made on the basis of the actual number of days in the month or year in question.

2.2     "*Close of Escrow*" means the date on which documents are recorded, and relates only to prorations and/or adjustments unless otherwise specified.

3.          Termination of Agency Obligation.

3.1     If there is no action taken on or additional instructions given regarding this escrow within six (6) months after the date scheduled for the Close of Escrow as set forth in the agreement and escrow instructions or written extensions thereof, your agency obligation shall terminate at your option and all documents, moneys, or other items held by you shall be returned to the parties depositing same.

   3.2  In the event of cancellation of this escrow, whether it be at the request of any of the principals or otherwise, the fees and charges due your company, including expenditures incurred and/or authorized shall be borne equally by the Parties hereto (unless otherwise agreed to specifically).

  **4.**    <u>Conflicting Instructions</u>.  Upon receipt of any conflicting instructions, other than cancellation instructions, you are no longer obligated to take any further action in connection with this escrow until further consistent instructions are received from the principals to this escrow.

  **5.**    <u>Counterparts</u>. All supplements or amendments hereto may be signed in counterparts with the same effect as if both Parties have signed a single document.

# EXHIBIT B

**DN** **Dell Nichols**
*Realty & Development, LLC*

*"Creating Real Estate Value"*
**EXCLUSIVE AUTHORIZATION OF SALE**

D. Ray Strong, as Chapter 11 Trustee for Castle Arch Real Estate Investment Company, LLC and manager of affiliated entities noted below ("Owner") in the bankruptcy cases being jointly administered under Case No. 11-35082 in the United States Bankruptcy Court for the District of Utah ("Bankruptcy Court") hereby grants to Dell Nichols Realty & Development, LLC ("Broker"), the exclusive right to negotiate a sale with respect to the real property described below (the "Property") for a period commencing on___December 3, 2013___and ending at midnight on December 2, 2014_____, (the "Listing Period") unless this Authorization is extended in writing and signed by both Owner and Broker, or unless otherwise ordered by the Bankruptcy Court.  The Properties are as outlined on Exhibit "A" which by referenced is made a part hereof.

Notwithstanding the foregoing, the Owner and Broker shall have the option to terminate this Agency Agreement upon thirty (30) days written notice to the other party, or if otherwise ordered by the Bankruptcy Court.  However, the Owner's agreement to pay a commission to the Brokerage extends until a date one (1) year following the termination date with regard to anyone who was shown or offered the Property under section 2 and who acquires it within this extended time period, unless the Broker terminates this Agency Agreement.

The price, terms and conditions of the sale for each property, owned by the entities shown on Exhibit "A", shall be determined by Owner on a property by property basis.  The sales price, terms and conditions to which the Owner of the Property agrees in writing will be that represented to the marketplace.  Any and all sales hereunder will be as is and expressly conditioned on approval by the Bankruptcy Court after appropriate notice and hearing.

In consideration of the mutual promises contained in this Authorization, Owner agrees to pay Broker commissions as follows:

Six (6%) percent of the gross sales price or as otherwise agreed to in writing by the Owner.

Commissions shall be paid through escrow upon the closing of sales or exchange transactions after Bankruptcy Court approval; absent an escrow, commissions shall be paid upon recordation of a deed or upon delivery of such deed or other instrument of conveyance if recordation is deferred more than one month thereafter. Owner shall pay said commissions to Broker if during the Listing Period: (a) the Property or any interest therein is sold, transferred or conveyed by or through Broker, Owner or any other person or entity; or (b) a purchaser is procured by or through Broker, Owner or any other person or entity who is ready, willing and able to purchase the Property or any interest therein on the terms above stated or other terms acceptable to the owner of the Property.

Owner agrees to cooperate with Broker in effecting a sale of the Property and immediately to refer to Broker all inquiries of any person or entity interested in purchasing the Property. All negotiations are to be through Broker. Owner agrees that the applicable bankruptcy estate will pay all customary escrow, title and revenue charges after Bankruptcy Court approval, and Owner will execute such documents as may be necessary to effect a sale of the Property. Broker is authorized to accept a deposit from any prospective purchaser.  In sales and exchange transactions, Broker is authorized, upon the opening of escrow, to transfer such deposit to the escrow agent for the account of the purchaser.

It is understood that it is illegal for either Owner or Broker to refuse to present, sell or lease real property to any person because of race, color, religion, national origin, sex, marital status, age or physical disability.

Owner hereby warrants and represents to Broker that: (1) he has authority to act on behalf of the title owners for the property as trustee in the above-noted bankruptcy case; neither Broker nor any salesperson affiliated with Broker has made any promises or representations to or agreements with Owner not contained herein which in any manner affected Owner's and Broker's rights and obligations under this Authorization.

In the event a claim or controversy arises concerning any failure to pay Broker all or any portion of the amounts provided herein, Owner and Broker hereby agree that such claim or controversy shall be determined by the Bankruptcy Court.

**AGENCY.**

The Broker and its agents named in this Authorization are agents of the Owner. As such they owe the Owner fiduciary duties of undivided loyalty, obedience to lawful instructions, full disclosure, confidentiality, reasonable care, diligence and accounting.

The Owner instructs the Broker to cooperate by sharing the commission under this Authorization with other licensed brokers and agents.

If the commission split is other than   50 / 50   of the net Broker commission amount with another broker, it must be approved in writing by the Owner.

The heirs, transferees, successors and assigns of the parties hereto are duly bound by the provisions hereof.

**The Broker shall be permitted to co-list the Property with other brokers, providing the co-list broker commission shall be paid by Broker within the commission amounts stated above.**

**NO MODIFICATION OF OR AMENDMENT TO THIS LISTING SHALL BE EFFECTIVE UNLESS THE SAME IS IN WRITING AND SIGNED BY BOTH THE OWNER AND AN AUTHORIZED OFFICER OF BROKER.**

Owner hereby acknowledges that neither Broker nor any salesperson associated with Broker is qualified or authorized to give legal or tax advice; if Owner desires such advice he shall consult with an attorney or accountant.

Owner acknowledges receipt of a copy of this Authorization and which Owner has read and understands.

**D. Ray Strong as Chapter 11 Trustee for Consolidated Legacy Debtors, CAOPI, and CAOPII; Post-Confirmation Estate Representative and Trust Trustee for the Legacy, CAOPI, and CAOPII Trusts**

DATED   2/20/14

By:   _____
**D. Ray Strong**

Its:   **Chapter 11 Trustee, Post-Confirmation Trust Trustee, and Estate Representative**

Address:   **201 South Main Street, Suite 450
Salt Lake City, UT  84111**

**Dell Nichols Realty & Development, LLC**

By:   _____
its principal broker

2

## EXHIBIT "A"

**PROPERTY**

Tooele, UT – Land with Water Rights (if any) – Approx. 348 acres

Kingman, AZ – Land with Water Rights (if any) – Approx. 535 acres

Smyrna, TN – Land with Water Rights (if any) – Approx. 485 acres

Thayne, WY – Land with Water Rights (if any) – Approx. 39 acres

**OWNERSHIP ENTITIES:**

Castle Arch Real Estate Investment Company, LLC

CAOP Managers, LLC

Castle Arch Opportunity Partners I, LLC

Castle Arch Opportunity Partners II, LLC

Castle Arch Secured Development Fund, LLC

Castle Arch Kingman, LLC

Castle Arch Smyrna, LLC



# EXHIBIT C

## Commitment for Title Insurance

*First American Title*™

ISSUED BY

# Pioneer Title Agency **as agent for First American Title Insurance Company**

# Commitment

First American Title Insurance Company, a Nebraska corporation ("Company"), for a valuable consideration, commits to issue its policy or policies of title insurance, as identified in Schedule A, in favor of the Proposed Insured named in Schedule A, as owner or mortgagee of the estate or interest in the land described or referred to in Schedule A, upon payment of the premiums and charges and compliance with the Requirements; all subject to the provisions of Schedules A and B and to the Conditions of this Commitment.

This Commitment shall be effective only when the identity of the Proposed Insured and the amount of the policy or policies committed for have been inserted in Schedule A by the Company.

All liability and obligation under this Commitment shall cease and terminate 180 days after the Effective Date or when the policy or policies committed for shall issue, whichever first occurs, provided that the failure to issue the policy or policies is not the fault of the Company.

The Company will provide a sample of the policy form upon request.

In Witness Whereof, First American Title Insurance Company has caused its corporate name and seal to be affixed by its duly authorized officers on the date shown in Schedule A.

**First American Title Insurance Company**

Dennis J. Gilmore
President

Jeffrey S. Robinson
Secretary

# Pioneer Title Agency, Inc.

2213 Stockton Hill Road, ,Kingman, AZ 86401

(This Commitment is valid only when Schedules A and B are attached)

Copyright 2006-2009 American Land Title Association. All rights reserved. The use of this form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

CONDITIONS

1.    The term mortgage, when used herein, shall include deed of trust, trust deed, or other security instrument.

2.    If the proposed Insured has or acquired actual knowledge of any defect, lien, encumbrance, adverse claim or other matter affecting the estate or interest or mortgage thereon covered by this Commitment other than those shown in Schedule B hereof, and shall fail to disclose such knowledge to the Company in writing, the Company shall be relieved from liability for any loss or damage resulting from any act of reliance hereon to the extent the Company is prejudiced by failure to so disclose such knowledge. If the proposed Insured shall disclose such knowledge to the Company, or if the Company otherwise acquires actual knowledge of any such defect, lien, encumbrance, adverse claim or other matter, the Company at its option may amend Schedule B of this Commitment accordingly, but such amendment shall not relieve the Company from liability previously incurred pursuant to paragraph 3 of these Conditions.

3.    Liability of the Company under this Commitment shall be only to the named proposed Insured and such parties included under the definition of Insured in the form of policy or policies committed for and only for actual loss incurred in reliance hereon in undertaking in good faith (a) to comply with the requirements hereof, or (b) to eliminate exceptions shown in Schedule B, or (c) to acquire or create the estate or interest or mortgage thereon covered by this Commitment. In no event shall such liability exceed the amount stated in Schedule A for the policy or policies committed for and such liability is subject to the insuring provisions and Conditions and the Exclusions from Coverage of the form of policy or policies committed for in favor of the proposed Insured which are hereby incorporated by reference and are made a part of this Commitment except as expressly modified herein.

4.    This Commitment is a contract to issue one or more title insurance policies and is not an abstract of title or a report of the condition of title. Any action or actions or rights of action that the proposed Insured may have or may bring against the Company arising out of the status of the title to the estate or interest or the status of the mortgage thereon covered by this Commitment must be based on and are subject to the provisions of this Commitment.

5.    The policy to be issued contains an arbitration clause. All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties. You may review a copy of the arbitration rules at< http://www.alta.org/>.

| | **Commitment for Title Insurance** |
|---|---|
| First American Title™ | BY<br>**Pioneer Title Agency** as agent for First<br>American Title Insurance Company |
| **Schedule A** | |

Order No.:  **02852616-029**

1.   Effective Date:  **12/15/14 at 7:30 AM**

2.   Policy or Policies to be issued:                                                    Amount

    a.   **ALTA Extended Owners Policy (6-17-06)**                          **$413,058.00**

        Proposed Insured:

        **UNS Electric, Inc., an Arizona Corporation**

    b.   **None**                                                                     **$0.00**

        Proposed Insured:

    c.   **None**                                                                     **$0.00**

        Proposed Insured:

3.   The estate or interest in the land described or referred to in this Commitment is

    **A FEE**

4.   Title to the fee estate or interest in the land is at the Effective Date vested in:

    **CASTLE ARCH REAL ESTATE INVESTMENT COMPANY, L.L.C., A CALIFORNIA LIMITED LIABILITY
    COMPANY who acquired title as CASTLE ARCH REAL ESTATE INVESTMENT CO., A CALIFORNIA
    LIMITED LIABILITY COMPANY**

5.   The land referred to in this Commitment is described as follows:

    **See Exhibit A attached hereto and made a part hereof.**

By: _____
          Authorized Countersignature
    Examined by: **Kathleen Zach**

| | **Commitment for Title Insurance** |
|---|---|
| *First American Title*™ | BY |
| | **Pioneer Title Agency** as agent for First American Title Insurance Company |
| **Exhibit A** | |

Order No.: **02852616-029-SHH**

**LEGAL DESCRIPTION**

The Land referred to herein below is situated in the County of Mohave, State of Arizona, and is described as follows:

PARCEL NO. 1:
(310-30-006)

THAT PORTION OF PARCEL "C1", AS SHOWN ON RECORD OF SURVEY PLAT RECORDED JUNE 6, 2005, IN BOOK 28 OF RECORDS OF SURVEYS, PAGE 60, RECORDS OF MOHAVE COUNTY, ARIZONA, AND BEING A DIVISION OF SECTION 15, TOWNSHIP 22 NORTH, RANGE 16 WEST OF TL1E GILA AND SALT RIVER BASE AND MERIDIAN, MOHAVE COUNTY, ARIZONA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWEST SECTION CORNER OF SAID SECTION 15 AND RUNNING THENCE, NORTH 00 DEGREES 10 MINUTES 00 SECONDS EAST, ALONG THE WEST LINE OF SAID SECTION 15, A DISTANCE OF 2640.81 FEET TO THE WEST ONE-QUARTER SECTION CORNER OF SAID SECTION 15;

THENCE, SOUTH 89 DEGREES 49 MINUTES 06 SECONDS EAST ALONG THE EAST-WEST CENTER LINE OF SAID SECTION 15, A DISTANCE OF 2643.25 FEET TO THE NORTHEAST CORNER OF THE SOUTHWEST QUARTER OF SAID SECTION 15;

THENCE, SOUTH 00 DEGREES 09 MINUTES 54 SECONDS WEST, ALONG THE NORTH-SOUTH CENTER LINE OF SAID SECTION 15, A DISTANCE OF 2640.91 FEET TO THE SOUTH ONE-QUARTER SECTION CORNER OF SAID SECTION 15; THENCE, NORTH 89 DEGREES 48 MINUTES 58 SECONDS WEST, ALONG THE SOUTH LINE OF SAID SECTION 15, A DISTANCE OF 2643.34 FEET TO THE POINT OF BEGINNING;

EXCEPT THEREFROM THAT PARCEL OF LAND LOCATED WITHIN THE PARCEL OF LAND DESCRIBED ABOVE AND BEING DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHWEST SECTION CORNER OF SAID SECTION 15 AND RUNNING THENCE, NORTH  00 DEGREES 10 MINUTES 00 SECONDS EAST, ALONG THE WEST LINE OF SAID SECTION 15, A DISTANCE OF 42.00 FEET;

THENCE, SOUTH 89 DEGREES 48 MINUTES 58 SECONDS EAST, 42.00 FEET TO THE TRUE POINT OF BEGINNING;

THENCE, NORTH 00 DEGREES 10 MINUTES 00 SECONDS EAST, ALONG A LINE LYING 42.00 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID SECTION 15, A DISTANCE OF 465.00 FEET;

THENCE, SOUTH 89 DEGREES 48 MINUTES 58 SECONDS EAST, 465.00 FEET;

**Commitment for Title Insurance**

*First American Title*™

BY

**Pioneer Title Agency** as agent for
**First American Title Insurance Company**

# Exhibit A (Continued)

Order No.: **02852616-029-SHH**

THENCE, SOUTH 00 DEGREES 10 MINUTES 00 SECONDS WEST, 465.00 FEET;

THENCE, NORTH 89 DEGREES 48 MINUTES 58 SECONDS WEST, ALONG A LINE LYING 42.00 FEET NORTH OF AND PARALLEL WITH THE SOUTH LINE OF SAID SECTION 15, A DISTANCE OF 465.00 FEET TO THE POINT OF BEGINNING.

PARCEL NO. 2:
(310-28-019)

PARCEL B2, AS SHOWN ON AMENDED RECORD OF SURVEY PLAT RECORDED NOVEMBER 10, 2004, IN BOOK 27 OF RECORDS OF SURVEYS, PAGE 16, RECORDS OF MOHAVE COUNTY, ARIZONA, AND BEING A DIVISION OF SECTION 10, TOWNSHIP 22 NORTH, RANGE 16 WEST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MOHAVE COUNTY, ARIZONA.

EXCEPT ALL OIL, GAS, COAL AND MINERALS, AS RESERVED IN INSTRUMENT RECORDED IN BOOK 78 OF DEEDS, PAGE 143.

PARCEL NO. 3:
(320-15-018)

THAT PORTION OF PARCEL "D", AS SHOWN ON RECORD OF SURVEY PLAT RECORDED NOVEMBER 14, 2005 IN BOOK 29 OF RECORDS OF SURVEYS, PAGES 98-98A, RECORDS OF MOHAVE COUNTY, ARIZONA AND BEING A DIVISION OF SECTION 22, TOWNSHIP 22 NORTH, RANGE 16 WEST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MOHAVE COUNTY, ARIZONA, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST SECTION CORNER OF SAID SECTION 22 AND RUNNING THENCE, SOUTH 89 DEGREES 48 MINUTES 58 SECONDS EAST, ALONG THE NORTH LINE OF SAID SECTION 22, A DISTANCE OF 1883.92 FEET;

THENCE, SOUTH 00 DEGREES 08 MINUTES 31 SECONDS WEST, 1271.71 FEET;

THENCE, NORTH 89 DEGREES 48 MINUTES 58 SECONDS WEST, 1417.22 FEET:

THENCE, SOUTH 00 DEGREES 08 MINUTES 31 SECONDS WEST, 466.68 FEET;

THENCE, NORTH 89 DEGREES 48 MINUTES 58 SECONDS WEST, 466.70 FEET TO A POINT ON THE WEST LINE OF SAID SECTION 22;

THENCE, NORTH 00 DEGREE 08 MINUTES 31 SECONDS EAST, ALONG THE WEST LINE OF SAID SECTION 22, A DISTANCE OF 1738,39 FEET TO THE POINT OF BEGINNING.

**Commitment for Title Insurance**

*First American Title*™

BY

**Pioneer Title Agency** as agent for

**First American Title Insurance Company**

# Exhibit A (Continued)

Order No.: **02852616-029-SHH**

EXCEPT AN UNDIVIDED 1/2 INTEREST IN AND TO ALL OIL, GAS, HYDROCARBONS, COAL, MINERALS AND MINERAL RIGHTS, AS RESERVED IN INSTRUMENT RECORDED IN BOOK 2512, PAGE 68 OF OFFICIAL RECORDS.

## Commitment for Title Insurance

*First American Title™*

BY

## Pioneer Title Agency **as agent for First American Title Insurance Company**

# Schedule BI

Order No.: **02852616-029-SHH**

## <u>REQUIREMENTS</u>

The following requirements must be satisfied:

1. Payment of the necessary consideration for the estate or interest to be insured.

2. Pay all premiums, fees and charges for the policy.

3. Documents creating the estate or interest to be insured, must be properly executed, delivered and recorded.

4. Payment of all taxes and/or assessments levied against the subject premises which are due and payable.

5. Pay 2010 through 2013 taxes by Redemption from Certificate of Purchase No. (unknown), Parcel No. 310-30-006. NOTE:  Mohave County Treasurer's records indicate that there are fees still due under Tax Year 2009. (affects Parcel No. 1)

6. Pay 2014 taxes, Parcel No. 310-30-006, now delinquent and interest must be added . (affects Parcel No. 1)

7. Pay 2010 through 2013 taxes by Redemption from Certificate of Purchase No. (unknown), Parcel No. 310-28-019. (affects Parcel No. 2)

8. Pay 2014 taxes, Parcel No. 310-28-019. (affects Parcel No. 2)

9. Pay 2010 through 2013 taxes by Redemption from Certificate of Purchase No. (unknown), Parcel No. 310-15-018. NOTE:  Mohave County Treasurer's records indicate that there are fees still due under Tax Year 2009. (affects Parcel No. 3)

10. Pay 2014 taxes, Parcel No. 310-15-018. (affects Parcel No. 3)

    NOTE: Contact the Mohave County Treasurer at (928) 753-0737 prior to close of this transaction to confirm amount. Any taxes due at time of closing will be shown on policy.

11. Approval by all parties of the legal description to be insured herein.

_____          _____
Seller                                Buyer



**Commitment for Title Insurance**

BY

# Pioneer Title Agency as agent for
**First American Title Insurance Company**

## Schedule BI (Continued)

Order No.: **02852616-029-SHH**

12. Usual inspection report by an employee of the Company immediately prior to recording. If such inspection discloses any work started or materials delivered then furnish Letter of Indemnity and other supporting documentation as listed below assuring PIONEER TITLE AGENCY, INC. and First American Title Insurance Company, that they will be held harmless from any claim arising from the construction of any improvements on the herein described property. Said Letter of Indemnity is <u>subject to the approval</u> of PIONEER TITLE AGENCY, INC., and/or First American Title Insurance Company.

   a) Loss of Priority Questionnaire
   b) Copy of construction loan agreement with construction cost breakdown
   c) Copy of financial statements for Indemnitors
   d) Copies of any lien waivers, paid receipts or cancelled checks
   e) Copy of Certificate of Occupancy/Final Inspection form
   f) Copy of appraisal of said property

   Said indemnity must be executed by the Manager/Managing Member of Castle Arch Real Estate Investment Company, L.L.C., individually and as authorized officer and  the general contractor, together with spouse, if applicable.

13. FURNISH plat of survey acceptable to the Company. The right is reserved to make additional requirements or exceptions upon examination of said plat.

   NOTE: The plat of survey furnished to satisfy the above requirements must be made by a Registered Land Surveyor, showing proper ties to locating monuments, location of the improvements on the premises, easements or rights-of-way, over or under the property, together with any encroachments or projections, fences or any other matters affecting the use and occupancy of the premises, and CERTIFICATION BY said Land Surveyor shall read as follows:

   To (name of insured, if known), (name of lender, if known), (name of insurer, if known), (names of others as negotiated with the client):

   This is to certify that this map or plat and the survey on which it is based were made in accordance with the 2011 Minimum Standard Detail Requirements for **ALTA/ACSM** Land Title Surveys, jointly established and adopted by ALTA and NSPS and includes Items 1, 8, 10, 11(b), 16, 17, 20(a), and 20(b) from Table A thereof.   The filed work was completed on _____.

   Date of Plat or Map: _____ (Surveyor's signature, printed name and seal with Registration/License Number)

   Upon furnishing of said plat, any matter disclosed by said plat will be added to Schedule B.

   NOTE: Should Zoning coverage be requested, items 7(a), 7(b), 7(c), and 9 of Table A, and information regarding the usage of the property must be included.

14. Furnish the Company with proper Estoppel(s) by the Owner itemizing all Leases, identifying Lessee, date of Lease, terms and any options to renew.  Said Estoppel shall also state that none of the leases referred to therein contain options to purchase.

   Upon receipt and approval by the Company, Exception No. 21 of Schedule B, Part II will be limited to those parties identified in the Estoppel.

**Commitment for Title Insurance**

BY

## Pioneer Title Agency as agent for

**First American Title Insurance Company**

## Schedule BI (Continued)

*First American Title*™

Order No.: **02852616-029-SHH**

15. Furnish copy of Certificate of Registration of the foreign limited liability company named below filed with the Arizona Corporation Commission.

Limited Liability Company          CASTLE ARCH REAL ESTATE INVESTMENT COMPANY, L.L.C., A CALIFORNIA LIMITED LIABILITY

or
Proper showing that said limited liability company is in good standing in its domiciliary jurisdiction.

The right is reserved to make additional requirements upon examination of said certificate.

16. Furnish copy of filed Articles of Organization of the limited liability company named below which states whether said limited liability company is member managed or manager managed:

Limited Liability Company          : CASTLE ARCH REAL ESTATE INVESTMENT COMPANY, L.L.C., A CALIFORNIA LIMITED LIABILITY

17. Submit fully executed copy of the Operating Agreement (and all amendments) of the limited liability company named below for examination. The right is reserved to make additional requirements upon said examination.

Limited Liability Company          : CASTLE ARCH REAL ESTATE INVESTMENT COMPANY, L.L.C., A CALIFORNIA LIMITED LIABILITY

The right is reserved to make additional requirements upon examination of the above.

18. Furnish Certified copy of Resolution signed by all members of the limited liability company named below, designating the empowered party(ies) and authorizing this transaction:

Limited Liability Company          CASTLE ARCH REAL ESTATE INVESTMENT COMPANY, L.L.C., A CALIFORNIA LIMITED LIABILITY

-or-

In lieu of the above requirement, ALL MEMBERS of said limited liability company must join in the execution of the Deed in Lieu of Foreclosure referred to in Requirement    herein.

19. Proper proceedings in the United States District Court, Arizona District, in the matter of the Estate of  CASTLE ARCH REAL ESTATE INVESTMENT COMPANY, L.L.C., A CALIFORNIA LIMITED LIABILITY, debtor, Case No. 11-35082, leading to the recordation of a certified copy of an Order authorizing or approving this transaction.
Note: Escrow shall not close and policy issued until 14 days from the date of said Order confirming sale has been entered with the Clerk of the Bankruptcy Court, with no appeal from said Order or request to extend the 14 day period having been filed.  Prior to close of Escrow and no sooner than 14 days subsequent to the entry of the Order, Escrow must request a Company employee to verify that the appeal period has expired and that no appeal or request to extend the 14 day period has been filed.



*First American Title™*

**Commitment for Title Insurance**

BY

## Pioneer Title Agency as agent for
**First American Title Insurance Company**

# Schedule BI (Continued)

Order No.: **02852616-029-SHH**

20. Record Partial Release of the subject property from Mortgage in the original amount of $1,280,000.00,and any other amount payable under the terms thereof:

| | |
|---|---|
| Dated: | March 25, 2008 |
| Recorded: | April 28, 2008 |
| Book: | 7184 of Official Records |
| Page: | 219 |
| Instrument No.: | 2008029732 |
| Mortgagor | Castle Arch Kingman, L.L.C., a limited liability company |
| Mortgagee | Castle Arch Secured Development Fund, L.L.C., a Nevada Limited Liability Company |

(affects Parcel No. 2)

21. Record Partial Release of the subject property from Mortgage:

| | | |
|---|---|---|
| Amount | : | $3,325,892.81 |
| Dated | : | June 30, 2009 |
| Recorded | : | July 2, 2009 |
| Book | : | 7523 of Official Records |
| Page | : | 934 |
| Mortgagor | : | Castle Arch Kingman, L.L.C., a limited liability company |
| Mortgagee | : | Castle Arch Secured Development Fund, L.L.C., a Nevada limited liability company |

(affects Parcel No. 2)

22. Record Deed from CASTLE ARCH REAL ESTATE INVESTMENT COMPANY, L.L.C., A CALIFORNIA LIMITED LIABILITY COMPANY who acquired title as CASTLE ARCH REAL ESTATE INVESTMENT CO., A CALIFORNIA LIMITED LIABILITY COMPANY to UNS Electric, Inc., an Arizona Corporation.
NOTE:  ARS 11:1133 may require the completion and filing of an Affidavit of Value.

TAX NOTE:

| | |
|---|---|
| Year | 2014 |
| Parcel No. | 310-30-006 |
| Total Tax | $1,294.48 |
| First Half | Delinquent |
| Second Half | Payable |

(NOTE:  2010 through 2013 taxes are delinquent)
(affects Parcel No. 1)

TAX NOTE:

| | |
|---|---|
| Year | 2014 |
| Parcel No. | 310-28-019 |
| Total Tax | $321.56 |
| First Half | Delinquent |
| Second Half | Payable |

(NOTE:  2010 through 2013 taxes are delinquent; and fees from 2009 are due)
(affects Parcel No. 2)

**Commitment for Title Insurance**

*First American Title*™

BY

**Pioneer Title Agency** as agent for
**First American Title Insurance Company**

# Schedule BI (Continued)

Order No.:  **02852616-029-SHH**

TAX NOTE:

| | |
|---|---|
| Year | 2014 |
| Parcel No. | 310-15-018 |
| Total Tax | $709.58 |
| First Half | Delinquent |
| Second Half | Payable |

(NOTE:  2010 through 2013 taxes are delinquent; and fees from 2009 are due)
(affects Parcel No. 3)

NOTE:  The only conveyance(s) affecting said land recorded within 24 months of the date of this commitment is (are) as follows:

NONE

NOTE:   The company hereby informs the parties that it has not made a determination of whether or not this transaction is subject to the provisions of ARS 33-422 entitled "Land Divisions; Disclosure Affidavit; Recording and ARS 11-831 entitled "Review of Land Divisions; Definitions."  It will be the responsibility of the parties to make this determination, therefore, the company assumes no liability with respect to these matters.

**Note:  Pursuant to Arizona Revised Statutes 11-480, effective January 1, 1991, the County Recorder may not accept documents for recording that do not comply with the following:**

- **Print must be ten-point type (pica) or larger.**
- **Margins of at least one-half inch along the left and right sides one-half inch across the bottom and at least two inches on top for recording and return address information.**
- **Each instrument shall be no larger than 8 ½ inches in width and 14 inches in length.**

**End of Schedule BI**

| | **Commitment for Title Insurance** |
|---|---|
| First American Title™ | BY |
| | **Pioneer Title Agency** as agent for First American Title Insurance Company |
| **Schedule BII** | |

Order No.: **02852616-029-SHH**

<u>**EXCEPTIONS**</u>

The policy or policies to be issued will contain exceptions to the following matters unless the same are disposed of to the satisfaction of the Company:

1.  (a)  Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies  taxes or assessments on real property or by the Public Records;(b)  proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2.  Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.

3.  Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.

4.  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land not shown by the Public Records.

5.  (a)  Unpatented mining claims; (b)  reservations or exception in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), (c) are shown by the Public Records.

(Note:  The above Exceptions Nos. 1 through 5, inclusive, will be eliminated from any A.L.T.A. Extended Coverage Policy, A.L.T.A. Plain Language Policy, A.L.T.A. Homeowner's Policy, A.L.T.A. Expanded Coverage Residential Loan Policy and any short form versions thereof. However, the same or similar exception may be made in Schedule B of those policies in conformity with the remaining Exceptions of this Commitment shown below.)

6.  Taxes and assessments collectible by the County Treasurer not yet due and payable for the following year:

    Year                              : 2015

7.  Water rights, claims or title to water, whether or not shown by the public records.

8.  Easements and rights incident thereto, as set forth in instrument:

    Recorded in Book          : 78 of Deeds
    Page                              : 143
    Purpose                         : toll lines, range division fences and sewer line
    (undefined)
    (affects Parcel Nos. 1 and2)



**Commitment for Title Insurance**

BY

**Pioneer Title Agency** as agent for
**First American Title Insurance Company**

## Schedule BII (Continued)

Order No.: **02852616-029-SHH**

9.  Easements and rights incident thereto, as set forth in instrument:

    Recorded in Docket      : 68
    Page                    : 296
    Purpose                 : pipeline
    (affects Parcel Nos. 1and 3)

10. Easements and rights incident thereto, as set forth in instrument:

    Recorded in Book        : 10 of Official Records
    Page                    : 457
    Purpose                 : pipeline
    (affects Parcel No. 3)

11. Easements and rights incident thereto, as set forth in instrument:

    Recorded in Book        : 23 of Official Records
    Page                    : 119 and in
    Book                    : 45 of Official Records,
    Page                    : 402
    Purpose                 : water pipeline
    (affects Parcel Nos. 1and 3)

12. Matters Shown on Survey:

    Recorded in Book        9 of Record of Surveys
    Page                    44-44D, and in
    Recorded in Book        13 of Record of Surveys
    Page                    75-75D
    (affects Parcel No. 1, 2, and 3)

13. Matters Shown on Survey:

    Recorded in Book        25 of Record of Surveys
    Page                    5
    (affects Parcel No. 2)

14. Matters Shown on Survey::

    Recorded in Book        : 25 of Record of Surveys
    Page                    : 6
    (affects Parcel No. 1)



**Commitment for Title Insurance**

BY

## Pioneer Title Agency as agent for
**First American Title Insurance Company**

# Schedule BII (Continued)

Order No.: **02852616-029-SHH**

15. Matters Shown on Survey:

| | |
|---|---|
| Recorded in Book | 27 of Record of Surveys |
| Page | 6 |
| (affects Parcel No. 2) | |

16. Matters Shown on Survey:

| | |
|---|---|
| Recorded in Book | 28 of Record of Survey |
| Page | 60 |
| (affects Parcel No. 1) | |

17. Matters Shown on Survey:

| | |
|---|---|
| Recorded in Book | 29 of Record of Surveys |
| Page | 98-98A |
| (affects Parcel No. 3) | |

18. Easements and rights incident thereto, as set forth in instrument:

| | |
|---|---|
| Recorded in Book | : 261 of Official Records |
| Page | : 367 |
| Purpose | : utility |
| (affects Parcel No. 3) | |

19. Reservations and rights as set forth in instrument recorded in Book 2512 of Official Records, Page 68.
    (affects Parcel No. 3)

20. Development Agreement according to the terms and conditions contained therein:

| | |
|---|---|
| By and Between: | Castle Arch Kingman, L.L.C. – Kingman 2100 and Lingenfelter Investments Limited Partnership, an Arizona limited partnership and Mohave County, a political subdivision of the State of Arizona |
| Dated | : August 4, 2008 |
| Recorded | : October 7, 2008 |
| Book | : 7321 of Official Records |
| Page | : 600 |
| Instrument No. | : 2008066431 |
| (affects Parcel Nos. 1, 2, AND 3) | |

21. The rights of parties in possession by reason of any unrecorded lease or leases or month to month tenancies affecting any portion of the within described property.

    NOTE:  This matter will be more fully set forth or deleted upon compliance with Requirement No. 13 set forth herein.

**Commitment for Title Insurance**

*First American Title*™

BY

**Pioneer Title Agency** as agent for
**First American Title Insurance Company**

# Schedule BII (Continued)

Order No.:  **02852616-029-SHH**

22.  The following matters disclosed by an ALTA/ACSM Survey made by _____ on _____, designated as Job No. _____.

NOTE:  This matter will be more fully set forth or deleted upon compliance with the applicable requirement set forth herein.

**End of Schedule BII**



*First American Title*™

## Privacy Information

### We Are Committed to Safeguarding Customer Information
In order to better serve your needs now and in the future, we may ask you to provide us with certain information. We understand that you may be concerned about what we will do with such information - particularly any personal or financial information. We agree that you have a right to know how we will utilize the personal information you provide to us. Therefore, together with our subsidiaries we have adopted this Privacy Policy to govern the use and handling of your personal information.

### Applicability
This Privacy Policy governs our use of the information that you provide to us. It does not govern the manner in which we may use information we have obtained from any other source, such as information obtained from a public record or from another person or entity. First American has also adopted broader guidelines that govern our use of personal information regardless of its source. First American calls these guidelines its Fair Information Values.

### Types of Information
Depending upon which of our services you are utilizing, the types of nonpublic personal information that we may collect include:
- Information we receive from you on applications, forms and in other communications to us, whether in writing, in person, by telephone or any other means;
- Information about your transactions with us, our affiliated companies, or others; and
- Information we receive from a consumer reporting agency.

### Use of Information
We request information from you for our own legitimate business purposes and not for the benefit of any nonaffiliated party. Therefore, we will not release your information to nonaffiliated parties except: (1) as necessary for us to provide the product or service you have requested of us: or (2) as permitted by law. We may, however, store such information indefinitely, including the period after which any customer relationship has ceased. Such information may be used for any internal purpose, such as quality control efforts or customer analysis. We may also provide all of the types of nonpublic personal information listed above to one or more of our affiliated companies. Such affiliated companies include financial service providers, such as title insurers, property and casualty insurers, and trust and investment advisory companies, or companies involved in real estate services, such as appraisal companies, home warranty companies and escrow companies. Furthermore, we may also provide all the information we collect, as described above, to companies that perform marketing services on our behalf, on behalf of our affiliated companies or to other financial institutions with whom we or our affiliated companies have joint marketing agreements.

### Former Customers
Even if you are no longer our customer, our Privacy Policy will continue to apply to you.

### Confidentiality and Security
We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities who need to know that information to provide products or services to you. We will use our best efforts to train and oversee our employees and agents to ensure that your information will be handled responsibly and in accordance with this Privacy Policy and First American's Fair Information Values. We currently maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

### Information Obtained Through Our Web Site
First American Financial Corporation is sensitive to privacy issues on the Internet. We believe it is important you know how we treat the information about you we receive on the Internet.

In general, you can visit First American or its affiliates' Web sites on the World Wide Web without telling us who you are or revealing any information about yourself. Our Web servers collect the domain names, not the e-mail addresses, of visitors. This information is aggregated to measure the number of visits, average time spent on the site, pages viewed and similar information. First American uses this information to measure the use of our site and to develop ideas to improve the content of our site.

There are times, however, when we may need information from you, such as your name and email address. When information is needed, we will use our best efforts to let you know at the time of collection how we will use the personal information. Usually, the personal information we collect is used only by us to respond to your inquiry, process an order or allow you to access specific account/profile information. If you choose to share any personal information with us, we will only use it in accordance with the policies outlined above.

### Business Relationships
First American Financial Corporation's site and its affiliates' sites may contain links to other Web sites. While we try to link only to sites that share our high standards and respect for privacy, we are not responsible for the content or the privacy practices employed by other sites.

### Cookies
Some of First American's Web sites may make use of "cookie" technology to measure site activity and to customize information to your personal tastes. A cookie is an element of data that a Web site can send to your browser, which may then store the cookie on your hard drive.

FirstAm.com uses stored cookies. The goal of this technology is to better serve you when visiting our site, save you time when you are here and to provide you with a more meaningful and productive Web site experience.

------------------------------------------------------------

### Fair Information Values
**Fairness** We consider consumer expectations about their privacy in all our businesses. We only offer products and services that assure a favorable balance between consumer benefits and consumer privacy.

**Public Record** We believe that an open public record creates significant value for society, enhances consumer choice and creates consumer opportunity. We actively support an open public record and emphasize its importance and contribution to our economy.

**Use** We believe we should behave responsibly when we use information about a consumer in our business. We will obey the laws governing the collection, use and dissemination of data.

**Accuracy** We will take reasonable steps to help assure the accuracy of the data we collect, use and disseminate. Where possible, we will take reasonable steps to correct inaccurate information. When, as with the public record, we cannot correct inaccurate information, we will take all reasonable steps to assist consumers in identifying the source of the erroneous data so that the consumer can secure the required corrections.

**Education** We endeavor to educate the users of our products and services, our employees and others in our industry about the importance of consumer privacy. We will instruct our employees on our fair information values and on the responsible collection and use of data. We will encourage others in our industry to collect and use information in a responsible manner.

**Security** We will maintain appropriate facilities and systems to protect against unauthorized access to and corruption of the data we maintain.

## <u>CERTIFICATE OF SERVICE – BY NOTICE OF ELECTRONIC FILING (CM/ECF)</u>

I hereby certify that on February 19, 2015, I electronically filed the foregoing **TRUSTEE'S MOTION SEEKING AUTHORIZATION AND APPROVAL OF (1) SALE OF PROPERTY, INCLUDING AND RELATING TO REAL PROPERTY LOCATED IN MOHAVE COUNTY, ARIZONA, OUT OF THE ORDINARY COURSE OF BUSINESS, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, AND SUBJECT TO HIGHER AND BETTER OFFERS, PURSUANT TO 11 U.S.C. § 363(b) AND (f) AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002 AND 6004; (2) PROPOSED SALE PROCEDURES; AND (3) PAYMENT OF COSTS OF SALE, INCLUDING COMMISSION TO REAL ESTATE BROKER** (the "<u>Motion</u>") with the United States Bankruptcy Court for the District of Utah by using the CM/ECF system.  I further certify that the parties of record in this case, as identified below, are registered CM/ECF users and will be served through the CM/ECF system.

- Gregory J. Adams gadams@mbt-law.com
- Adam S. Affleck asa@pyglaw.com, debbie@princeyeates.com;docket@princeyeates.com
- Troy J. Aramburu taramburu@swlaw.com, rmaxwell@swlaw.com;docket_slc@swlaw.com
- Jeffrey M Armington armington.jeff@dorsey.com
- Julie A. Bryan julie@crslaw.com, diana@crslaw.com;joshua@crslaw.com
- Mona Lyman Burton mburton@hollandhart.com, ckelly@hollandhart.com;intaketeam@hollandhart.com;slclitdocket@hollandhart.com
- Schuyler G. Carroll scarroll@perkinscoie.com, Dolsky-efile@perkinscoie.com
- Leonard J. Carson len@pearsonbutler.com, kylie@pearsonbutler.com
- William H. Christensen wchristensen@larsenrico.com, ogappmayer@larsenrico.com;fileclerk@larsenrico.com
- Andrew B. Clawson andrew@abclawutah.com, kylie@pearsonbutler.com
- T. Edward Cundick tec@princeyeates.com, heidi@princeyeates.com;docket@princeyeates.com
- Anna W. Drake annadrake@att.net
- Jodi Knobel Feuerhelm jfeuerhelm@perkinscoie.com, blumm@perkinscoie.com;docketPHX@perkinscoie.com
- Jennie B. Garner garner.jennie@dorsey.com
- Eric D Goldberg egoldberg@gordonsilver.com
- Eric D Goldberg egoldberg@stutman.com
- Sarah Goldberg goldberg.sarah@dorsey.com
- David R. Hague dhague@fabianlaw.com, dromero@fabianlaw.com
- George B. Hofmann gbh@pkhlawyers.com, dh@pkhlawyers.com;jt@pkhlawyers.com
- Mary Margaret Hunt hunt.peggy@dorsey.com, long.candy@dorsey.com;stauffer.erin@dorsey.com;slc.lit@dorsey.com
- Mary Margaret Hunt hunt.peggy@dorsey.com, long.candy@dorsey.com;stauffer.erin@dorsey.com;slc.lit@dorsey.com
- Jennifer A. James jaj@clydesnow.com, mcarter@clydesnow.com
- Lon A. Jenkins jenkins.lon@dorsey.com, daniels.heidi@dorsey.com
- Neil A. Kaplan nak@clydesnow.com, mcarter@clydesnow.com
- Penrod W. Keith pkeith@djplaw.com, khughes@djplaw.com
- Penrod W. Keith pkeith@djplaw.com, khughes@djplaw.com
- Michael L. Labertew michael@labertewlaw.com
- Mark A. Larsen mlarsen@larsenrico.com, wchristensen@larsenrico.com;ogappmayer@larsenrico.com

- Ralph R. Mabey rmabey@kmclaw.com
- Christopher J Martinez martinez.chris@dorsey.com, stauffer.erin@dorsey.com
- Adelaide Maudsley maudsley@chapman.com
- Lance E. Miller lancemiller@americanapparel.net
- John T. Morgan tr john.t.morgan@usdoj.gov,
  James.Gee@usdoj.gov;Lindsey.Huston@usdoj.gov;Suzanne.Verhaal@usdoj.gov
- Jeffrey P. Mortimer jeff@rulontburton.com
- Oliver K. Myers myersok@msn.com
- David Olsky dolsky@perkinscoie.com
- Rick Poster Rick@posterlaw.com
- Jon A Reed jreed@larsenrico.com
- Knute A. Rife KARife@RifeLegal.com
- Lee Rudd leerudd@ruddlaw.com, leerudd@gmail.com;G5697@notify.cincompass.com
- Nathan Seim seim.nathan@dorsey.com
- Nathan Seim seim.nathan@dorsey.com
- Jeremy C. Sink jsink@mbt-law.com
- James A Sorenson jsorenson@rqn.com, tpahl@rqn.com;docket@rqn.com
- Stephen G. Stoker sgstoker@stokerswinton.com, sgstokerlc@gmail.com
- D. Ray Strong tr rstrong@brg-expert.com
- Gerald H. Suniville gsuniville@vancott.com, docketing@vancott.com
- Marca Tanner marca.tanner@gmail.com
- United States Trustee USTPRegion19.SK.ECF@usdoj.gov
- Russell S. Walker rwalker@wklawpc.com, ckirk@wklawpc.com
- Kim R. Wilson bankruptcy_krw@scmlaw.com
- Brock N. Worthen bworthen@swlaw.com, hsias@swlaw.com
- Richard L. Wynne rlwynne@jonesday.com

I further certify that on February 19, 2015, the Motion was served via U.S. First Class Mail, postage prepaid, to the following:

Lingenfelter Investments Limited Partnership
c/o S&V Acceptance, LLC (Registered Agent)
7920 East Thompson Peak Parkway, Suite 150
Scottsdale, AZ 85255

Commerce Real Estate Solutions
170 South Main Street, Suite 1600
Salt Lake City, Utah 84101

I further certify that on February 19, 2015, the Motion was emailed to the following:

Mohave County
christine.ballard@mohavecounty.us

UNS Energy Corp.
MJerden@tep.com
AWelander@tep.com

_/s/ Peggy Hunt_